# EXHIBIT
# A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

ROGER EGAN,                                      :

                                    Plaintiff,   :

        v.                                       :

MARSH & McLENNAN COMPANIES, INC.,                :

                                    Defendant.   :

------------------------------------------------------------X

**SUMMONS**

Index No. 07/602281

Date Purchased: 7/11/07

Plaintiff designates New York
County as the place for trial

To the above named Defendant:

        YOU ARE HEREBY SUMMONED to answer the complaint in this action, and to
serve a copy of your answer, or if the complaint is not served with this summons, to serve a
notice of appearance, on the plaintiff's attorneys within 20 days after service of this summons,
exclusive of the day of service (or within 30 days after the service is complete if this summons is
not personally delivered to you within the State of New York); and in the case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

        The basis of the venue designated is NY CPLR § 503(a), (c).

Dated: New York, New York
        July 10, 2007

Defendant's Address:

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036

NEW YORK
COUNTY CLERK'S OFFICE

JUL 1 1 2007

NOT COMPARED
WITH COPY FILE

FOLEY & LARDNER LLP

By: _Peter N. Wang_
        Peter N. Wang
        Emily R. Sausen
90 Park Avenue
New York, New York  10016
(212) 682-7474
Attorneys for Plaintiff

NYC_26340.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

ROGER EGAN,                                         :        Index No.

                              Plaintiff,            :

                                                    :        **VERIFIED COMPLAINT**

              v.                                    :

MARSH & McLENNAN COMPANIES, INC.,                   :

                              Defendant.            :

                                                    :
-----------------------------------------------------------------X

      Plaintiff, ROGER EGAN ("Egan"), by his attorneys, Foley & Lardner LLP, for

his Complaint, alleges as follows:

## NATURE OF THE ACTION

    1.      This is an action for breach of contract.  Plaintiff was employed by Defendant for

32 years—from September 1972 until December 2004.  In April 2004, the New York State

Attorney General ("NYS AG") commenced an investigation of Defendant, and in October 2004,

the NYS AG filed a civil complaint against Defendant.  Although Defendant made clear to

Plaintiff -- and to the public -- that Plaintiff was not responsible for the problems which underlay

the investigation, Defendant used the investigation as an excuse to terminate Plaintiff, and

thereafter to refuse to make payments that it owed to Plaintiff.

## PARTIES

    2.      Egan is an individual residing at 2 Hartley Farms Road, Morristown, New Jersey.

    3.      Defendant Marsh & McLennan Companies, Inc. ("MMC") is a Delaware

corporation with its principal place of business at 1166 Avenue of the Americas, New York,

New York.  MMC is a global professional services firm which owns companies active in the

sectors of risk and insurance services, risk consulting and technology, and investment

management.

## JURISDICTION AND VENUE

4.      This Court has personal jurisdiction over defendant pursuant to CPLR § 301.

5.      Venue lies in this county pursuant to CPLR § 503(a), (c).

## FACTUAL BACKGROUND

6.      Egan was employed by MMC from September 1972 through December 2004,

ultimately becoming president and chief operating officer of Marsh, Inc. ("Marsh"), the risk and

insurance services subsidiary of MMC.  As an employee of MMC, periodically Egan became

entitled to certain benefits, including, among other things, equity awards and the right to receive

pension and severance payments upon retirement or termination.

**Severance Plans**

7.      On or about November 21, 1996, MMC issued a plan for severance payments for

MMC executives who terminate from MMC for reasons other than cause, death, total and

permanent disability or normal retirement, and who at the time of termination have at least ten

years of service with MMC and are grantees of certain types of restricted stock awards ("Special

Severance Pay Plan," attached hereto as Exhibit A).

8.      Section 4 of the Special Severance Pay Plan provides that the total severance

amount shall be based on a percentage of the shares and units subject to the executive's

outstanding awards (other than any supplemental awards) which were forfeited at the executive's

termination of employment, with such percentage to be determined by the executive's years of

service at termination.  The Special Severance Pay Plan's severance amount, as a percentage of

forfeited awards, for executives with 25 years or more of service, is 90%.

2

9.    Section 5 of the Special Severance Pay Plan provides that "[d]ividends or dividend equivalents as appropriate, shall be paid on all shares or share equivalents remaining unpaid under this Plan at the normal times that dividends are paid to other Company common stock owners."

10.    Section 6 of the Special Severance Pay Plan provides that payments under the Plan shall be made in shares of MMC common stock in three annual installments commencing one year following termination of employment.

11.    In addition to and separate from the Special Severance Pay Plan, MMC provided a standard severance plan for its managing directors pursuant to which departing managing directors would be eligible to receive a certain number of years of salary based on years of service to MMC ("Standard Severance Plan").

12.    On information and belief, in or about November 2004, MMC filed with the Delaware Department of Labor a Reduction in Force plan ("RIF") containing severance provisions. The RIF provided that MMC would pay its employees a certain number of weeks of salary for every year of service to MMC.

**Equity Awards**

13.    On or about January 16, 2003, MMC granted Egan an award of restricted stock units pursuant to the MMC 2000 Senior Executive Incentive and Stock Award Plan ("2003 Restricted Stock Unit Award").

14.    Sections I and IV of the 2003 Restricted Stock Unit Award define the vesting schedule as the earlier of January 16, 2006 or the date of termination of employment, provided that such termination is not for "misappropriation of the assets of the Company; willful

3

misconduct in the performance of your duties; your refusal to perform the duties of your position; or your conviction of a felony."

15.     Section I of the 2003 Restricted Stock Unit Award obligates MMC to deliver the restricted stock units to Egan as soon as practicable after the date of vesting, free of restriction.

16.     Section II of the 2003 Restricted Stock Unit Award obligates MMC to pay Egan "dividend equivalent payments" on the restricted stock units.

17.     On or about March 17, 2004, MMC granted Egan another award of restricted stock pursuant to the MMC 2000 Senior Executive Incentive and Stock Award Plan ("2004 Restricted Stock Award").

18.     Section I.A of the 2004 Restricted Stock Award directs that Egan's restricted stock is scheduled to vest on the earlier of January 1, 2012 or the later of Egan's Normal or Deferred Retirement Date, as such terms are defined in MMC's primary retirement plan applicable to Egan.

19.     Section I.B of the 2004 Restricted Stock Award obligates MMC to distribute Egan's shares as soon as practicable after the vesting.

20.     Section II of the 2004 Restricted Stock Award obligates MMC to pay Egan dividends on the restricted stock.

21.     In or about November 2005, MMC stopped paying dividends to Egan on Egan's restricted stock.

**Pension**

22.     On or about August 19, 2005, MMC's Retirement Service Center sent Egan a letter outlining the benefits payable to Egan from MMC's U.S. Retirement Program ("Retirement Program").

4

23.    The Retirement Program obligates MMC to pay Egan a monthly straight life annuity benefit for Egan's lifetime, commencing, at a reduced amount, on October 1, 2005, when Egan reached the age of 55 ("Qualified Plan").

24.    The Retirement Program also obligates MMC to pay Egan certain amounts, in either monthly payments commencing on October 1, 2005, or in a lump sum distribution ("Benefit Equalization Plan").

25.    The Retirement Program also includes an obligation for MMC to pay Egan certain monthly benefits under the Supplemental Retirement Program ("SERP"), commencing on October 1, 2005.

**Egan's Constructive Termination and MMC's Failure to Pay Amounts Due**

26.    On or about November 8, 2004, MMC issued a press release announcing that Egan had been asked to step down from his position as president and chief operating officer of Marsh, but that Egan would be helping with transition.

27.    Within the press release, Michael Cherkasky, president and chief executive officer of MMC and chairman and chief executive officer of Marsh, was quoted as saying that the decision to ask Egan to step down was "not based on any suggestion of culpability," but was based on Egan's accountability as a senior officer of the business units that the NYS AG was investigating.

28.    Cherkasky further told Egan, in a personal meeting between the two sometime shortly after Egan was asked to step down, that Egan should get an attorney and that MMC would come up with a generous settlement for him.

29.    On or about November 12, 2004, Joseph Bachelder, an attorney retained by Egan -- at the express advice of MMC -- for the purpose of facilitating the negotiation of a fair

5

settlement agreement between Egan and MMC, presented Cherkasky with a proposed separation agreement ("Separation Agreement"). The Separation Agreement (attached hereto as Exhibit B), contained provisions for, among other things, a cash severance package, treatment of equity awards, and pension plan benefits.

30.    On or about December 7, 2004, MMC asked Egan to vacate MMC premises. Egan was given approximately six hours to pack his belongings, following which he was denied access to MMC's offices and to his MMC e-mail account and personal files. MMC's actions represent a constructive termination of Egan by MMC.

31.    Approximately two weeks after Egan was asked to vacate MMC premises, Cherkasky told Egan that negotiations of the Separation Agreement would have to wait until after MMC settled with the NYS AG.

32.    While awaiting negotiations of the Separation Agreement, and at all times prior and subsequent, and despite having been denied access to his MMC e-mail account, Egan cooperated fully with both the MMC internal investigation led by outside counsel and the NYS AG investigation.

33.    On or about January 31, 2005, MMC settled with the NYS AG.

34.    On or about February 8, 2005, Peter Beshar, Senior Vice President and General Counsel at MMC, wrote Egan to tell him that MMC would not be reimbursing Egan for the legal fees incurred by Bachelder to negotiate Egan's Separation Agreement.

35.    Also on or about February 8, 2005, Cherkasky told Egan that MMC was ready to negotiate Egan's Separation Agreement and that said negotiations could be concluded in ten days. Cherkasky told Egan to have Bachelder contact Mike Petrullo, MMC's chief administrative officer. Two days later, Bachelder sent Petrullo the Separation Agreement.

6

36.    Despite having promised Egan on or about February 8, 2005 that MMC was ready to negotiate Egan's Separation Agreement, Cherkasky changed course one week later and, at that time, told Egan that MMC could no longer talk to Egan about the Separation Agreement.

37.    In response to Cherkasky's about-face regarding MMC's willingness to discuss Egan's proposed Separation Agreement, on or about April 8, 2005, Egan submitted his resignation from employment by MMC to Cherkasky. Egan wrote in his resignation letter that he hoped MMC would be willing to engage in discussions about a fair separation agreement in the near future.

38.    On or about April 18, 2005, outside counsel for MMC wrote to Bachelder to propose that MMC and Egan enter into an agreement which included, among other things, a provision stating that the parties would agree that Egan's employment with MMC terminated at the close of business on December 31, 2004, and that such termination "will have no impact on any right he might otherwise have for compensation or indemnification and will not be considered as an admission of wrongdoing or be relevant to any issue regarding the termination of his employment." ("Standstill Agreement," attached hereto as Exhibit C).

39.    On or about November 4, 2005, after receiving no response from MMC about the Separation Agreement, Bachelder made a third attempt to open negotiations with MMC about Egan's Separation Agreement by sending the Agreement to Leon Lichter, Vice President in MMC's Legal Department.

