UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ROGER EGAN,

                       Plaintiff,

               v.

MARSH & McLENNAN COMPANIES, INC.,
MARSH USA INC. SEVERANCE PAY PLAN,
MARSH INC. FALL 2004 RESTRUCTURING
SEVERANCE PAY PLAN,

                       Defendants.

-------------------------------------------------------------------X

No. 07 Civ. 7134 (SAS)

**AMENDED COMPLAINT**

**Jury Trial Demanded**

       Plaintiff, ROGER EGAN ("Egan"), by his attorneys, Foley & Lardner LLP, for his Amended Complaint, alleges as follows:

### NATURE OF THE ACTION

       1.     Egan was employed by Defendant Marsh & McLennan Companies, Inc. and its wholly-owned subsidiaries (collectively, "MMC") for 32 years – from September 1972 until December 2004. Over that period, Egan rose through the corporate ranks, ultimately becoming a managing director, President and Chief Operating Officer of Marsh, Inc. ("Marsh"), MMC's risk and insurance subsidiary, and joining the elite ranks of MMC's approximately fifty member partnership.

       2.     Consistent with its treatment of other MMC partners and senior officers, the terms of Egan's employment, and his rights upon termination, were never embodied in a written employment contract. One was not needed. Through its words and actions over many years, MMC repeatedly assured Egan that, in the event his employment ever was involuntarily terminated without cause, he would receive the same package of benefits MMC consistently

gave other partners and senior officers upon their involuntary termination without cause – and certainly, at the very least, the termination benefits lower-level employees received pursuant to a variety of formal "plans."

3.    MMC involuntarily terminated Egan's employment without cause in December of 2004. Despite Egan's decades of faithful and exemplary service to the company, and the explicit and implicit promises made to him over the years (including after his termination) about the termination benefits he would receive, MMC refused to make good on its obligations to him.

4.    This lawsuit seeks to hold MMC to such obligations.

## PARTIES

5.    Egan is an individual residing at 2 Hartley Farms Road, Morristown, New Jersey.

6.    Defendant Marsh & McLennan Companies, Inc. is a Delaware corporation with its principal place of business at 1166 Avenue of the Americas, New York, New York. MMC is a global professional services firm which owns companies active in the sectors of risk and insurance services, risk consulting and technology, and investment management.

7.    Defendant Marsh USA Inc. Severance Pay Plan ("SPP") is a severance plan sponsored by Marsh USA Inc.

8.    Defendant Marsh Inc. Fall 2004 Restructuring Severance Pay Plan ("Restructuring SPP") is a severance plan sponsored by Marsh.

## FACTUAL BACKGROUND

9.    Egan was employed by MMC from September 1972 through December 2004, ultimately becoming one of only approximately fifty partners of MMC, as well as a managing director, President and Chief Operating Officer of Marsh.

2

**Egan's Equity Awards And Rights Upon Termination**

10.    Over the term of his employment, Egan, in recognition of his valuable service to MMC, was awarded stock options, restricted stock, deferred stock units and restricted stock units – all on various vesting schedules.

11.    Egan also was made a participant in a plan issued by MMC on November 21, 1996, which provided a specific benefit to MMC executives who terminate from MMC for reasons other than cause, death, total and permanent disability or normal retirement, and who at the time of termination had at least ten years of service with MMC and are grantees of certain types of restricted stock awards ("Special Severance Pay Plan"). Under the terms of that plan, a severance award would be paid in MMC shares equal to a percentage of the restricted stock and restricted stock units the executive forfeited upon his/her termination of employment. For executives like Egan, with 25 years or more of service, the stock awarded under this plan would equal 90% of the restricted stock and restricted stock units forfeited.