40.    Given that MMC appeared unwilling to negotiate the Separation Agreement with Egan, on or about November 22, 2005, Egan reached out to Jack Sinnott, Vice Chairman, Office of the CEO, and an MMC director. By this time, MMC had stopped paying Egan dividends on his MMC restricted stock, claiming that Egan had "forfeited" his restricted shares.

7

41.    MMC has failed to pay Egan any amounts under the Severance Plan.

42.    MMC has failed to pay Egan dividends on his restricted stock since November 2005.

43.    MMC has failed to pay Egan any retirement benefits pursuant to the Retirement Program, the Benefits Equalization Plan, or SERP.

44.    All conditions precedent to Egan's right to recover on the causes of action alleged herein have been performed or have occurred or been excused.

45.    On information and belief, MMC has provided other of its former executives who were similarly situated to Egan at MMC and who left MMC at or about the same time as Egan with generous settlement packages, well in excess of the amounts Egan has received.

### FIRST CAUSE OF ACTION

(Breach of Contract - Severance Plans)

46.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45, inclusive, as if fully set forth herein.

47.    Pursuant to Sections 4, 5, and 6 of the Special Severance Pay Plan, MMC is obligated to pay Egan 90% of the shares and units subject to Egan's outstanding awards (other than any supplemental awards) which were forfeited at Egan's termination of employment, to be paid in three annual installments commencing one year after Egan's termination of employment, as well as dividends, to be paid at the normal time dividends are paid to other MMC common stock owners.

48.    Despite due demand, MMC has refused to pay these amounts to Egan.  MMC's failure to fulfill this obligation is a breach of the Special Severance Pay Plan.

8

49.    Egan was also entitled, by virtue of his position as a managing director at MMC and his years of service with MMC, to receive severance payments under the Standard Severance Plan and the RIF.

50.    Despite due demand, MMC has refused to pay any amounts to Egan pursuant to the Standard Severance Plan or the RIF.

51.    By virtue of the foregoing, Egan has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Breach of Contract - Stock Award Plan)

52.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45, inclusive, as if fully set forth herein.

53.    Pursuant to the MMC 2000 Senior Executive Incentive and Stock Award Plan and the grants of restricted stock and restricted stock units made to Egan pursuant to the Plan, MMC is obligated to effect the vesting of the shares granted to Egan upon Egan's termination, and to pay Egan dividends (or dividend equivalent payments) on these shares.

54.    Egan was constructively terminated by MMC on December 7, 2004.

55.    Despite due demand, MMC has refused to consider Egan's restricted stock and restricted stock unit awards to be vested, insisting that Egan has "forfeited" his shares. MMC has also refused to pay Egan dividends on these shares since November 2003. MMC's failure to fulfill this obligation is a breach of the 2000 Senior Executive Incentive and Stock Award Plan.

56.    By virtue of the foregoing, Egan has been damaged in an amount to be determined at trial.

9

## THIRD CAUSE OF ACTION

(Breach of Contract – Retirement Program)

57.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45, inclusive, as if fully set forth herein.

58.    Pursuant to MMC's Retirment Program, MMC must confer on Egan certain retirement benefits under three individual retirement plans, commencing on October 1, 2005.

59.    MMC has not conferred these benefits.  Consequently, it has breached the Retirement Program.

60.    By virtue of the foregoing, Egan has been damaged in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION

(Promissory Estoppel)

61.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45, inclusive, as if fully set forth herein.

62.    MMC, speaking through Cherkasky, made a clear and unambiguous promise to Egan that it would provide Egan with a generous settlement commensurate with his 32 years of service to MMC.

63.    Egan reasonably and foreseeably relied on this promise, and his reliance was particularly reasonable and foreseeable in light of the treatment being afforded other former MMC employees who had been similarly situated to Egan at MMC and who left MMC at or about the same time as Egan did.

64.    MMC breached this promise by failing to offer Egan a settlement agreement and by failing to accept the settlement agreements that Egan proffered to MMC.

10

65. As a result of its reliance on MMC's promise, Egan has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff requests judgment as follows:

(a) On the First Cause of Action, damages in an amount to be determined at trial;

(b) On the Second Cause of Action, damages in an amount to be determined at trial;

(c) On the Third Cause of Action, damages in an amount to be determined at trial;

(d) On the Fourth Cause of Action, damages in an amount to be determined at trial; and

(e) The costs and disbursements of this action, including attorney's fees, together with such other and further relief as this Court deems just, proper and equitable.

Dated: New York, New York
July 10, 2007

FOLEY & LARDNER LLP

By: _Peter N. Wang_
Peter N. Wang
Emily R. Sausen
90 Park Avenue
New York, New York 10016
(212) 682-7474
Attorneys for Plaintiff Roger Egan

11

## **VERIFICATION**

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )

ROGER EGAN, being duly sworn, states:

I am the Plaintiff in the foregoing Complaint and know the contents thereof. The same is

true to my own knowledge, except as to the matters alleged upon information and belief and, as

to those matters, I believe them to be true.

_R E Egan_
Roger Egan

Sworn to before me this
_21_ day of June, 2007

_Patricia Corbett Brody_
Notary Public

PATRICIA CORBETT-BRADY
Notary Public, State of New York
No. 01CO5031735 Qualified in Queens Co.
Certificate Filed in New York County
Commission Expires August 8, 2010

Marsh & McLennan Companies, Inc.
Special Severance Pay Plan
(as amended and restated as of November 21, 1996)

1.  **Eligibility:**

Eligibility for severance payments under this Plan will be limited to executives who terminate from the Company or its subsidiaries for reasons other than cause, death, total and permanent disability or normal retirement and who at time of termination:

a.  are grantees of outstanding awards ("Awards") of restricted stock, incentive units awarded in lieu of restricted stock, restricted stock units awarded in lieu of restricted stock or restricted stock units awarded to replace another grant under the Marsh & McLennan Companies Restricted Stock Plan (1985), the Marsh & McLennan Companies 1988 Incentive and Stock Award Plan, the Marsh & McLennan Companies 1992 Incentive and Stock Award Plan (the "1992 Plan") or any successor thereto, but excluding any supplemental Awards ("Supplemental Awards") issued under the 1992 Plan (or any successor thereto) in connection with the granting of replacement awards under any such plan in exchange for the surrender and cancellation of then outstanding Awards (the outstanding Awards, other than any Supplemental Awards, shall hereinafter be referred to as the "Covered Awards"); and

b.  have at least ten years of service with the Company or its subsidiaries.

2.  **Non-Solicitation Agreement:**

In addition to satisfying the above eligibility criteria, the executive at or before termination will be required to enter into a Non-Solicitation Agreement with the Company providing that in order to receive severance payments under this Plan, the executive must refrain, for a three year period from the date of termination, from (i) soliciting or accepting business from any clients of the Company or its subsidiaries, and (ii) soliciting an employee of the Company or its subsidiaries to terminate his or her employment.

3.  **Forfeiture:**

All payments under this Plan made in accordance with Paragraph 4 below will be made only after the executive has, to the satisfaction of the Company in its sole discretion, demonstrated compliance with the Non-Solicitation Agreement. If, in the judgment of the Company, the executive has violated such agreement, all rights to severance payments remaining under this Plan shall be forfeited.

Marsh & McLennan Companies, Inc.
Special Severance Pay Plan
Page Two

4.  Severance Amount Determination:

The total severance amount shall be based on a percentage of the shares and units subject to the executive's Covered Awards which were forfeited at the executive's termination of employment (the "Forfeited Awards"). Such percentage shall be determined by the executive's years of service at termination as follows:

| Years of Service | Severance Amount (as a Percentage of Forfeited Awards) |
|---|---|
| 10-14 | 50% |
| 15-19 | 60% |
| 20-24 | 75% |
| 25 and Above | 90% |

5.  Dividends:

Dividends or dividend equivalents as appropriate, shall be paid on all shares or share equivalents remaining unpaid under this Plan at the normal times that dividends are paid to other Company common stock owners.

6.  Form and Manner of Payment:

Payments under this Plan shall be made in shares of MMC common stock in three annual installments commencing one year following termination of employment. Such payments, however, will be made only after the executive has, to the satisfaction of the Company, demonstrated compliance with the Non-Solicitation Agreement.

Annual share installments will be issued in MMC stock, less the number of shares needed to pay applicable withholding taxes. Such installments shall be determined by multiplying (i) the number of shares remaining under this Plan by (ii) a fraction, the numerator of which is 1 and the denominator of which is the number of remaining installments, including the one being made.

7.  Death Benefits:

If the executive dies after termination of employment and before payment of all installments under this Plan, shares remaining unpaid at death shall be issued to the estate of the executive. Such payment, however, will be made only after the executive's personal representative has to the satisfaction of the company demonstrated compliance by the executive through the date of his or her death with the Non-Solicitation Agreement.

Marsh & McLennan Companies, Inc.
Special Severance Pay Plan
Page Three

8.    Administration:

This Plan shall be administered by the Compensation Committee, which shall be composed of
disinterested persons as such term is defined in the rules of the Securities and Exchange
Commission, and whose actions and determination on matters related to this Plan shall be
conclusive.  Subject to the express provisions of this Plan, the powers of the Committee
include having the authority, in its discretion, to:

a.   define, prescribe, amend and rescind rules, regulations, procedures, terms and conditions
relating to this Plan, including any addenda required to comply with applicable non-United
States law; and

b.   make all other determinations necessary or advisable for administering this Plan,
including, but not limited to, interpreting this Plan, correcting defects, reconciling
inconsistencies and resolving ambiguities.

9.    Amendment and Termination:

This Plan may be amended or terminated at any time by the Board of Directors of the
Company.

1/97
o\a69.doc

TOTAL P.03

BLO DRAFT – 11/12/04
FOR PURPOSES OF NEGOTIATING SETTLEMENT ONLY

Proposed Separation Agreement (the "Agreement")
Between M Co. (the "Company") and Mr. R (the "Executive")

| | | |
|---|---|---|
| 1. | Retirement Date | The Company to bridge the Executive to early retirement at age 55. For all purposes, the Executive shall be deemed to have satisfied the requirements for early retirement. |
| 2. | Cash Severance | $5.5 million (representing 2 times base salary ($800,000) and 2003 bonus (cash and the value of restricted shares) ($1,950,000)), payable in a lump sum within 10 days after the execution of the Agreement (the "Effective Date"). Pro-rata bonus (cash and restricted shares) for 2004 (approximately $1.625 million), payable when bonuses are paid to other senior executives. |
| 3. | Treatment of Equity Awards | As of the Effective Date, full vesting of all outstanding equity awards pursuant to the applicable stock incentive plan, including, but not limited to, stock options, restricted shares and restricted stock units (including RUSs and RURs), with all vested stock options remaining exercisable for the remainder of their original terms. Notwithstanding anything to the contrary in the Company's plans or award agreements, the Executive's equity awards shall not be subject to forfeiture or clawback for any reason. In the event that any stock options are repriced by the Company or any equity awards are otherwise adjusted, the Executive shall be entitled to participate fully in such repricing or adjustment on the same basis as other senior executives of the Company. In addition, in the event of a change in control of the Company, the Executive's outstanding equity awards shall be treated no less favorably than the outstanding equity awards held by senior executives of the Company. |
| 4. | Health and Welfare Benefits | The Executive and his eligible dependents shall continue to participate, at the same cost to the Executive as if he remained a senior executive of the Company, in all the Company's health and welfare plans, programs and arrangements, until the earlier of (i) the second anniversary of the Effective Date or (ii) the date or dates upon which the Executive receives comparable coverage from a subsequent employer. In the event that the Executive and/or his eligible dependents are unable to participate in any plan, program or arrangement, the |

Company shall provide him with an amount, which after taxes, will enable the Executive to purchase equivalent coverage. In all events, the Executive and his eligible dependents shall be entitled to participate in the Company's retiree medical program as such program is in effect as of the Effective Date.