12.    Above and beyond the foregoing, however, Egan, as an MMC partner and senior officer, also would be entitled upon any involuntary termination of his employment without cause to the severance and retirement benefits MMC consistently gave its partners and senior officers under such circumstances. Specifically, for the elite group of MMC partners and other senior officers, MMC, notwithstanding the terms of any written plans and awards to the contrary, had, upon information and belief, a consistent and regular policy of paying, upon involuntary termination without cause, cash severance in an amount equal to a multiple of the individual's base salary and bonus (including stock bonus), a prorated portion of the individual's bonus in the year of his/her termination, immediate vesting of all restricted stock and restricted stock unit awards, an extension of the exercise period on the individual's stock option awards for the remainder of the exercise term of the awards, a continuation of the individual's health benefits,

3

the immediate payment of the individual's retirement pension at a "bridged" rate equal to the amount the individual would have been entitled to had he/she waited until the age of 62 to retire, and the continuation of indemnification/D&O liability insurance.

13.    This consistent policy was well-known among MMC partners and senior officers. Indeed, Egan, in his management position, was often consulted on the termination packages to be offered to terminated partners and senior officers. The standard package outlined above was always used as the baseline.

14.    Egan's entitlement to the above also was explicitly expressed to him on a number of occasions by MMC agents. For example, at a dinner with MMC's chairman in 2001, Egan raised the idea of entering into an employment contract with MMC. MMC's then-chairman, Jeffrey Greenberg, responded that it was MMC's practice and policy not to have employment contracts with its partners and senior officers because, as demonstrated by MMC's consistent practice and policy of awarding generous termination packages to its senior people, and especially MMC partners, they were not necessary. MMC, Greenberg promised, would "take care" of Egan as it took care of all its senior people.

15.    Egan relied on MMC's history of dealing with its partners and senior officers, and on the assurances he received that he would be treated at least as well as they had been treated. As one of the most well-known and respected managers in his industry, Egan was often approached with lucrative offers of employment from other companies. However, on the basis of the assurances he received that he would get no less than the same generous termination package as his peers within MMC, Egan passed up these offers and continued his employment with MMC.

16.    Although less generous than the treatment of MMC partners and senior officers, MMC also, upon information and belief, had a regular and consistent policy and practice of

4

paying at least a year's base salary plus bonus, upon involuntary termination without cause, to the managing directors of its subsidiaries (such as Marsh).

17.    Egan relied on this regular and consistent practice as well.  It assured him that if, for any reason, MMC wrongly refused to honor its obligations to him as a partner of MMC, he would still be entitled to receive severance as a Marsh managing director.  This added assurance contributed to Egan's decision to continue his employment with MMC.

18.    In addition to the foregoing, MMC also had at least two formal "plans" in place for the payment of severance to employees under certain circumstances upon their involuntary termination without cause.  These plans, the SPP and the Restructuring SPP, provided managing directors with severance equal to one year's base salary (the SPP) or one year's base salary plus 60% of the managing director's 2003 bonus (the Restructuring SPP).

19.    Furthermore, regardless of whether any particular employee fell within the literal eligibility requirements of the SPP, the Restructuring SPP or any other formal "plan," MMC, upon information and belief, had a regular and consistent policy and practice of paying severance equal to the severance provided under such plans to any employee involuntarily terminated without cause during the time period covered by such plans.   The existence of this regular and consistent policy and practice gave Egan even greater comfort that, if MMC wrongly refused to honor its obligations to him as a partner of MMC, managing director of Marsh, or pursuant to the terms of the SPP, Restructuring SPP, or any other formal plan, he would nevertheless be protected.  This also contributed to his decision to continue his employment with MMC.

**Egan's Involuntary Termination Without Cause and MMC's Refusal to Pay Amounts Due**

20.     In April 2004, the New York State Attorney General ("NYS AG") commenced an investigation of MMC.

21.     Upon information and belief, to help contain the damage from the investigation (and the litigation that followed), MMC elevated Michael Cherkasky, a close personal friend of then-Attorney General Elliot Spitzer, to the chairmanship of the company.

22.     Although acknowledging Egan's lack of culpability in anything related to the NYS AG's investigation, Cherkasky asked Egan to resign in the Fall of 2004.

23.     As part of this request, Cherkasky once again reiterated MMC's policy with respect to the benefits Egan would be entitled to upon his termination – explicitly advising Egan to hire a lawyer so that Egan and MMC could reach a "generous settlement."