5.  Stock Investment
    Supplemental Plan                TBD.

6.  Pension              The Company shall pay the Executive an amount which represents the difference between the Executive's entitlements under the retirement plans (including the qualified plan, the Benefit Excess Plan ("BEP") and the Supplemental Retirement Plan ("SERP")) at age 55 and what the Executive would have been entitled to if he had remained employed by the Company and retired at age 60 and had a final average compensation (based on the average of the last 5 years prior to age 60) of $1 million (this assumes a 5% annual increase in the Executive salary from 2004 to 2010, when the Executive will be 60). The Executive shall be entitled to elect a lump-sum payment for the non-annuity portion of his BEP and SERP benefits.

7.  Other                For one year, the Executive shall be provided with office space that is comparable to his current office space, office and administrative support and the full-time services of his current secretary. The Executive shall be entitled to retain his laptop computer and BlackBerry. For two years, the Executive shall continue to be entitled to his current perquisites (including any income tax gross up).

8.  Reimbursement of
    Business Expenses            The Company shall promptly reimburse the Executive for reasonable business expenses incurred by him through the Effective Date and shall reimburse the Executive for legal fees and other expenses incurred by him in negotiating his termination of employment by the Company.

9.  Indemnification/D&O
    Liability Insurance          The Executive shall continue to be indemnified (and advanced expenses) to the fullest extent permitted under applicable law and/or pursuant to the corporate governance documents of the Company and its affiliates (including the insurance broker). The Executive shall continue to be covered under the Company's directors' and officers' liability insurance policies (as well as those of any affiliate for which the Executive was a director or

37012-1                               2

officer) until suits can no longer be brought against him as a matter of law. The Company agrees (i) the Executive shall have the right to be represented by separate counsel in connection with any investigation, suit or action relating to his duties or actions as an officer or director of the Company or any affiliate (including the insurance broker) ("Covered Action") and (ii) to advance to the Executive fees and expenses (including, without limitation, his attorneys' fees) incurred in connection with any such Covered Action, including, but not limited to, fees and expenses incurred in his representation by Cyrus R. Vance, Jr. and the law firm of Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C. The Executive shall only be required to repay any such advance if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that the Executive is not entitled to be indemnified for such expenses, in which event the Executive shall only be required to repay any such advance on an after-tax basis.

10.   Access to Company Materials

The Company agrees the Executive shall have full and unfettered access to any and all materials (whether in hard copy, electronic or other form) in the possession or control of the Company (or any affiliate) which would be of assistance to the Executive and/or his counsel in connection with the Executive's preparation for, or defense of, any Covered Action.

11.   Non-Disparagement/
       Company Statements

The Company agrees that it shall not, and it shall cause its directors and senior officers (and those of any affiliate) not to, make any statement which would disparage the Executive or impair his reputation. The Executive agrees that he shall not make any statement which would disparage the Company or its directors and senior executives (or those of any affiliate). The Company agrees to provide a letter of recommendation for the Executive affirmatively stating his positive contributions to the Company and that the Executive's termination of employment was not as a result of any culpability in connection with the current investigations (form of statement to be provided as an exhibit to the Agreement). It further agrees to respond to any other third party inquiries as to the Executive's employment and termination thereof by providing a statement to the same effect.

37012-1                                              3

| 12. | Arbitration | Any disputes between the Company and the Executive relating to the Agreement will be settled in the Borough of Manhattan, by binding and final arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The Company shall advance the Executive his expenses (including any attorneys' fees) in connection with any claim, subject to the Executive's obligation to repay such advance, on an after-tax basis, in whole or in part, if and to the extent the arbitrator(s) determine(s) that there was no reasonable basis for the Executive's position in respect of a particular claim. |

| 13. | No Mitigation/No Offset | The Executive shall be under no obligation to seek other employment and there shall be no offset against amounts due to him on account of any remuneration or benefits provided by subsequent employment he may obtain or on account of any claims the Company or any affiliate may have against him. |

| 14. | Tax Indemnity | (a)    If the termination of the Executive's employment is deemed by the Internal Revenue Service to be in connection with a change in control of the Company, the Company agrees to fully gross up the Executive for any excise tax liability and the Executive agrees to cooperate with the Company to rebut any presumption that his termination was in connection with a change in control.

(b)    The Executive is a participant in various plans operated by the Company that provide non-qualified deferred compensation. In the event that the Executive is subject to additional tax liability under Section 409A of the Internal Revenue Code, including a deemed interest charge, the 20% additional tax and the present value cost of incurring federal and state tax liability before he receives such deferred compensation (including any retirement benefits and stock awards), the Company agrees to fully gross up the Executive for all such additional tax liability. The Executive agrees that he will cooperate with the Company in challenging the assessment of such additional tax liability. |

| 15. | Representations | The Company shall make standard representations and warranties regarding its authority to enter into the Agreement, etc. |

| 16. | Governing Law | New York. |

## Agreement

This is to confirm certain arrangements agreed to between us.

1. Roger Egan's employment with Marsh & McLennan Companies, Inc. terminated at the close of business on December 31, 2004. Such termination will have no impact on any right he might otherwise have for compensation or indemnification and will not be considered as an admission of wrongdoing or be relevant to any issue regarding the termination of his employment.

2. If we do not otherwise reach agreement as to the characterization of the termination of Mr. Egan's employment and his rights under MMC's compensation programs and any plan, program or agreement maintained by any of MMC's subsidiaries or affiliates, we have agreed that both parties will be free to maintain their respective positions with regard to Mr. Egan's termination. By way of example, Mr. Egan will be free to assert, among other things, that his employment terminated other than for "Cause" for purposes of any such program, plan or agreement. MMC similarly, will be free to assert, among other things, that his termination was for "Cause" for purposes of any such program, plan or agreement. Each party will be free to make such claims without regard to any time limits, notice requirements or cure provisions, all of which are hereby waived. Of course, all parties retain all rights to contest another party's position.

3. MMC confirms that Mr. Egan is entitled to COBRA continuation coverage in accordance with applicable law.

Except as specifically provided herein, all written agreements between or among the parties remain in full force and effect, and nothing herein shall prevent any party from exercising

any right of any kind or nature under any such agreement unless expressly barred from doing so by the terms of this Agreement.

AGREED TO:

Marsh & McLennan Companies, Inc.                    For Roger Egan

By:_____              _____
     Lewis Bernard                                         Roger Egan
     Chair, Compensation Committee

Dated:  April ___, 2005

- 2 -

# EXHIBIT B

# MARSH USA INC. SEVERANCE PAY PLAN

Amended and restated as of October 1, 2003.

## 1. Purpose

This Severance Pay Plan (the "Plan"), as amended and restated, has been adopted by Marsh USA Inc. (the "Company") to provide financial assistance to eligible employees of the Company who are notified of their involuntary termination on or after October 1, 2003 under the circumstances described herein.

This Plan supersedes all previous policies, practices, programs or plans that may have been followed by the Company (or any predecessor, merged or acquired entity) for employees covered by this Plan.

This document constitutes both the plan document and summary plan description required under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). In the event of any conflict between the provisions of this document and any other communication, the provisions of this document will govern.

## 2. Eligibility

a. In General

Except as otherwise provided in this Section 2, an employee who is classified and treated by the Company as a salaried employee and is currently employed by the Company in the United States may be eligible for severance benefits under this Plan if the following conditions are met:

(i) the Company has determined, in its sole discretion, that the employee lacks the job skills required for the job even though the employee is diligently attempting to perform the essential functions of the job but is unable to do so through no fault of his/her own, or the employee has been separated from the Company through no fault of the employee as a result of a restructuring or downsizing program, closing of a facility, reorganization, or because the employee's position has been eliminated;

(ii) the employee remains in his/her position in good standing, in the sole discretion of the Company, until the last day of employment with the Company as designated by the Company ("Termination Date"); and

(iii) the employee reconciles his/her expense account, returns any financial advances and Company property, and repays any personal loans on or before his/her Termination Date or the date designated by the Company, whichever is earlier.

b. Exclusions

An individual is not eligible for benefits under this Plan if:

(i) he/she is classified by the Company as an hourly or temporary employee, independent contractor or consultant, agency worker or leased employee; or

(ii) his/her termination is a result of voluntary resignation, retirement or other voluntary termination of employment, failure to return from a vacation or an approved leave of absence, or death; or

(iii) his/her termination is for cause, which, for purposes of this Plan, includes, but is not limited to (whether work-related or not), a termination for: insubordination; dishonesty; theft; willful misconduct; failure to comply with Company policies or guidelines; harassment; fighting or other violent or threatening behavior; excessive absenteeism or tardiness; falsification of records such as employment applications, travel and entertainment records, reports of work hours and client related expenses; commission of an act rising to the level of a crime; or being under the influence of illicit drugs or alcohol at work or on the Company's premises. In addition, documented poor performance may be considered termination for "cause." Determinations regarding what constitutes "cause" shall be made by the Plan Administrator (or its delegate) in its sole discretion; or

(iv) he/she transfers within the Company or any related company, including a successor to all or a part of the Company (following for example, a sale, divestiture or merger of all or part of the Company's business or assets, acquisition, or any other form of corporate reorganization), whether or not the position is comparable or better; or

(v) the Company obtains a comparable or better position for the employee with an unrelated company, and the employee accepts the position; or

(vi) he/she has been offered a comparable or better position or a reasonable change of work assignment with the Company or any entity related to the Company or its parent company, which is within a 50 mile radius of the location of the previous position, whether or not he/she accepts such position. The conditions in this subparagraph (vi) apply to both active employees and to employees returning from an authorized leave of absence within twelve (12) months after the commencement of such leave. The determination of whether a position is comparable or better or a reasonable change of work assignment, for purposes of this Plan, will be made by the Plan Administrator (or its delegate) in its sole discretion; or

(vii) his/her selection for involuntary termination is revoked by the Company prior to the Termination Date; or

(viii) at the time of his/her selection for involuntary termination, he/she has been out of the office on a leave of absence, whether paid or unpaid, including a disability leave of absence, for a period of six (6) months or more; or

(ix) he/she commences new employment prior to the Termination Date.

c. In addition, an employee may not be eligible for severance benefits under this Plan if he/she is entitled to severance/notice pay as a matter of law, or is covered by an individual employment agreement or any other contractual arrangement:

(i) providing for continuation of salary and/or other payments or benefits if he/she is terminated before a certain date and/or providing for severance benefits; or

(ii) where the Company would be obligated to continue his/her salary and/or other payments or benefits after his/her termination because of a contractual guarantee; or

(iii) where the employee has executed or entered into a Memorandum of Agreement or other agreement with a company acquired by the Company or by a related company that provides for a termination notice period of greater than fifteen (15) days.