24.     On the basis of this promise, and the assurance provided by MMC's past conduct, Egan agreed to stay on to help with the transition and, thereafter, if appropriate, to resign.

25.     On or about November 12, 2004, Joseph Bachelder, the attorney retained by Egan at Cherkasky's urging, presented Cherkasky with a proposed separation agreement ("Separation Agreement"). The terms of the Separation Agreement (attached hereto as Exhibit A) were based entirely on the termination packages MMC regularly and consistently provided to its other terminated partners and senior officers over the years.

26.     Despite the agreement that he would remain at the company to help with the transition, MMC, on or about December 7, 2004, constructively terminated Egan's employment – demanding that he vacate MMC premises, giving him approximately six hours to pack his belongings, and, thereafter, denying him access to MMC's offices and to his MMC e-mail account and personal files.

6

27.    Moreover, approximately two weeks after Egan was asked to vacate MMC premises, Cherkasky told Egan that negotiation of the Separation Agreement would have to wait until the resolution of MMC's litigation with the NYS AG.

28.    Still believing that MMC would ultimately fulfill its obligations to him, Egan waited.

29.    On or about January 31, 2005, MMC settled with the NYS AG.

30.    On or about February 8, 2005, Cherkasky reiterated MMC's obligations to Egan, telling him that MMC was ready to negotiate the Separation Agreement and that negotiations could be concluded in ten days. Cherkasky told Egan to have Bachelder contact Mike Petrullo, MMC's chief administrative officer. Two days later, Bachelder sent Petrullo the Separation Agreement for his review and approval.

31.    Despite having promised Egan again that MMC was prepared to fulfill its obligations, Cherkasky changed course one week later and, at that time, told Egan that MMC could no longer talk to Egan about the Separation Agreement.

32.    Bachelder, on Egan's behalf, made a third attempt, on or about November 4, 2005, to reopen discussions with MMC by sending the Separation Agreement to Leon Lichter, Vice President in MMC's Legal Department.

33.    Egan, on or about November 22, 2005, also discussed the matter with Jack Sinnott, MMC's Vice Chairman, Office of the CEO.   Sinnott again made clear that MMC would fulfill its obligations to Egan.

34.    Finally, Egan discussed the matter with Cherkasky on or about March 16, 2007. Cherkasky once again reiterated that MMC was prepared to fulfill its obligations and advised Egan that he would get back to him within thirty days. Cherkasky never contacted Egan again.

35.    Despite all of these efforts, and MMC's repeated acknowledgement of its obligations to Egan, MMC simply has refused to fulfill those obligations.  Moreover, MMC has also stopped paying Egan dividends on his MMC restricted stock and restricted stock units, claiming that Egan had "forfeited" his restricted shares and restricted stock units.  MMC also has cancelled Egan's option awards.

36.    To date, MMC has yet to pay Egan any amounts due him and continues to deprive him of his rights to restricted stock, restricted stock units and options.

37.    All conditions precedent to Egan's right to recover on the causes of action alleged herein have been performed or have occurred or been excused.

## FIRST CAUSE OF ACTION

(Breach of Contract – Special Severance Pay Plan)

38.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

39.    Pursuant to the Special Severance Pay Plan, MMC is obligated to issue Egan an amount of MMC stock equal to 90% of the restricted stock and restricted stock units (if any) which were forfeited at Egan's termination of employment.

40.    Despite due demand, MMC has refused to issue such stock.  MMC's failure to fulfill this obligation is a breach of the Special Severance Pay Plan.

41.    By virtue of the foregoing, Egan has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

(Breach of Contract – Restricted Stock and Restricted Stock Unit Awards)

42.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

8

43.    Pursuant to the terms of the grants of restricted stock and restricted stock units made to Egan during his employment with MMC, MMC is obligated to effect the vesting of such restricted stock and restricted stock units upon Egan's termination, and to pay Egan dividends (or dividend equivalent payments) on these shares.

44.    Egan was constructively terminated by MMC on December 7, 2004.

45.    Despite due demand, MMC has refused to consider Egan's restricted stock and restricted stock unit awards to be vested, insisting that Egan has "forfeited" his shares. MMC has also refused to pay Egan dividends on these shares since November 2005.