In that case, the employee will be eligible to receive the greater of: (A) the benefits provided for under the employment agreement or other contractual arrangement or the severance/notice pay to be provided as a matter of law; or (B) provided the employee executes a Waiver and Release Agreement in the form and within the time required by the Company, the benefits provided for under this Plan. In no event will an employee be entitled to receive benefits under both the employment agreement, other contractual arrangement, or under law, and this Plan.

## 3. Severance Benefits

The following severance benefits are provided for under this Plan. If, by virtue of the nature of the employee's termination, he/she is eligible for notice of termination pursuant to the federal Worker Adjustment Retraining & Notification Act ("WARN") or any similar state or local plant or facility closing law, his/her severance benefits under this Plan shall be reduced by such statutory notice entitlement.

a. Basic Severance Benefit

Except as otherwise provided in this Section 3, an employee who meets the eligibility requirements of Section 2 above ("Plan Participant") will be eligible to receive Basic Severance Pay equal to two (2) weeks' Base Salary (as defined below).

b. Enhanced Severance Benefits

In lieu of the Basic Severance Benefit described above, a Plan Participant who executes and returns a Waiver and Release Agreement in the form and within the time required by the Company, the terms of which are incorporated herein by reference and which may include, without limitation, non-solicitation provisions, will be eligible to receive Enhanced Severance Benefits as follows:

(i) Enhanced Severance Pay

With the exception of Managing Directors, a Plan Participant eligible for Enhanced Severance Pay will receive Enhanced Severance Pay based on the chart below and the Plan Participant's Base Salary, as defined below. In no event, however, will Enhanced Severance Pay exceed one (1) year's Base Salary. Managing Directors eligible for Enhanced Severance Pay will receive one (1) year's Base Salary.

| Title | Enhanced Severance<br>The greater of: |
|---|---|
| Non-officer | 2 weeks' of Base Salary per Year of Service* OR 1 month's Base Salary |
| Assistant Vice President | 2 weeks' of Base Salary per Year of Service* OR 3 months' Base Salary |
| Vice President | 2 weeks' of Base Salary per Year of Service* OR 6 months' Base Salary |
| Senior Vice President | 2 weeks' of Base Salary per Year of Service* OR 9 months' Base Salary |
| Managing Director | 12 months' Base Salary |

*To a maximum of one (1) year's Base Salary.

- For purposes of determining the amount of Basic or Enhanced Severance Pay a Plan Participant is eligible to receive under the terms of this Plan, the term "Base Salary" means such Plan Participant's base salary including any applicable shift differential, but exclusive of overtime compensation, commissions, bonuses, other payments, or any fringe benefits or other forms of remuneration, as in effect on the Plan Participant's Termination Date. Any performance/merit reviews that are pending or in process as the Termination Date also shall not be taken into account in determining a Plan Participant's Base Salary or the amount of Severance Pay. For a Plan Participant who has switched from part-time to full-time, or vice verse, during the twelve (12) month period preceding his/her Termination Date, his/her Base Salary shall be determined using the weighted average of his/her base salary during such prior twelve (12) month period.

- In addition, for purposes of determining the amount of Enhanced Severance Pay a Plan Participant is eligible to receive under the terms of this Plan, a Plan Participant will be credited with a Year of Service for each completed twelve (12) month period with the Company or any related company as measured from the Plan Participant's date of hire through the end of any Basic Severance period. Further, if a Plan participant has worked for a partial year of service, he/she will be credited with 1/12 of a Year of Service for each completed month or portion thereof. For rehires or employees with a change in employment status, the start dates of service for purposes of calculating severance will be the benefit vesting date under the general service rules applicable to the Marsh & McLennan Companies, Inc., United States Retirement Program. If applicable, appropriate service will be granted for continuous service with predecessor companies acquired by a Marsh & McLennan company. Notwithstanding the above, in no event will a Plan Participant be credited with Years of Service for any period for which the Plan Participant already received severance pay from the Company, any related company or any predecessor of the Company or related company.

(ii) Outplacement Counseling

A Plan Participant eligible for Enhanced Severance Pay will be eligible to receive, upon request, outplacement benefits at the Company's expense, at a level, for a duration (as set forth below), and by an outplacement Company to be selected by the Plan Administrator. Outplacement counseling must commence no later than sixty (60) days following the Termination Date. If the Plan Participant chooses not to participate in outplacement counseling as offered under this Plan, the Company will not provide the Plan Participant with any additional compensation in lieu thereof.

| Title | Outplacement Benefit |
|---|---|
| Non-Officer | 1-2 Day Program |
| Assistant Vice President or Vice President | 3 Month Program |
| Senior Vice President or Managing Director | 6 Month Program |

## 4. Manner Of Payment

Payment of Basic Severance Pay under this Plan will be made in a lump-sum payment, less applicable withholdings, on or about the 30th calendar day following the Termination Date.

Enhanced Severance Pay payable pursuant to the terms of a signed Waiver and Release Agreement will not be paid until such Agreement is executed, returned to the Company, and becomes effective by its terms. Subject to the foregoing, such Enhanced Severance Pay will be paid in a lump sum, less applicable withholdings, on or about the 30th calendar day following the receipt of the signed Waiver and Release Agreement by the Company.

## 5. Payment Offsets

The Company reserves the right to reduce any severance benefit paid under this Plan to the extent necessary to take into account any of the following: any outstanding financial obligations(s) that the employee has to the Company, including, but not limited to, expense account balances, employee loans, relocation allowances, employee advances (including tuition advances and vacation or sick days taken in advance of their being earned by the employee) and the value of any computer hardware or software, communications equipment or other Company-provided property in the individual's possession that he/she has failed to return to the Company as of the Termination Date or the date designated by the Company, whichever is earlier.

The determination of any such severance benefit reductions will be made by the Plan Administrator (or its delegate) in its sole discretion.

## 6. If An Employee Is Re-Employed By The Company

Any re-employment in any capacity of a terminated employee must be approved by the Human Resources Director, North American Operations, and the Senior Business Manager of the Company. If an employee accepts re-employment with the Company, its parent or any affiliate or subsidiary of the Company, or becomes an independent contractor to or consultant for the Company, its parent or any affiliate or subsidiary of the Company prior to the expiration of the period commensurate with which Enhanced Severance is paid to him/her, he/she may be required to refund all or a pro-rata portion of the Enhanced Severance Pay to the Company as a condition of re-employment (i.e., the amount paid in excess of the actual period of unemployment). Any amount required to be refunded will be determined by the Plan Administrator (or its delegate) in its sole discretion. Should such employment be accepted, and should an employee be required to refund all or a pro-rata portion of such payments to the Company, such circumstances will not affect the validity of the Waiver and Release Agreement previously executed by the employee.

## 7. Effect On Other Benefits

Except as may otherwise be provided under this Plan or under any other applicable Company plan(s), or required by applicable law, all Company-provided benefits will terminate on the Plan Participant's Termination Date.

## 8. Source Of Benefits

Benefits under this Plan will be paid from the general assets of the Company. No assets or funds with respect to any such benefits will be segregated by the Company in any fund, account or trust. A Plan Participant shall have no greater claim against the assets of the Company than as a general unsecured creditor.

## 9. Administration

The Plan will be administered by the Company. As Plan Administrator, the Company has delegated responsibility for the day-to-day administration of the Plan to the Human Resource Director, North American Operations.

The Company and/or the Human Resources Director, North American Operations, may appoint or employ such persons as either deems necessary to render advice with respect to any responsibility of either

under the Plan. Both the Company and the Human Resources Director, North American Operations, may delegate to any one or more of the Company's employees any responsibility it may have under the Plan and may designate any other person or persons to carry out any responsibility of either under the Plan.

Acting on behalf of the Company, the Human Resources Director, North American Operations, shall make the rules and regulations necessary to administer the Plan. The Company and the Human Resources Director, North American Operations, shall have the discretionary authority and responsibility to determine eligibility for benefits and the amount of such benefits, and to construe the terms of the Plan. The determinations and constructions of the Company or the Human Resources Director, North American Operations, as the case may be, will be final, binding and conclusive as to all parties, unless found by a court of competent jurisdiction to be arbitrary and capricious. Any delegation of the Company's or the Human Resources Director, North American Operations, shall carry such discretionary authority as the Company of the Human Resources Director, North American Operations, possesses regarding the matter unless otherwise specified.

Correspondence regarding this Plan should be addressed to:

Marsh USA Inc. Severance Pay Plan
c/o Human Resources Director,
North American Operations
Marsh USA Inc.
1166 Avenue of the Americas
New York, New York 10036-2708
(212) 345-6000

## 10. Claims Procedure

An employee who is eligible for benefits under this Plan will be notified and provided with any forms required in connection with receipt of Plan benefits, including if applicable, a Waiver and Release Agreement. If such employee disagrees with the determination of his/her benefits, he/she may, within thirty (30) days of receipt of the initial notification, submit a written statement to the Plan Administrator describing the basis of his/her claim for benefits, together with any documents which he/she believes supports his/her claim. Any employee who is not so notified but believes that he/she is entitled to benefits under the Plan may, within thirty (30) days of such employee's Termination Date, submit a written statement to the Plan Administrator describing the basis of his/her claim for benefits and requesting any forms required in connection with payment of such benefits.

If any claim for severance benefits is wholly or partially denied, the Plan Administrator shall notify the claimant within ninety (90) days after the written claims statement is submitted, or within ninety (90) days after any required forms are filed, if later (except that in special circumstances the Plan Administrator may take an additional ninety (90) days to consider its decision, in which case the employee will be notified of the extension). Such notification shall set forth: (1) the specific reasons for the denial (including reference to any pertinent Plan provisions on which the denial is based); (2) if applicable, a description of any additional material or information necessary for the claimant to perfect the claim, and an explanation of why such material or information is necessary; and (3) the claims review procedure and (4) a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA if the claim is denied following a review on appeal.

Any employee whose claim for benefits under this Plan is denied may make a written request to the Plan Administrator, within sixty (60) days after such denial, for a review of the denial. Any such request must include any evidence relevant to the claim and may include a request for pertinent documents. The employee claiming benefits shall be notified of the final decision of the Plan Administrator within sixty (60) days after his/her request for a review is received. However, if the Plan Administrator finds it necessary to extend this period due to special circumstances and so notifies the claimant in writing, the decision shall be rendered as soon as practicable, but in no event later than one hundred and twenty (120) days after the claimant's request for review. The decision shall be in writing and shall set forth the specific

reasons for the denial (including reference to any pertinent Plan provisions on which the denial is based) and a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA.