46.    MMC's failure to fulfill this obligation is a breach of the restricted stock and restricted stock unit awards.

47.    By virtue of the foregoing, Egan has been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

(Breach of Implied Contract For The Payment of Termination Benefits)

48.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

49.    MMC, through its words and actions, offered to give Egan, upon any involuntary termination of his employment without cause, at least the same termination package it consistently and regularly gave terminated MMC partners and senior officers.

50.    Egan relied on and accepted that offer by continuing his employment with MMC and not insisting on a written contract setting out the same rights.

51.    This created a binding implied-in-fact contract that MMC has breached by refusing, following Egan's involuntary termination without cause and due demand, to give Egan

9

at least the same termination package MMC consistently and regularly gave terminated MMC partners and senior officers.

52.    By virtue of the foregoing, Egan has been damaged in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION

(Breach of Implied Contract For The Payment of Severance Benefits)

53.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

54.    MMC, through its words and actions, offered to give Egan, upon any involuntary termination of his employment without cause, at least the same severance it consistently and regularly gave terminated managing directors of MMC subsidiaries.

55.    Egan relied on and accepted that offer by continuing his employment with MMC and not insisting on a written contract setting out the same rights.

56.    This created a binding implied-in-fact contract that MMC has breached by refusing, following Egan's involuntary termination without cause and due demand, to give Egan at least the same severance MMC consistently and regularly gave terminated managing directors of MMC subsidiaries.

57.    By virtue of the foregoing, Egan has been damaged in an amount to be proved at trial.

## FIFTH CAUSE OF ACTION

(Breach of Implied Contract For The Payment of Severance Benefits)

58.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

10

59.    By regularly and consistently providing severance at least equal to the severance provided under existing plans (such as the SPP and Restructuring SPP) to any employee involuntarily terminated without cause during the period covered by such plans (regardless of the eligibility requirements of such plans), MMC offered to give Egan, upon the involuntary termination of his employment without cause, severance at least equal to the severance provided under any plans covering the period during which Egan was terminated.

60.    Egan relied on and accepted that offer by continuing his employment with MMC and not insisting on a written contract setting out the same rights.

61.    This created a binding implied-in-fact contract that MMC has breached by refusing, following Egan's involuntary termination without cause and due demand, to give Egan severance at least equal to the severance provided under the plans existing at the time of Egan's termination.

62.    By virtue of the foregoing, Egan has been damaged in an amount to be proved at trial.

## SIXTH CAUSE OF ACTION

(Breach of Policy For The Payment of Termination Benefits)

63.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

64.    MMC engaged in a regular and consistent practice and policy of providing a package of benefits to MMC partners and senior officers who were involuntarily terminated without cause.

65.    Egan relied on that regular and consistent practice and policy by continuing his employment with MMC.

11

66.    MMC has breached this policy by refusing, despite due demand, to pay Egan, upon his involuntary termination without cause, at least the amount consistently and regularly given to other terminated MMC partners and senior officers upon their involuntary termination without cause.

67.    By virtue of the foregoing, Egan has been damaged in an amount to be proved at trial.

## SEVENTH CAUSE OF ACTION

(Breach of Policy For The Payment of Severance)

68.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

69.    MMC engaged in a regular and consistent practice and policy of providing at least a year's base salary plus bonus to managing directors of its subsidiaries who were involuntarily terminated without cause.

70.    Egan relied on that regular and consistent practice and policy by continuing his employment with MMC.

71.    MMC has breached this policy by refusing, despite due demand, to pay Egan, upon his involuntary termination without cause, at least the amount consistently and regularly given to other terminated managing directors of MMC subsidiaries.

72.    By virtue of the foregoing, Egan has been damaged in an amount to be proved at trial.

## EIGHTH CAUSE OF ACTION

(Breach of Policy For The Payment of Severance)

73.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

12

74.    MMC engaged in a regular and consistent practice and policy of providing severance at least equal to the severance provided under existing plans (such as the SPP and Restructuring SPP) to any employee involuntarily terminated without cause during the period covered by such plans (regardless of whether the employee satisfied the eligibility requirements of the plans).