The Plan Administrator's decision on claims shall be final, binding, and conclusive on all interested persons unless found by a court of competent jurisdiction to be arbitrary and capricious.

## 11. Amendment Or Termination Of This Plan

The Company, acting through the Human Resources Director, North American Operations, reserves the right, whether in an individual case or more generally, to amend or terminate this Plan, and/or to alter, reduce or eliminate any pay practice, policy or benefit, in whole or in part, with or without advance notice; provided, however, that no such amendment or termination shall adversely affect the benefits payable with respect to any Plan Participant who has a Termination Date prior to the adoption of such amendment or termination. The Company may award additional b enefits, w hether o n a n individual basis or more generally, under this Plan on a discretionary basis.

## 12. Withholding Of Taxes

The Company will withhold, or cause to have withheld, all applicable income and payroll taxes from any severance pay benefit paid under this Plan to the extent required by law. Federal income taxes will be withheld at the flat tax rate established under the Internal Revenue Code.

## 13. General Information

The following pages describe other information a Plan Participant should know about the Plan.

Plan Sponsor
    Marsh USA Inc.
    1166 Avenue of the Americas
    New York, New York 10036-2708
    (212) 345-6000

Plan Administrator
    Marsh USA Inc.
    1166 Avenue of the Americas
    New York, New York 10036-2708
    (212) 345-6000

An employee may contact the Plan Administrator by writing to the Human Resources Director, North American Operations, at the above address.

Type of Plan
    The Plan is a severance plan.

Effective Date
    The Plan was originally effective as of February 1, 2001. This amendment and restatement of the Plan is effective as of July 1, 2002.

Plan Year
    The Plan's records are kept on a calendar year basis.

Plan Identification
    The official name of the Plan is the Marsh USA Inc. Severance Pay Plan. The Internal Revenue Service identifies Marsh USA Inc. by the number 36-1436000 and the Department of Labor identifies the Plan by the plan number 501.

Legal Service

It is hoped that legal action with regard to the Plan will not be considered necessary. However, if legal action does become necessary, the agent named for service of process is:

Barbara H. Frank, Esq.
Vice President and Counsel
Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, New York 10036-2708

Additionally, legal service may be served upon the Plan Administrator.

## 14. ERISA Rights

As a participant in the Marsh USA Inc. Severance Pay Plan, an employee is entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). ERISA provides that a Plan Participant shall be entitled to:

### Receive Information About the Plan and Benefits

- Examine without charge, at the Plan Administrator's office and at other specified locations such as worksites, all documents governing the Plan, including insurance contracts and a copy of the latest annual report (Form 5500 Series), if any, filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration; and
- Obtain upon written request to the Plan Administrator, copies of all documents governing the operation of the Plan, including insurance contracts and copies of the latest annual report (Form 5500 Series), if any, and updated Summary Plan Description. The Plan Administrator may make a reasonable charge for the copies.

### Prudent Action by Plan Fiduciaries

In addition to creating rights a Plan Participant, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of a Plan Participant and beneficiaries. No one, including an individual's employer, or any other person, may fire an employee or otherwise discriminate against an employee in any way to prevent an employee from obtaining a severance benefit or exercising an employee's rights under ERISA.

### Enforce an Employee's Rights

If an employee's claim for severance benefits is denied or ignored, in whole or in part, the employee has a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps an employee can take to enforce the above rights. For instance, if an employee requests a copy of Plan documents or the latest annual report from the Plan and does not receive them within thirty (30) days, the employee may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay the employee up to one hundred and ten dollars ($110) a day until the employee receives the materials, unless the materials were not sent for reasons beyond the control of the Plan Administrator. If an employee has a claim for benefits which is denied or ignored, in whole or in part, the employee may file suit in a state or Federal court. In addition, if an employee disagrees with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, the employee may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if an employee is discriminated against for asserting his/her rights, the employee may seek assistance from the U.S. Department of Labor, or an employee may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If the employee is successful, the court may order the person the employee has sued to pay these costs and fees. If the employee loses, the court may order the employee to pay these costs and fees, for example, if it finds the employee's claim is frivolous.

**Assistance with Questions**
If an employee has any questions about the Plan, the employee should contact the Plan Administrator:

Human Resources Director
North American Operations
Marsh USA Inc.
1166 Avenue of the Americas
New York, New York 10036-2708
(212) 345-6000

If an employee has any questions about this statement or about an employee's rights under ERISA, or if an employee needs assistance in obtaining documents from the Plan Administrator, the employee should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in the telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.   An employee may also obtain certain publications about an employee's rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.

**Governing Law**
To the extent that this Plan is not governed by federal law, the law of the State of New York shall govern.

# EXHIBIT C

# MARSH INC. FALL 2004 RESTRUCTURING SEVERANCE PAY PLAN

## 1. Purpose

This Severance Pay Plan (the "Plan") has been adopted by Marsh Inc. (the "Company") to provide financial assistance to eligible employees of the Company and its subsidiaries who are selected for and notified of their involuntary termination between November 1, 2004 and December 31, 2004, in connection with the Company's Fall 2004 restructuring under the circumstances described herein.

This Plan supersedes all previous policies, practices, programs or plans that may have been followed by the Company (or any predecessor, merged or acquired entity) for employees covered by this Plan.

This document constitutes both the plan document and summary plan description required under the Employee Retirement Income Security Act of 1974, as amended. In the event of any conflict between the provisions of this document and any other communication, the provisions of this document will govern.

## 2. Eligibility

### a. In General

Except as otherwise provided in this Section 2, an employee who is classified and treated by the Company as a salaried employee and is currently employed by the Company in the United States may be eligible for severance benefits under this Plan if the following conditions are met:

(i) the Company has determined, in its sole discretion, that (A) it is in the interests of the Company to include the employee in the group of employees to be involuntarily terminated in connection with the Company's Fall 2004 restructuring; and (B) the employee's manager selects the employee for involuntary termination and the Director of Human Resources for Marsh Inc. approves that selection during the period from November 1, 2004 through December 31, 2004 due to the changing needs of the business, including but not limited to a determination that the employee lacks the job skills required for the job, changes in the job skills required for the employee's job, changes in the structure of the business, the need for downsizing, closing of a facility, or elimination of the employee's position;

(ii) the employee remains in his/her position in good standing, in the sole discretion of the Company, until the last day of employment with the Company as designated by the Company ("Termination Date"); and

(iii) the employee reconciles his/her expense account, returns any financial advances and Company property, and repays any personal loans on or before his/her Termination Date or the date designated by the Company, whichever is earlier.

### b. Exclusions

An individual is not eligible for benefits under this Plan if:

(i) he/she is classified by the Company as an hourly or temporary employee, independent contractor or consultant, agency worker or leased employee (without regard to a subsequent reclassification of such worker following an administrative or judicial adjudication requiring such reclassification);

(ii) his/her termination is a result of voluntary resignation, retirement or other voluntary termination of employment, failure to return from a vacation or an approved leave of absence, or death;

(iii) his/her termination is for cause, which, for purposes of this Plan, includes, but is not limited to (whether work-related or not), a termination for: insubordination; dishonesty; theft; willful misconduct; failure to comply with Company policies or guidelines; harassment and/or discrimination; fighting or other violent or threatening behavior; excessive absenteeism or tardiness; falsification of records such as employment applications, travel and entertainment records, reports of work hours and client related expenses; commission of an act rising to the level of a crime; or being under the influence of illicit drugs or alcohol at work or on the Company's premises. In addition, documented poor performance may be considered termination for "cause";

(iv) he/she transfers within the Company or to any related company, including a successor to all or a part of the Company (following for example, a sale, divestiture or merger of all or part of the Company's business, stock or assets, an acquisition, or any other form of corporate reorganization), whether or not the position is comparable or better;

(v) the Company obtains a comparable or better position for the employee with an unrelated company, and the employee accepts the position;

(vi) he/she has been offered a comparable or better position or a reasonable change of work assignment with the Company or any entity related to the Company or its parent company which is within a 50 mile radius of the location of the previous position, whether or not he/she accepts such position. The conditions in this subparagraph (vi) apply to both active employees and to employees returning from an authorized leave of absence within twelve (12) months after the commencement of such leave;

(vii) his/her selection for involuntary termination is revoked by the Company prior to the Termination Date;

(viii) at the time of his/her selection for involuntary termination, he/she has been out of the office on a leave of absence, whether paid or unpaid, including a disability leave of absence, for a period of six (6) months or more;

(ix) he/she commences new employment prior to the Termination Date;

(x) he/she is covered by an individual employment agreement or any other contractual arrangement (A) providing for continuation of salary and/or other payments or benefits if he/she is terminated before a certain date and/or providing for severance benefits and/or providing for compensation or benefits in lieu of severance benefits; (B) where the Company would be obligated to continue his/her salary and/or other payments or benefits after his/her termination because of a contractual guarantee; or (C) where the employee has executed or entered into a Memorandum of Agreement or other agreement with a company acquired by the Company or by a related company that provides for a termination notice period of greater than fifteen (15) days; or

(xi) he/she is entitled to severance/notice pay as a matter of law that is greater than the benefits provided for under this Plan. For example, if an employee is eligible for severance/notice pay as a matter of law (e.g., notice of termination pursuant to the federal Worker Adjustment Retraining & Notification Act ("WARN") or any similar state or local plant or facility closing law), and he/she is also eligible for and satisfies all requirements necessary to receive Plan benefits, and his/her Plan benefits are greater than the benefits required as a matter of law, then his/her Plan benefits shall be deemed to include the benefits required by law. In no event shall an employee be eligible to receive severance benefits under law and this Plan.

c. An employee may not receive severance benefits under both this Plan and any other Company or Company affiliate plan, program, policy or practice providing similar benefits with respect to the same period of employment preceding the employee's Termination Date.

## 3. Severance Benefits

The following severance benefits are provi            d for under this Plan.

### a. Basic Severance Benefit

Except as otherwise provided in this Se        n 3, an employee who meets the eligibility requirements of
Section 2 above ("Plan Participant") wil        e eligible to receive Basic Severance Pay equal to two (2)
weeks' "Base Salary" as defined in Sectio        3(b)(iv).

### b. Enhanced Severance Benefits

In lieu of the Basic Severance Benefit de        ibed in Section 3(a) above, a Plan Participant who executes,
returns and does not revoke a Waiver a         Release Agreement in the form and within the time required
by the Company including, without lim        tion, non-solicitation provisions, will be eligible to receive
Enhanced Severance Benefits to include        nhanced Severance Pay, Supplemental Severance Pay and
Outplacement Counseling as describe       below.  In no event, however, will the sum of a Plan
Participant's Enhanced Severance Pa         us Supplemental Severance Pay exceed two (2) years'
"Annual Compensation" as defined in Se        n 3(b)(iv).