75.    Egan relied on that regular and consistent practice and policy by continuing his employment with MMC.

76.    MMC has breached this policy by refusing, despite due demand, to pay Egan at least the amount of severance provided under any plan covering the period during which his employment was involuntarily terminated.

77.    By virtue of the foregoing, Egan has been damaged in an amount to be proved at trial.

## NINTH CAUSE OF ACTION

(Promissory Estoppel)

78.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

79.    MMC promised Egan on numerous occasions (both before and after his involuntary termination without cause) that he would receive at least the same package of termination benefits MMC regularly and consistently provided to terminated MMC partners and senior officers.

80.    Egan reasonably and foreseeably relied to his detriment on this promise by foregoing suit against MMC for wrongful termination and other wrongful actions MMC took during this time, and by spending legal fees on a lawyer to negotiate his Separation Agreement.

81.    MMC breached this promise by failing to provide Egan the promised benefits, despite due demand.

82.    As a result of his reliance on MMC's promise, Egan has been damaged in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

(Promissory Estoppel)

83.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

84.    MMC promised Egan on numerous occasions (both before and after his involuntary termination without cause) that he would receive no less than the same severance benefits MMC regularly and consistently provided to terminated managing directors of MMC subsidiaries.

85.    Egan reasonably and foreseeably relied to his detriment on this promise by foregoing suit against MMC for wrongful termination and other wrongful actions MMC took during this time, and by spending legal fees on a lawyer to negotiate his separation agreement.

86.    MMC breached this promise by failing to provide Egan the promised benefits, despite due demand.

87.    As a result of his reliance on MMC's promise, Egan has been damaged in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

(Promissory Estoppel)

88.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

14

89.    MMC promised Egan on numerous occasions (both before and after his involuntary termination without cause) that he would receive severance at least equal to the severance provided under any severance plans in force at the time of his termination (such as the SPP and Restructuring SPP).

90.    Egan reasonably and foreseeably relied to his detriment on this promise by foregoing suit against MMC for wrongful termination and other wrongful actions MMC took during this time, by spending legal fees on a lawyer to negotiate his separation agreement, and by not following the administrative claims procedures set forth in such plans.

91.    MMC breached this promise by failing to provide Egan the promised benefits, despite due demand.

92.    As a result of his reliance on MMC's promise, Egan has been damaged in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

(Breach of The SPP)

93.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

94.    Pursuant to the SPP, Egan was entitled to severance, upon his involuntary termination without cause, in an amount equal to one year's base salary.

95.    Despite due demand, Egan has not been paid this amount.  This constitutes a breach of the SPP.

96.    By virtue of the foregoing, Egan has been damaged in an amount to be determined at trial.

97.    Egan is empowered to bring suit for such relief under 29 U.S.C. § 1132.

## THIRTEENTH CAUSE OF ACTION

(Breach of The Restructuring SPP)

98.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37, inclusive, as if fully set forth herein.

99.    Pursuant to the Restructuring SPP, Egan was entitled to severance, upon his involuntary termination without cause, in an amount equal to one year's base salary plus 60% of his year 2003 bonus.

100.    Despite due demand, Egan has not been paid this amount.  This constitutes a breach of the Restructuring SPP.

101.    By virtue of the foregoing, Egan has been damaged in an amount to be determined at trial.

102.    Egan is empowered to bring suit for such relief under 29 U.S.C. § 1132.

WHEREFORE, Plaintiff requests judgment as follows:

(a)    On the First Cause of Action, damages in an amount to be determined at trial;

(b)    On the Second Cause of Action, damages in an amount to be determined at trial;

(c)    On the Third Cause of Action, damages in an amount to be determined at trial;

(d)    On the Fourth Cause of Action, damages in an amount to be determined at trial;

(e)    On the Fifth Cause of Action, damages in an amount to be determined at trial;

(f)    On the Sixth Cause of Action, damages in an amount to be determined at trial;