#### (i) Enhanced Severance Pay

A Plan Participant who is eligible for E        anced Severance Benefits will receive Enhanced Severance
Pay as determined under the chart be       .  In no event will a Plan Participant's Enhanced Severance
Pay exceed 12 months of Base Sala        For the purposes of determining a Participant's Enhanced
Severance Pay, the terms "Base Sala         and "Year of Service" have the meaning set forth in Section
3(b)(iv).

| Officer Title | | Enhanced Severance Pay |
|---|---|---|
| Non-officer | (S | ect to a maximum of one (1) year's Base Salary) |
| Assistant Vice President | 2 we   s E | e Salary per Year of Service OR 1 month's Base Salary, whichever is greater |
| Vice President | 2 we   s E |  Salary per Year of Service OR 3 months' Base Salary, whichever is greater |
| Senior Vice President | 2 we   s E |  Salary per Year of Service OR 6 months' Base Salary, whichever is greater |
| Managing Director | 2 we   s E |  Salary per Year of Service OR 9 months' Base Salary, whichever is greater |
| | | 12 months' Base Salary |

#### (ii) Supplemental Severance Pay

A Plan Participant who is eligible f        nhanced Severance Benefits will receive Supplemental
Severance Pay equal to sixty pe    ent        %) of the Participant's "2003 Bonus Award," if any. For the
purposes of determining a Parti        nt        Supplemental Severance Pay, the term "2003 Bonus Award"
has the meaning set forth in Sec       3        (iv).

#### (iii) Outplacement Counseling

A Plan Participant who is eligible         r        anced Severance Benefits will be eligible to receive, upon
request, outplacement counseli       an        s provided by an outplacement company to be selected by
the Plan Administrator at the Co      p      n        e expense at a level and for the time period set forth in the
chart below.  Outplacement cou       in        must commence no later than sixty (60) days following the
Termination Date.  The Comp           y        ill not provide a Plan Participant with any additional

compensation if he/she does not request to, or chooses not to, participate in the outplacement counseling offered under this Plan.

| Officer Title | Type of Program |
|---|---|
| Non-Officer | 2 Day Public Seminar |
| Assistant Vice President or Vice President | 3 Month Program |
| Senior Vice President or Managing Director | 6 Month Program |

(iv) Severance Benefit Definitions

- *Base Salary.* For purposes of determining the amount of Basic or Enhanced Severance Pay a Plan Participant is eligible to receive under the terms of this Plan, the term "Base Salary" means such Plan Participant's base salary including any applicable shift differential, but exclusive of overtime compensation, commissions, bonuses, other payments, or any fringe benefits or other forms of remuneration, as in effect on the Plan Participant's Termination Date. Any performance/merit reviews that are pending or in process as of the Termination Date also shall not be taken into account in determining a Plan Participant's Base Salary or the amount of Severance Pay. For a Plan Participant who has switched from part-time to full-time, or vice versa, during the twelve (12) month period preceding his/her Termination Date, his/her Base Salary shall be determined using the weighted average of his/her base salary during such prior twelve (12) month period.

- *Year of Service.* For purposes of determining the amount of Enhanced Severance Pay a Plan Participant is eligible to receive under the terms of this Plan, a Plan Participant will be credited with a "Year of Service" for each completed twelve (12) month period with the Company and certain related companies as measured from the Plan Participant's date of hire through the Termination Date. Further, if a Plan Participant has worked for a partial year of service, he/she will be credited with 1/12 of a Year of Service for each completed month or portion thereof. For rehires or employees with a change in employment status, the start dates of service for purposes of calculating severance will be the most recent hire date. If applicable, appropriate service will be granted for continuous service with predecessor companies acquired by a Marsh & McLennan company. Notwithstanding the above, in no event will a Plan Participant be credited with Years of Service for any period for which the Plan Participant already received severance pay from the Company, any related company or any predecessor of the Company or related company.

- *2003 Bonus Award.* For purposes of determining the amount of Supplemental Severance Pay a Plan Participant is eligible to receive under the terms of this Plan, the term "2003 Bonus Award" means the gross aggregate amount received, if any, by a Plan Participant in the Spring of 2004 as a Marsh Incentive Compensation Plan (ICP) Bonus Award with respect to the service the Plan Participant performed in 2003. For the avoidance of doubt, any other cash or noncash award, whether or not referred to or characterized as a "bonus," including without limitation any Middle Market Incentive Plan Awards, are excluded from the definition of "2003 Bonus Award" and will not factor into the determination of Supplemental Severance Pay under this Plan.

- *Annual Compensation.* For purposes of determining the maximum amount of severance pay (the sum of Enhanced Severance Pay plus Supplemental Severance Pay) a Plan Participant is eligible to receive under the terms of this Plan, the term "Annual Compensation" means the total of all compensation, including wages, salary, and any other benefit of monetary value, whether paid in the form of cash or otherwise, which was paid as consideration for the Plan Participant's service during the year immediately preceding the Termination Date, or which would have been so paid at the Participant's usual rate of compensation if the Participant had worked a full year.

## 4. Manner Of Payment

Payment of Basic Severance Pay under this Plan will be made in a lump-sum payment, less applicable withholdings, on or about the 60th calendar day following the Termination Date.

Neither Enhanced Severance Pay nor Supplemental Severance Pay will be paid until a Waiver and Release Agreement is executed, is returned to the Company, is not revoked and becomes effective by its terms (the "Release Effective Date"). Subject to the foregoing, Enhanced Severance Pay and Supplemental Severance Pay will be paid in semi-monthly installments, less applicable withholdings, commencing no later than the first 15th or 30th of a month that is at least 30 calendar days following the Release Effective Date. Under no circumstances will installment payments for severance benefits under this Plan continue for more than 12 months.

## 5. Payment Offsets

The Company reserves the right to reduce any severance benefit paid under this Plan to the extent necessary to take into account any of the following: any outstanding financial obligations(s) that the Plan Participant has to the Company and any of its affiliates and subsidiaries, including, but not limited to, any set-off, counterclaim, recoupment, defense, or other claim, right or action that the Company may have against the employee, any expense account balances, employee loans, relocation allowances, employee advances (including tuition advances and vacation or sick days taken in advance of their being earned by the employee) and the value of any computer hardware or software, communications equipment or other Company-provided property in the individual's possession that he/she has failed to return to the Company as of the Termination Date or the date designated by the Company, whichever is earlier.

## 6. If Plan Participant Is Re-Employed By The Company

Any re-employment in any capacity of a terminated Plan Participant must be approved by a Senior Business Manager of the Company. A Plan Participant will be required to refund to the Company all or a pro-rata portion of his/her Enhanced Severance Pay and Supplemental Severance Pay as a condition of re-employment (including as an independent contractor or consultant) with the Company, its parent or any affiliate or subsidiary of the Company if his/her re-employment starts before the period covered by Enhanced Severance Pay expires. Any such re-employment or refund shall not affect the validity of the Waiver and Release Agreement executed by the Plan Participant.

## 7. Effect On Other Benefits

Except as may otherwise be provided under this Plan or under any other applicable Company plan(s), or required by applicable law, all Company-provided benefits will terminate on the Plan Participant's Termination Date. No benefits provided under this Plan shall be taken into account in determining benefits under any other plan, policy, practice or program of the Company, its parent, affiliate or subsidiary.

## 8. Source Of Benefits

Benefits under this Plan will be paid from the general assets of the Company. No assets or funds with respect to any such benefits will be segregated by the Company in any fund, account or trust. A Plan Participant shall have no greater claim against the assets of the Company than as a general unsecured creditor.

<u>9. Administration</u>

The Plan will be administered by the Plan Administrator. The Company has designated the Marsh Inc. Managing Director, Government and Employee Relations to be the Plan Administrator and, during any periods that such position is not filled, the Company.

The Plan Administrator shall make the rules and regulations necessary to administer the Plan. The Plan Administrator shall have the discretionary authority and responsibility to construe the terms of the Plan and to make all determinations under the Plan in its sole discretion including, without limitation, determining eligibility for benefits and the amount of such benefits, what constitutes "cause", whether a position is comparable or better or a reasonable change of work assignment, the amount of any refund upon re-employment and the amount of any payment offsets. The determinations and constructions of the Plan Administrator will be final, binding and conclusive as to all parties.

The Plan Administrator may (i) appoint or employ such persons as it deems necessary to render advice with respect to any of its responsibilities under the Plan, (ii) delegate to any one or more of the Company's employees any responsibility it may have under the Plan and (iii) designate any other person or persons to carry out any of its responsibilities under the Plan. Any delegation of the Plan Administrator shall carry such discretionary authority as the Plan Administrator possesses regarding the matter unless otherwise specified.

Correspondence regarding this Plan should be addressed to:

Marsh Inc. Fall 2004 Restructuring Severance Pay Plan
Managing Director, Government and Employee Relations
Marsh Inc.
1166 Avenue of the Americas
New York, New York 10036-2708
(212) 345-6000

<u>10. Claims Procedure</u>

An employee who is eligible for benefits under this Plan will be notified and provided with any forms required in connection with receipt of Plan benefits including if applicable, a Waiver and Release Agreement. If such employee disagrees with the determination of his/her benefits, he/she may, within thirty (30) days of receipt of the initial notification, submit a written statement to the Plan Administrator describing the basis of his/her claim for benefits, together with any documents which he/she believes supports his/her claim. Any employee who is not so notified but believes that he/she is eligible for benefits under the Plan may, within thirty (30) days of such employee's Termination Date, submit a written statement to the Plan Administrator describing the basis of his/her claim for benefits and requesting any forms required in connection with payment of such benefits.

If any claim for severance benefits is wholly or partially denied, the Plan Administrator shall notify the claimant within ninety (90) days after the Plan's receipt of the written claim (except that in special circumstances the Plan Administrator may take an additional ninety (90) days to consider its decision, in which case the employee will be notified of the extension). Such notification shall set forth: (1) the specific reasons for the denial (including reference to any pertinent Plan provisions on which the denial is based); (2) if applicable, a description of any additional material or information necessary for the claimant to perfect the claim, and an explanation of why such material or information is necessary; (3) the claims review procedure and (4) a statement of the claimant's right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA") if the claim is denied following a review on appeal.

Any employee whose claim for benefits under this Plan is denied may make a written request to the Plan Administrator within sixty (60) days after such denial for a review of the denial. Any such request must include any evidence relevant to the claim and may include a request for relevant documents. The

employee claiming benefits shall be notified of the final decision of the Plan Administrator within sixty (60) days after his/her request for a review is received. However, if the Plan Administrator finds it necessary to extend this period due to special circumstances and so notifies the claimant in writing, the decision shall be rendered as soon as practicable, but in no event later than one hundred and twenty (120) days after the claimant's request for review. The decision shall be in writing and shall set forth the specific reasons for the denial (including reference to any pertinent Plan provisions on which the denial is based) and a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA.

The Plan Administrator's action or determination in this review procedure shall be final, binding, and conclusive on all interested persons.

No action for benefits may be brought by any Plan Participant or beneficiary unless the Plan's claims review procedure has been exhausted (that is, all appeals of adverse determinations have been made and decided). Any such action must be commenced within three (3) years of the first date by which all the essential facts and circumstances which support the claim had arisen, provided that the three-year period will never begin later than the date on which the claim arose or, if the individual properly and timely follows the Claims Procedure described above, the date a final determination denying the claim, in whole or part, has been issued under that procedure.