(g)    On the Seventh Cause of Action, damages in an amount to be determined at trial;

(h)    On the Eighth Cause of Action, damages in an amount to be determined at trial;

(i)    On the Ninth Cause of Action, damages in an amount to be determined at trial;

(j)    On the Tenth Cause of Action, damages in an amount to be determined at trial;

16

(k)    On the Eleventh Cause of Action, damages in an amount to be determined at trial;

(l)    On the Twelfth Cause of Action, damages in an amount to be determined at trial;

(m)    On the Thirteenth Cause of Action, damages in an amount to be determined at

trial; and

(l)    The costs and disbursements of this action, including attorney's fees, together

with such other and further relief as this Court deems just, proper and equitable.

Dated: New York, New York
       October 10, 2007

FOLEY & LARDNER LLP

By: _____

Peter N. Wang (PW 9216)
Jeremy L. Wallison (JW 6707)
90 Park Avenue
New York, New York 10016
(212) 682-7474

*Attorneys for Plaintiff Roger Egan*

17

# EXHIBIT A

**BLO DRAFT – 11/12/04**
**FOR PURPOSES OF NEGOTIATING SETTLEMENT ONLY**

Proposed Separation Agreement (the "Agreement")
Between M Co. (the "Company") and Mr. R (the "Executive")

| | | |
|---|---|---|
| 1. | Retirement Date | The Company to bridge the Executive to early retirement at age 55. For all purposes, the Executive shall be deemed to have satisfied the requirements for early retirement. |
| 2. | Cash Severance | $5.5 million (representing 2 times base salary ($800,000) and 2003 bonus (cash and the value of restricted shares) ($1,950,000)), payable in a lump sum within 10 days after the execution of the Agreement (the "Effective Date"). Pro-rata bonus (cash and restricted shares) for 2004 (approximately $1.625 million), payable when bonuses are paid to other senior executives. |
| 3. | Treatment of Equity Awards | As of the Effective Date, full vesting of all outstanding equity awards pursuant to the applicable stock incentive plan, including, but not limited to, stock options, restricted shares and restricted stock units (including RUSs and RURs), with all vested stock options remaining exercisable for the remainder of their original terms. Notwithstanding anything to the contrary in the Company's plans or award agreements, the Executive's equity awards shall not be subject to forfeiture or clawback for any reason. In the event that any stock options are repriced by the Company or any equity awards are otherwise adjusted, the Executive shall be entitled to participate fully in such repricing or adjustment on the same basis as other senior executives of the Company. In addition, in the event of a change in control of the Company, the Executive's outstanding equity awards shall be treated no less favorably than the outstanding equity awards held by senior executives of the Company. |
| 4. | Health and Welfare Benefits | The Executive and his eligible dependents shall continue to participate, at the same cost to the Executive as if he remained a senior executive of the Company, in all the Company's health and welfare plans, programs and arrangements, until the earlier of (i) the second anniversary of the Effective Date or (ii) the date or dates upon which the Executive receives comparable coverage from a subsequent employer. In the event that the Executive and/or his eligible dependents are unable to participate in any plan, program or arrangement, the |

Company shall provide him with an amount, which after taxes, will enable the Executive to purchase equivalent coverage. In all events, the Executive and his eligible dependents shall be entitled to participate in the Company's retiree medical program as such program is in effect as of the Effective Date.

5.  Stock Investment
    Supplemental Plan          TBD.

6.  Pension                    The Company shall pay the Executive an amount which represents the difference between the Executive's entitlements under the retirement plans (including the qualified plan, the Benefit Excess Plan ("BEP") and the Supplemental Retirement Plan ("SERP")) at age 55 and what the Executive would have been entitled to if he had remained employed by the Company and retired at age 60 and had a final average compensation (based on the average of the last 5 years prior to age 60) of $1 million (this assumes a 5% annual increase in the Executive salary from 2004 to 2010, when the Executive will be 60). The Executive shall be entitled to elect a lump-sum payment for the non-annuity portion of his BEP and SERP benefits.