## 11. Amendment Or Termination Of This Plan

The Company, acting through the person or entity holding, from time to time, the title of "Plan Administrator" pursuant to Section 9 of this Plan but acting solely in a settlor capacity, reserves the right to amend or terminate this Plan; provided, however, that no such amendment or termination shall adversely affect the benefits payable with respect to any Plan Participant who has a Termination Date prior to the adoption of such amendment or termination.

The Company's right to alter, reduce or eliminate any pay practice, policy or benefit, in whole or in part, in an individual case or more generally, with or without advance notice, is wholly unaffected by the existence, terms and operation of this Plan.

## 12. Withholding Of Taxes

The Company will withhold, or cause to have withheld, all income, payroll, and other taxes from any severance pay benefit paid under this Plan to the extent required by applicable law. Federal income taxes will be withheld at the flat tax rate established under the Internal Revenue Code.

## 13. General Information

The following describes other information a Plan Participant should know about the Plan.

Plan Sponsor
    Marsh Inc.
    1166 Avenue of the Americas
    New York, New York 10036-2708
    (212) 345-6000

Plan Administrator
    Managing Director, Government and Employee Relations
    Marsh Inc.
    1166 Avenue of the Americas
    New York, New York 10036-2708
    (212) 345-6000

Type of Plan
    The Plan is a severance plan.

Effective Date
   The Plan is effective as of the date signed for that limited period, and with respect to that limited population, as specified above.

Plan Year
   The Plan's records are kept on a calendar year basis.

Plan Identification
   The official name of the Plan is the Marsh Inc. Fall 2004 Restructuring Severance Pay Plan.  The Internal Revenue Service identifies Marsh Inc. by the Employer Identification Number 13-4046956 and the Internal Revenue Service and the Department of Labor identify the Plan by the plan number 501.

Legal Service
   It is hoped that legal action with regard to the Plan will not be considered necessary.  However, if an employee feels that he/she has cause for legal action after he/she has exhausted the Plan's Claims Procedures (see Section 10 above), a timely complaint may be served on the agent named for service of process:

   John W. Hamlin, Esq.
   Senior Employment Counsel
   Marsh & McLennan Companies, Inc.
   1166 Avenue of the Americas
   New York, New York 10036-2708

   Additionally, legal service may be served on the Plan Administrator.

## 14. ERISA Rights

A Plan Participant in the Marsh Inc. Fall 2004 Restructuring Severance Pay Plan is entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  ERISA provides that a participant shall be entitled to:

**Receive Information about the Plan and Benefits**
- Examine without charge, at the Plan Administrator's office and at other specified locations, including work sites, all documents governing the Plan, including a copy of the latest annual report (Form 5500 Series), if any, filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration; and

- Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, the latest annual report (Form 5500 Series) and an updated Summary Plan Description.  The Plan Administrator may make a reasonable charge for the copies.

**Prudent Action by Plan Fiduciaries**
In addition to creating rights for Plan Participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plans.  The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of Plan Participants and beneficiaries.  No one, including an individual's employer or any other person, may fire an employee or otherwise discriminate against an employee in any way to prevent an employee from obtaining a severance benefit or exercising an employee's rights under ERISA.

**Enforce an Employee's Rights**
If an employee's claim for severance benefits is denied or ignored, in whole or in part, the employee has a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are several steps an employee can take to enforce his/her rights. For instance, if an employee requests a copy of Plan documents or the latest annual report from the Plan and does not receive them within thirty (30) days, the employee may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay the employee up to one hundred and ten dollars ($110) a day until the employee receives the materials, unless the materials were not sent for reasons beyond the control of the Plan Administrator. If an employee has a claim for benefits which is denied or ignored, in whole or in part, the employee may file suit in a state or Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if an employee is discriminated against for asserting his/her rights, the employee may seek assistance from the U.S. Department of Labor, or he/she may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If the employee is successful, the court may order the person the employee has sued to pay these costs and fees. If the employee loses, the court may order the employee to pay these costs and fees, for example, if it finds the employee's claim is frivolous.

**Assistance with Questions**
If an employee has any questions about the Plan, the employee should contact:

Managing Director, Government and Employee Relations
Marsh Inc.
1166 Avenue of the Americas
New York, New York 10036-2708
(212) 345-6000

If an employee has any questions about this statement or about an employee's rights under ERISA, or if an employee needs assistance in obtaining documents from the Plan Administrator, the employee should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in the telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. An employee may also obtain certain publications about an employee's rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

15. Miscellaneous

**Not a Contract for Employment**
This Plan is not a contract for employment and does not give any individual a right of employment or continued employment with the Company, its parent or any of its subsidiaries or affiliates.

**No Assignment of Benefits**
Plan Participants cannot assign, pledge, borrow against or otherwise promise any benefit payable under this Plan before he/she receives that benefit.

**Governing Law**
Except where preempted by ERISA or other U.S. laws, the law of the State of New York shall govern without giving effect to principles of conflict of laws.

# EXHIBIT D

# Retirement Plan

**Plan Administration Description dated as of May 10, 2006**

## Table of Contents:

Plan document ........................................................................................................................ 2
Plan Administration Description ............................................................................................ 2
Benefits determinations and claims procedures .................................................................. 4
If the Company amends or terminates the plan .................................................................... 4
Limits on plan amendments, including changes in actuarial factors, options and subsidies ...................... 5
Vested Benefits Are Insured By The PBGC.......................................................................... 5
Administrative information..................................................................................................... 6
Plan details........................................................................................................................... 8
Contacts .............................................................................................................................. 10
Other importation information.............................................................................................. 11

# Plan document

The Plan Administration Description ("Description"), together with the questions and answers about the Retirement Plan in this Benefits Handbook, constitute the Summary Plan Description for the Retirement Plan and contains important information about the Retirement Program, which consists of the tax qualified Retirement Plan and two non-qualified plans, the Benefit Equalization Plan (BEP) and Supplemental Retirement Plan (SERP). (Please note that only some of these provisions and protections apply to BEP and SERP.)

The Plan Administrator uses the claims procedure described in this section of the Handbook to make determinations on claims for benefits under the Retirement Plan. The Plan Administrator has full discretion and the maximum authority to interpret the plan and make all claims/benefits determinations permitted by law. As explained below, the Plans are administered by a Committee, but certain responsibilities are delegated to specific persons called the Plan Administrator and the Company Representative, who may be the same person. Certain duties of the Plan Sponsor are delegated to the individual designated as the Company Representative.

Note that the table of contents and the various headings and sub-headings in this Description are provided for your convenience and in no way define, limit or otherwise describe the scope or intent of the plan.

Amendments to the plan provisions, including amendments regarding eligibility for coverage and the benefits provided under the plan, are made only by written amendments to the Retirement Plan. Amendments may be made by the Company's Board of Directors. The Board of Directors has in the past delegated to certain officers authority to adopt amendments necessary to keep the Plan tax qualified. The Plan also authorizes the person serving as Company Representative to carry out certain non-fiduciary functions, including determining service credit for employees of acquired businesses. Any material amendments are communicated to you by revising this section of the Handbook, or through Marsh & McLennan Companies, Inc.'s internal employee communication channels.

## Summary Plan Description

This Plan Administration Description provides information on how the Retirement Plan is administered, including:

- plan funding and claims administration

- how to obtain plan documents

- the claims review and appeal process

- your rights under ERISA (the Employee Retirement Income Security Act of 1974)

- other important facts about this plan

051006

Summary plan descriptions are intended to provide you with easy-to-understand general explanations of the more significant provisions of your benefit plans. If any conflict should arise between this Summary Plan Description and the provisions of the plan, or if any provision is not explained or only partially explained in this summary plan description, your rights will be determined under the provisions of the plan document (which may be changed from time to time), as interpreted by the Plan Administrator.

051006

# Benefits determinations and claims procedures

## Timing of notification of benefits determination

In the case of a claim, the person serving as Plan Administrator (who may be acting through his or her delegate) will notify you of the benefit determination (whether adverse or not) no later than 90 days after your claim was received. This period may be extended one time by the Plan Administrator for up to 90 days, provided that the extension is necessary due to matters beyond the control of the Plan Administrator and you are notified prior to the expiration of the initial 90-day period of the circumstances requiring the extension and the date by which the Plan Administrator expects to render a decision. If additional information is needed to process the claim, the Plan Administrator will notify you within this 90-day period and may request a one-time extension of not more than 90 days and suspend your claim until all information is received. A denial notice will explain the reason for denial, refer to the part of the plan on which the denial is based, describe any additional material or information necessary to complete claim so it may be processed, and provide the claim appeal procedures.

## Appeal of benefits determinations

If you believe a benefit under the plan was denied improperly, you may file a written appeal for the unpaid amount within 60 days of receipt of notification of the adverse benefit determination. The written appeal should specify the amount of the claim, include any other written comments, documents, records or other information that may be pertinent and should be sent to the Plan Administrator. A written decision will usually be issued by the Plan Administrator or the Committee within 60 days of your written appeal.

Upon request, you will be provided, free of charge, reasonable access to, and copies of all documents, records, and other information relevant to your claim for benefits.

## Authority over benefits determinations and appeals

The Plan Administrator and the Committee have full discretion and authority to determine all claims under the plan. Any final action or determination in this review procedure will be final, conclusive, and binding on the Claims and Plan Administrators, the Company, the plan participant and his or her legal representative, and the participant's family members and their legal representatives.

No action for benefits may be brought by any participant or beneficiary unless the plan's claims review procedure has been exhausted (that is, all appeals of adverse decisions have been made), any such action must be commenced within three years of the first date by which all the essential facts and circumstances which support your claim had arisen, provided that the three-year period will never begin later than the date on which the claim arose or a final determination denying your claim, in whole or in part, has been issued under the procedure described above.

# If the Company amends or terminates the plan

While the Company intends to continue the Benefits Program indefinitely, the Company reserves the right to terminate or amend the Program, in whole or part, at any time and for any reason as it deems advisable, as to any and all employees covered. In fact, as a matter of prudent business planning, the Company periodically evaluates the Benefits Program.

However, if the Company should exercise its right to amend, modify or terminate the tax-qualified Retirement Plan, Internal Revenue Code protections apply. In addition, it is not intended that the Benefit Equalization Plan or the Supplemental Retirement Plan amendments will reduce previously earned benefits, though your Benefit Equalization Plan and Supplemental Retirement Plan benefit may decrease if your Retirement Plan benefit increases.

To assure the availability of retirement benefits under the tax-qualified Plan, the Company has established a Master Trust and entered into various insurance contracts. If it ever becomes necessary to terminate that Plan, accrued benefits of affected Participants will be 100% vested (to the extent funded or guaranteed) and assets will be used to pay out benefits in the form of non-transferable annuity contracts and/or lump sums in accordance with legal requirements. The tax-qualified Plan provides that, in the event of a complete termination, any excess assets remaining after all liabilities have been satisfied will revert to the Company. In the event that the Benefit Equalization Plan and/or the Supplemental Retirement Plan were terminated, you would be entitled to any annuities purchased on your behalf to date as well as any other vested benefits the Company can pay out of its general assets.