7.  Other                      For one year, the Executive shall be provided with office space that is comparable to his current office space, office and administrative support and the full-time services of his current secretary. The Executive shall be entitled to retain his laptop computer and BlackBerry. For two years, the Executive shall continue to be entitled to his current perquisites (including any income tax gross up).

8.  Reimbursement of
    Business Expenses          The Company shall promptly reimburse the Executive for reasonable business expenses incurred by him through the Effective Date and shall reimburse the Executive for legal fees and other expenses incurred by him in negotiating his termination of employment by the Company.

9.  Indemnification/D&O
    Liability Insurance        The Executive shall continue to be indemnified (and advanced expenses) to the fullest extent permitted under applicable law and/or pursuant to the corporate governance documents of the Company and its affiliates (including the insurance broker). The Executive shall continue to be covered under the Company's directors' and officers' liability insurance policies (as well as those of any affiliate for which the Executive was a director or

officer) until suits can no longer be brought against him as a matter of law. The Company agrees (i) the Executive shall have the right to be represented by separate counsel in connection with any investigation, suit or action relating to his duties or actions as an officer or director of the Company or any affiliate (including the insurance broker) ("Covered Action") and (ii) to advance to the Executive fees and expenses (including, without limitation, his attorneys' fees) incurred in connection with any such Covered Action, including, but not limited to, fees and expenses incurred in his representation by Cyrus R. Vance, Jr. and the law firm of Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C. The Executive shall only be required to repay any such advance if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that the Executive is not entitled to be indemnified for such expenses, in which event the Executive shall only be required to repay any such advance on an after-tax basis.

10. Access to Company Materials

The Company agrees the Executive shall have full and unfettered access to any and all materials (whether in hard copy, electronic or other form) in the possession or control of the Company (or any affiliate) which would be of assistance to the Executive and/or his counsel in connection with the Executive's preparation for, or defense of, any Covered Action.

11. Non-Disparagement/
Company Statements

The Company agrees that it shall not, and it shall cause its directors and senior officers (and those of any affiliate) not to, make any statement which would disparage the Executive or impair his reputation. The Executive agrees that he shall not make any statement which would disparage the Company or its directors and senior executives (or those of any affiliate). The Company agrees to provide a letter of recommendation for the Executive affirmatively stating his positive contributions to the Company and that the Executive's termination of employment was not as a result of any culpability in connection with the current investigations (form of statement to be provided as an exhibit to the Agreement). It further agrees to respond to any other third party inquiries as to the Executive's employment and termination thereof by providing a statement to the same effect.

37012-1

12. Arbitration

Any disputes between the Company and the Executive relating to the Agreement will be settled in the Borough of Manhattan, by binding and final arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The Company shall advance the Executive his expenses (including any attorneys' fees) in connection with any claim, subject to the Executive's obligation to repay such advance, on an after-tax basis, in whole or in part, if and to the extent the arbitrator(s) determine(s) that there was no reasonable basis for the Executive's position in respect of a particular claim.

13. No Mitigation/No Offset

The Executive shall be under no obligation to seek other employment and there shall be no offset against amounts due to him on account of any remuneration or benefits provided by subsequent employment he may obtain or on account of any claims the Company or any affiliate may have against him.

14. Tax Indemnity

(a)     If the termination of the Executive's employment is deemed by the Internal Revenue Service to be in connection with a change in control of the Company, the Company agrees to fully gross up the Executive for any excise tax liability and the Executive agrees to cooperate with the Company to rebut any presumption that his termination was in connection with a change in control.

(b)     The Executive is a participant in various plans operated by the Company that provide non-qualified deferred compensation. In the event that the Executive is subject to additional tax liability under Section 409A of the Internal Revenue Code, including a deemed interest charge, the 20% additional tax and the present value cost of incurring federal and state tax liability before he receives such deferred compensation (including any retirement benefits and stock awards), the Company agrees to fully gross up the Executive for all such additional tax liability. The Executive agrees that he will cooperate with the Company in challenging the assessment of such additional tax liability.

15. Representations

The Company shall make standard representations and warranties regarding its authority to enter into the Agreement, etc.

16. Governing Law

New York.

37012-1

4