Other qualified plans may be merged into the Retirement Plan, and the Retirement Plan may also be merged, in whole or in part, into or with another plan. However, in no event will your benefit immediately after the transfer or merger (determined as if the plan terminated) be less than your benefit immediately prior to the transfer or merger (determined as if the Plan terminated).

## Limits on plan amendments, including changes in actuarial factors, options and subsidies

The Internal Revenue Code provides that no plan amendment may retroactively reduce your previously accrued benefit, unless necessary to keep the Plan tax qualified. This means, for example, that if the benefit formula is changed in the future by an amendment to the tax-qualified Plan, your accrued benefit after the amendment may never be less than your accrued benefit before the amendment. These rules also currently provide that certain changes in the actuarial factors used to calculate your benefits and the options and early retirement subsidiaries available under that Plan may not be applied to your accrued benefit prior to the change. In addition to being notified of any future changes in the benefit formula, you will be notified when tax qualified Plan assumptions or options are changed if you need to be informed of any rights you have that were protected by law as of the date of the change.

## Vested Benefits Are Insured By The PBGC

Your pension benefits under the Retirement Plan are insured by the Pension Benefit Guaranty Corporation (PBGC), a federal insurance agency. If the Retirement Plan terminates (ends) without proper funding to meet its benefit obligations, then the PBGC will step in to pay pension benefits. Most people receive all of the pension benefits they would have received under their plan, but some people may lose certain benefits. The PBGC guarantee generally covers: (1) normal and early retirement benefits; (2) disability benefits if you become disabled before the Retirement Plan terminates; and (3) certain benefits for your survivors.

The PBGC guarantee generally does not cover: (1) benefits greater than the maximum guaranteed amount set by law for the year in which the Retirement Plan terminates; (2) some or all of benefit increases and new benefits based on Retirement Plan provisions that have been in place for fewer than 5 years at the time the Retirement Plan terminates; (3) benefits that are not vested because you have not worked long enough for the Company; (4) benefits for which you have not met all of the requirements at the time the Retirement Plan terminates; (5) certain early retirement payments (such as supplemental benefits that stop when you become eligible for Social Security) that result in an early retirement monthly benefit greater than your monthly benefit at the Retirement Plan's normal retirement age; and (6) non-pension benefits, such as health insurance, life insurance, certain death benefits, vacation pay, and severance pay.

Even if certain of your benefits are not guaranteed, you may still receive some of those benefits from the PBGC depending on how much money the Retirement Plan has and on how much the PBGC collects from employers.

# Administrative information

The information presented in this summary plan description is intended to comply with the disclosure requirements of the regulations issued by the U.S. Department of Labor under the Employee Retirement Income Security Act (ERISA) of 1974, which apply to the Retirement Plan.

## Your rights under ERISA

As a participant in the Retirement Plan, you are entitled to certain rights and protections under ERISA (Employee Retirement Income Security Act of 1974). ERISA entitled you to:

- receive information about the plan and your benefits

- examine, at the Plan Administrator's office and other specified locations, including work sites, without charge, all plan documents governing the plan. These documents may include insurance contracts, if applicable, and the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration

- obtain, after sending a written request to the Plan Administrator, copies of documents governing the operation of the plan, including insurance contracts, if applicable, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. You may be asked to pay a reasonable charge for the copies

- receive a written summary of the plan's annual financial report. The Plan Administrator is required by law to provide each participant with a copy of this summary annual report.

- Obtain a statement telling you whether you have a right to receive a retirement plan benefit at normal retirement age (age 65) and, if so, what your benefits would be at normal retirement age if you stop working under the plan now. If you do not have a right to a retirement benefit, the statement will tell you how many more years you have to work to get a right to a benefit. This statement must be requested in writing and is not required to be given more than once every twelve months. The plan must provide the statement free of charge. Currently, such a statement is automatically provided to participants each year.

## Prudent actions by plan fiduciaries

In addition to creating rights for plan participants, ERISA imposes duties on the people responsible for the operation of the Retirement Plan. The people who operate this plan, called "fiduciaries" have a duty to do so prudently and in the best interest of you and other plan participants and beneficiaries. No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA.

## Enforce your rights

If your claim for a benefit under any of the three plans is denied or ignored, in whole or in part, you have a right to know why this was done, including the provisions of the plan on which the denial was based, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are several steps you can take to enforce your rights. For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the Administrator's control.

If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the plan's decision or lack of decision about the qualified

051006

status of a domestic relations order, you may file suit in federal court. If plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees if, for example, it finds your claim is frivolous.

## Assistance with your questions

If you have any questions about this plan, contact the Plan Administrator. If you have questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory. You may also contact the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your right and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

# Plan details

## Plan sponsor

The Plan Sponsor is:

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774

In addition to eligible employees of Marsh & McLennan Companies, Inc., the employee benefits plan described in this document covers employees classified on payroll as a U.S. salaried employee of MMC or any related company that is a participating employer in the Plan. Participating companies include MMC and all its subsidiaries and affiliates other than (i) Putnam Investments, Inc., and its subsidiaries, (ii) Kroll, Inc. and its subsidiaries, including its Quorum and Factual Data business, (iii) CS Stars, LLC (formerly Corporate Systems, Inc.), and (iv) except as described below, Mercer Human Resource Services, including Mercer HR Outsourcing, LLC and Mercer Trust Company. Certain employees of Mercer HR Services who were formerly Mercer HR Consulting employees were given the opportunity to continue participation in the Plan or to elect participation in the Mercer HR Services Retirement Plan. which: (1) have been designated by the Board of Directors of Marsh & McLennan Companies, Inc. as a participating employer under this plan; and (2) has adopted the plan. You may write to the Plan Administrator (described below) to learn which employers participate in this plan.

## Plan name

Marsh & McLennan Companies Retirement Plan (tax qualified)

## Plan administrator

The Plan provides for administration by a Committee (consisting of three or more persons appointed by Marsh & McLennan Companies' Chief Executive Officer or Board of Directors) or a Plan Administrator (who is appointed by Marsh & McLennan Companies' Chief Executive Officer). The Committee members and Plan Administrator may be removed at any time with or without cause. The Committee has full power and authority to administer the plan in its complete discretion; provided, however, that where the plan specifically provides duties to the Plan Administrator, the Committee and the Plan Administrator are jointly responsible for, and exercise complete discretion with respect to those duties.

The Plan Administrator is Marsh & McLennan Companies, Inc. Benefits Administration Committee and can be reached at:
Plan-Administrator – Retirement Plan
c/o Global Benefits, 6th Floor
Marsh and McLennan Companies, Inc.
Waterfront Corporate Center
121 River Street
Hoboken, NJ 07030-5794
Telephone: (201) 284-4000

The Plan Administrator has full discretion and authority to control and manage the operation and administration of each of the plans except to the extent authority has been granted to the Claims Administrator for adjudication of claims.

## Employer Identification Number (EIN)

As Plan Sponsor, the Company files benefit plan reports to the Federal Government under Employer Identification Number: 36-2668272.

## Plan number

The plan number is 001.

## Plan type

The Retirement Plan is a funded, tax-qualified defined benefit pension plan under which benefits are determined under a formula and contributions are actuarially determined. The Benefit Equalization Plan and Supplemental Retirement Plan are non-qualified defined benefit plans which are excess benefit plans or plans for a select group of management or highly-compensated employees.

## Plan year

The plan year is January 1–December 31.

## Source of benefits funding

The tax qualified Retirement Plan is funded entirely through Company contributions and investment gains. Expenses not paid by the Company may be paid from the trust. The assets under the Retirement Plan are held in a tax-exempt master trust by the following:

The Northern Trust Company of Chicago, Illinois
50 South La Salle Street
Chicago, Illinois 60690

An Investment Committee of 3 or more persons is appointed by the Chief Executive Officer of the Company or the Board to manage and supervise Plan Investments.

## Agent for legal process

We hope you never feel you need to resort to legal action to enforce your rights. However, if you feel you have cause for legal action after you have exhausted the plan's claims appeal process, a timely complaint may be served on the Plan Administrator, shown above, or the Company's General Counsel at:

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774

Remember, actions generally must be brought within three years of the date your benefit was denied (or the date your cause of action first arose, if earlier) unless a shorter period is allowed, or a longer period is required, by applicable state insurance law but only if such state insurance law is not pre empted by ERISA.

## New York State Law

Except where preempted by ERISA or other U.S. laws, the validity of the plans and any of its provisions will be determined under the laws of New York State without giving effect to principles of conflict of laws.

051006

# Contacts

### For filing a claim

Plan Administrator c/o
Marsh & McLennan Companies, Inc.
Waterfront Corporate Center
Global Benefits
121 River Street – 6th Floor
Hoboken, NJ 07030-5794

### For appealing a claim

Plan Administrator –Retirement Plan
Marsh & McLennan Companies, Inc.
Waterfront Corporate Center
Global Benefits
121 River Street – 6th Floor
Hoboken, NJ 07030-5794

### For a copy of the plan document

A copy of the plan document (and certain related documents, such as insurance company contracts and trust agreements, to the extent applicable) is available to review upon written request to the Plan Administrator. A copy of any of these documents will be furnished to a plan participant or beneficiary (or an authorized representative) upon request at a reasonable charge of 25 cents per page to cover reproduction and handling.

# Other importation information

## Not a contract of employment

This plan is not a contract of employment and does not give any individual a right of employment or continued employment with Marsh & McLennan Companies, Inc.

## If a mistake occurs

Every effort is made to pay your benefits from the plans accurately, but mistakes may occur occasionally. The Claims Administrator will make corrections that it deems appropriate, such as requiring a participant to repay an overpayment to the plan, making an additional payment to an underpaid participant, adjusting future benefit payments, or other actions as necessary to correct errors or omissions. You or your family member will be notified if the plan determines that a mistake was made.

## Non-assignment of benefits

You cannot assign, pledge, borrow against or otherwise promise any benefit payable under the Retirement Program before you receive that benefit. In addition, your interest in the tax-qualified Retirement Plan is not subject to the claims of creditors. Exception:

A Qualified Domestic Relations Order from a state court directing the Plan Administrator to pay all or a portion of your Retirement Plan account to a former spouse, child(ren), or dependent(s). An example of this is a property settlement relating to child support, alimony payments or marital property rights. The Plan's Qualified Domestic Relations Order procedures are available without charge.

## Top-heavy provisions

A "top-heavy" plan is a tax-qualified plan (which individually or when aggregated with related plans) provides more than 60% of its benefits for "key" employees. Both "top-heavy" and "key" employees are defined terms under the Internal Revenue Code. Plans of large employers such as Marsh & McLennan Companies are unlikely to become top-heavy. However, if the Retirement Plan becomes top heavy, certain minimum contributions for non-key employees and faster vesting may be required. Participants may be entitled to have faster vesting apply even if the Retirement Plan becomes and then ceases to be top heavy.