UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

ROGER EGAN,                                    :
                                               :
                              Plaintiff,       :      07 Civ. 7134 (SAS)
                                               :
                  - against -                  :
                                               :
MARSH & MCLENNAN COMPANIES, INC.,              :
MARSH USA INC. SEVERANCE PAY PLAN,             :
MARSH INC. FALL 2004 RESTRUCTURING             :
SEVERANCE PAY PLAN,                            :
                                               :
                              Defendants.      :
———————————————————— x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 3

    A.    The Parties ......................................................................................... 3

    B.    Egan's Employment with Marsh and Supposed Benefits ....................... 3

    C.    Egan's Departure from Marsh ............................................................. 6

    D.    The Claims in this Case ...................................................................... 8

ARGUMENT ...................................................................................................................... 9

I.    PLAINTIFF'S SECOND CAUSE OF ACTION FAILS TO STATE A
CLAIM BASED UPON THE PLAIN LANGUAGE OF THE
APPLICABLE RESTRICTED STOCK AND RSU AWARDS ........................ 9

    A.    Plaintiff's Restricted Stock and Unpaid Dividends Properly Were
Forfeited Upon Plaintiff's Termination ............................................... 10

    B.    Plaintiff's Restricted Stock Units Rightfully Were Forfeited Upon
Plaintiff's Termination ....................................................................... 11

II.    PLAINTIFF'S THIRD THROUGH ELEVENTH COMMON LAW
CAUSES OF ACTION SHOULD BE DISMISSED ..................................... 13

    A.    Plaintiff's Common Law Claims are Preempted by ERISA and
Any Supposed Oral Promises or "Regular and Consistent
Practices" are Unenforceable Modifications to Existing ERISA
Severance Plans ................................................................................. 15

    B.    Even if Construed as ERISA claims, Plaintiff's Promissory
Estoppel Claims Should Be Dismissed Because He Fails to Allege
"Extraordinary Circumstances" .......................................................... 23

III.    PLAINTIFF'S TWELFTH AND THIRTEENTH CAUSES OF ACTION
SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILED TO
EXHAUST ADMINISTRATIVE REMEDIES AND IS INELIGIBLE IN
ANY EVENT ........................................................................................ 25

    A.    Plaintiff's Claims for Benefits Under ERISA Are Deficient
Because Plaintiff Failed to Exhaust the Required Administrative
Claims Procedure ............................................................................... 26

    B.    Plaintiff is Ineligible for SPP and Restructuring SPP Benefits .............. 28

CONCLUSION .................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. AT&T Corp.*,
  2007 WL 1655668 (N.D.N.Y. June 5, 2007)........................................................................20

*Aetna Health Inc. v. Davila*,
  542 U.S. 200 (2004)................................................................................................................16

*Algie v. RCA Global Commc'n, Inc.*,
  891 F. Supp. 839 (S.D.N.Y. 1994) ........................................................................................16

*Andrews v. Metro North Commuter R.R. Co.*,
  882 F.2d 705 (2d Cir. 1989)..................................................................................................12

*Aramony v. United Way Replacement Benefit Plan*,
  191 F.3d 140 (2d Cir. 1999)..................................................................................................23

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)......................................................................................................9

*Bell v. Pfizer Inc.*,
  499 F. Supp. 2d 404 (S.D.N.Y. 2007)...................................................................................23

*Bessemer Trust Co. v. Branin*,
  498 F. Supp. 2d 632 (S.D.N.Y. 2007)...................................................................................22

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991)....................................................................................................10

*Deutsch v. Kroll Assocs. Inc*,
  2003 WL 22203740 (S.D.N.Y. Sept. 23, 2003)........................................................16, 22, 23

*Devlin v. Transp. Commc'ns Int'l Union*,
  173 F.3d 94 (2d Cir. 1999)....................................................................................................23

*Dow Jones & Co. v. Int'l Sec. Exch., Inc.*,
  451 F.3d 295 (2d Cir. 2006)....................................................................................................9

*Feifer v. Prudential Ins. Co. of Am.*,
  306 F.3d 1202 (2d Cir. 2002).................................................................................................16

*Flaherty v. Metromail Corp.*,
  235 F.3d 133 (2d Cir. 2000)..................................................................................................30

*Greifenberger v. Hartford Life Ins. Co.*,
   2003 WL 22990093 (S.D.N.Y. Dec. 18, 2003),
   *aff'd*, 131 Fed. Appx. 756 (2d Cir. 2005)...................................................................26

*Gilbert v. Burlington Indus., Inc.*,
   765 F.2d 320 (2d Cir. 1985),
   *aff'd*, 477 U.S. 901 (1986)..........................................................................................15

*Haft v. Dart Group Corp.*,
   841 F. Supp. 549 (D. Del. 1993).........................................................................12, 13

*Karl v. ASARCO, Inc.*,
   1998 WL 107113 (S.D.N.Y. Mar. 11, 1998),
   *aff'd*, 166 F.3d 1200 (2d Cir. 1998)...........................................................................29

*Keiser v. CDC Inv. Mgmt. Corp.*,
   2004 WL 516212 (S.D.N.Y. March 17, 2004)..........................................................23

*Kennedy v. Empire Blue Cross & Blue Shield*,
   989 F.2d 588 (2d Cir. 1993)........................................................................................26

*Matusovsky v. Merrill Lynch*,
   186 F. Supp. 2d 397 (S.D.N.Y. 2002)..........................................................................9

*Miller v. Citicorp*,
   1997 WL 96569 (S.D.N.Y. Mar. 4, 1997)...................................................................23

*Morlino v. Staten Island Univ. Hosp.*,
   1998 WL 160937 (E.D.N.Y. Apr. 1, 1998),
   *aff'd*, 173 F.3d 845 (2d Cir. 1999)............................................................................21

*Nelson v. Nielsen Media Research Inc.*,
   207 F. Supp. 2d 300 (S.D.N.Y. 2002)........................................................................16

*Owen v. Georgia-Pacific Corp.*,
   389 F. Supp. 2d 382 (D. Conn. 2005).........................................................................20

*Perreca v. Gluck*,
   295 F.3d 215 (2d Cir. 2002)........................................................................................16

*Phansalkar v. Anderson Weinroth & Co., L.P.*,
   2002 WL 1402297 (S.D.N.Y. June 26, 2002), *vacated & remanded*
   *in part on other grounds*, 344 F.3d 184 (2d Cir. 2003)............................................23

*Ramos v. SEIU Local 74 Welfare Fund*,
   2002 WL 519731 (S.D.N.Y. April 5, 2002)........................................................25, 28

*Robinson v. Sheet Metal Workers' Nat'l Pension Fund, Plan A,*
    441 F. Supp. 2d 405 (D. Conn. 2006) ............................................................25

*Sandler v. Marconi Circuit Tech. Corp.,*
    814 F. Supp. 263 (E.D.N.Y. 1993) ...........................................................19, 20

*Shamoun v. Bd. of Trustees,*
    357 F. Supp. 2d 598 (E.D.N.Y. 2005) .........................................................27

*Smith v. Dunham-Bush, Inc.,*
    959 F.2d 6 (2d Cir. 1992).................................................................17, 18, 19, 20

*Snyder v. Elliot W. Dann Co., Inc.,*
    854 F. Supp. 264 (S.D.N.Y. 1994) ..............................................................22

*Subaru Distribs. Corp. v. Subaru of Am., Inc.,*
    425 F.3d 119 (2d Cir. 2005).........................................................................3

*Tappe v. Alliance Capital Mgmt. L.P.,*
    177 F. Supp. 2d 176 (S.D.N.Y. 2001) .........................................................22

*Tamondong v. GMAC Commercial Credit LLC,*
    2006 WL 3377592 (S.D.N.Y. Nov. 17, 2006) .............................................28

*Thompson v. General Elec. Co.,*
    2002 WL 482862 (S.D.N.Y. March 29, 2002) ............................................24

*Ullrich v. Linotype-Hell Co.,*
    187 F. Supp. 2d 68 (E.D.N.Y. 2002) .......................................................20, 21

*Wallace v. New York City Dep't of Corrections,*
    1996 WL 586797 (E.D.N.Y. Oct. 9, 1996) ...............................................11, 12

*Weinberg v. Mizuho Capital Mkts. Corp.,*
    2003 WL 22462022 (S.D.N.Y. Oct. 30, 2003) .............................................22

*Weingold v. Western Union World Commc'ns Inc.,*
    1991 WL 90742 (S.D.N.Y. May 23, 1991) ..................................................21

*Welland v. Citigroup, Inc.,*
    2003 WL 22973574 (S.D.N.Y. Dec. 17, 2003),
    *aff'd,* 116 Fed. Appx. 321 (2d Cir. 2004)................................................11, 26

*Zikakis v. Staubach Retail Services, Inc.,*
    2005 WL 2347852 (S.D.N.Y. Sept. 26, 2005).............................................24

*Zydel v. Dresser Indus., Inc.*,
   764 F. Supp. 277 (W.D.N.Y. 1991) ............................................................................21, 22

## <u>Statutes</u>

29 U.S.C. § 1102 ............................................................................................................18

29 U.S.C. § 1132 ......................................................................................................25, 26

29 U.S.C. § 1144 ............................................................................................................15

Defendants Marsh & McLennan Companies, Inc. ("MMC"), Marsh USA Inc. Severance Pay Plan ("SPP"), and Marsh Inc. Fall 2004 Restructuring Severance Pay Plan (the "Restructuring SPP") respectfully submit this memorandum of law in support of their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) the Second through Thirteenth Causes of Action of the Amended Complaint of plaintiff Roger Egan ("plaintiff" or "Egan"), dated October 10, 2007.

## PRELIMINARY STATEMENT

On November 8, 2004, plaintiff Roger Egan, the former president and chief operating officer of Marsh, Inc. ("Marsh"), a subsidiary of MMC, was asked to step down from his position because he was accountable for the areas within Marsh that were the focus of investigations by the New York Attorney General's office. He was never asked to resign or otherwise terminate from the company and continued receiving full compensation and benefits until he chose to resign from the company on April 8, 2005, citing his desire to "get on with [his] life." A few days later, it was announced that plaintiff would serve as the Chief Executive Officer of Integro, a newly-formed insurance brokerage and risk management firm that directly competes with Marsh.

More than two years later, on July 11, 2007 — ignoring all requisite administrative claims procedures — plaintiff sued MMC in state court, requesting benefits under MMC's severance plans, equity plan, and retirement program. MMC removed the action to this Court and moved to dismiss the majority of plaintiff's claims because, *inter alia*, they were preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq.*, and the documents relied upon in his Complaint conclusively demonstrated that he was not entitled to the benefits he sought.

In response to this motion, plaintiff filed an Amended Complaint dropping his claim for retirement benefits and simply deleting all references to the damaging facts and documents previously incorporated. Presumably recognizing, as MMC pointed out in its initial motion, that he does not qualify for benefits under the two severance plans, plaintiff now fills his Amended Complaint with a slew of common law claims contending that he is entitled to severance benefits equivalent to those given under the severance plans (as well as additional severance benefits) — *regardless of the eligibility or administrative requirements of the formal severance plans* — because MMC supposedly "regularly and consistently" provided these benefits to its employees and orally promised to "take care of" Egan. Plaintiff further seeks benefits under the formal plans themselves but again does not allege that he initiated, let alone exhausted, the required administrative claims procedure before seeking relief in this Court.

Plaintiff has now had two opportunities to plead his case and has failed in both attempts. He again fails to plead facts demonstrating that he is eligible for the equity awards that he seeks. His state law claims — for severance benefits equal to those given under the formal plans as well as add-on benefits — continue to be preempted by ERISA regardless of his allegations of oral assurances or supposed common practices at MMC. Indeed, any alleged promises or informal customs are foreclosed by ERISA's prohibition of oral modifications to ERISA plans. Finally, plaintiff's ERISA claims for benefits under the formal severance plans remain deficient not only because plaintiff is ineligible for these benefits, but also because ERISA mandates the exhaustion of administrative remedies before filing suit so that claim administrators (rather than the courts) are responsible for initially evaluating benefit claims and to ensure that there is a complete record that is ripe for judicial review. For the reasons set forth more fully below, plaintiff's second through thirteenth causes of action should be dismissed.

## STATEMENT OF FACTS

The facts described below are based on the allegations of the Amended Complaint, which defendants dispute in many respects but accept as true for purposes of this motion, as well as several documents incorporated by reference in this action.  On a motion to dismiss, this Court may consider "any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).

### A.    The Parties

Defendant MMC is a premier global professional services firm that owns companies engaged in risk and insurance services, risk consulting and technology, and investment management.  (Am. Compl. ¶ 6.)  Defendant Marsh USA Inc. Severance Pay Plan ("SPP") is a severance plan sponsored by Marsh USA Inc. and Marsh Inc. Fall 2004 Restructuring Severance Pay Plan (the "Restructuring SPP") is a severance plan sponsored by Marsh, Inc. ("Marsh").  (*Id.*  ¶¶ 7-8.)  Plaintiff Roger Egan is a former partner of MMC and the former president and chief operating officer of Marsh, the risk and insurance services subsidiary of MMC.  (*Id.* ¶¶ 1, 9.)

### B.    Egan's Employment with Marsh and Supposed Benefits

Egan essentially alleges that over the years he became entitled to certain benefits that he is now seeking in this action.  For example, plaintiff claims that on November 21, 1996, he was made a participant in MMC's Special Severance Pay Plan ("SSPP") which provides benefits to certain terminated MMC executives.  (Am. Compl. ¶ 11.)[1]

---

[1]     The SSPP will not be discussed at length here because, although plaintiff's claim for benefits under this plan is without merit, it is not a subject of the present motion to dismiss.

In addition, plaintiff alleges that he was awarded restricted stock and restricted stock units ("RSUs") and MMC breached these equity awards by insisting that Egan forfeited these shares and refusing to pay dividends since November 2005. (Am. Compl. ¶¶ 45-46.) Specifically, plaintiff claims entitlement to restricted stock and RSUs that he received pursuant to a 2004 Restricted Stock Award dated March 17, 2004 (the "2004 Restricted Stock Award") and a January 16, 2003 Restricted Stock Unit Award (the "2003 Restricted Stock Unit Award") issued under the MMC 2000 Senior Executive Incentive and Stock Award Plan (the "Stock Award Plan"). (Am. Compl. ¶ 10; Declaration of Robert N. Holtzman in Support of Motion to Dismiss Plaintiff's Amended Complaint ("Holtzman Decl."), Exhs. A ("Compl.") ¶¶ 13-21, 52-56, B-D.)[2]

Plaintiff also alleges that MMC had at least two "formal 'plans'" for the payment of severance benefits to certain employees who were involuntarily terminated without cause, namely the SPP and the Restructuring SPP, which provide severance payments equal to one year's base salary in the case of the SPP or one year's base salary plus 60% of the individual's 2003 bonus in the case of the Restructuring SPP. (Am. Compl. ¶ 18.)

Notably absent from plaintiff's initial Complaint is his next claim that MMC had "a consistent and regular policy" of paying certain severance and retirement benefits to MMC partners and senior officers if they were involuntarily terminated without cause "notwithstanding

---

[2]   Although plaintiff attempts to avoid the language in the equity plans by speaking in generalities, his initial Complaint set forth in detail the two restricted stock and restricted stock unit awards under which plaintiff is claiming benefits. (Compl. ¶¶ 13-21.)

In addition, plaintiff's mention of "deferred stock units" and "stock options" (Am. Compl. ¶ 10) — presumably in an effort to generalize his allegations — will not be addressed because plaintiff does not actually set forth any cause of action related to these supposed benefits. Rather, as with his original Complaint, plaintiff claims only that MMC breached the "restricted stock and restricted stock unit awards." (Am. Compl. ¶ 46.)

the terms of any written plans and awards to the contrary[.]" (*Id.* ¶ 12.) Specifically, plaintiff

claims that — "upon information and belief" — MMC had a policy of paying to those unnamed

partners and senior officers:

> cash severance in an amount equal to a multiple of the individual's
> base salary and bonus (including stock bonus), a prorated portion
> of the individual's bonus in the year of his/her termination,
> immediate vesting of all restricted stock and restricted stock unit
> awards, an extension of the exercise period of the individual's
> stock option awards for the remainder of the exercise term of the
> awards, a continuation of the individual's health benefits, the
> immediate payment of the individual's retirement pension at the
> 'bridged' rate equal to the amount the individual would have been
> entitled to had he/she waited until the age of 62 to retire, and the
> continuation of indemnification/D&O liability insurance.

(*Id.*) Plaintiff alleges that in 2001, he spoke with MMC's then chairman, Jeffrey Greenberg,

about executing a written employment contract and Greenberg allegedly responded that a

contract was unnecessary given MMC's "consistent practice and policy of awarding generous

termination packages to its senior people, and especially MMC partners[.]" (*Id.* ¶ 14.) Egan

further alleges that Greenberg promised that MMC would "'take care' of Egan as it took care of

all its senior people." (*Id.*) Egan claims that he "relied on MMC's history of dealing with its

partners and senior officers, and on the assurances he received that he would be treated at least as

well as they had been treated" in continuing his employment with MMC and passing up offers of

employment from other companies. (*Id.* ¶ 15.)

      Egan next asserts — again, "upon information and belief" — that MMC had a

"regular and consistent policy and practice" of paying severance of at least a year's base salary

plus bonus, to managing directors of MMC subsidiaries (such as Marsh) upon involuntary

termination without cause. (*Id.* ¶ 16.) According to Egan, he relied on this practice as well in

continuing his employment with MMC. (*Id.* ¶ 17.)

Finally, plaintiff alleges that — "upon information and belief" — MMC had a "regular and consistent policy and practice" of paying severance equal to the severance provided under its formal plans like the SPP and the Restructuring SPP to any employee involuntary terminated without cause during the time period covered by such plans "regardless of whether [the] particular employee fell within the literal eligibility requirements of the [plans][.]" (*Id.* ¶ 19.) This supposed practice allegedly "contributed to [plaintiff's] decision to continue his employment with MMC." (*Id.*)

### C.   Egan's Departure from Marsh

In 2004, the New York Attorney General launched an investigation into the activities of Marsh. (*Id.* ¶ 20) As a result, in the fall of 2004, Michael G. Cherkasky, President and Chief Executive Officer of MMC, asked Egan to step down.[3] (*Id.* ¶ 22.) As explained by Cherkasky in MMC's press release of November 8, 2004, Egan was asked to step down from his specific position because he was "accountable for the areas of the business that have been the focus of investigations by the New York Attorney General's office, and therefore, we thought it was appropriate to make these changes." (Holtzman Decl., Exh. E at 1.)[4] Plaintiff, however, continued to be employed by Marsh, receiving his full compensation and benefits. (Am. Compl. ¶ 24; Holtzman Decl., Exh. E at 1.)

---

[3]    Plaintiff uses the word "resign" in his Amended Complaint and "step down from his position" in his initial Complaint. (*Compare* Am. Compl. ¶ 22 *with* Compl. ¶ 26.) The latter is clearly more accurate as plaintiff admitted in his initial Complaint that he did not choose to resign until April 8, 2005. (Compl. ¶ 37.)

[4]    Plaintiff quoted from and incorporated by reference MMC's press release in his initial Complaint. (Compl. ¶¶ 26-27.) Plaintiff cannot avoid the damaging language elsewhere in the press release, pointed out in defendant's initial motion to dismiss, by presenting the same allegations without including quotation marks around the press release language. (*Compare with* Am. Compl. ¶ 22.)

Plaintiff alleges that Cherkasky "reiterated MMC's policy with respect to the benefits Egan would be entitled to upon his termination — explicitly advising Egan to hire a lawyer so that Egan and MMC could reach a 'generous settlement.'" (Am. Compl. ¶ 23.)  Egan retained Joseph Bachelder and presented Cherkasky with a proposed separation agreement ("Separation Agreement") that included provisions regarding severance, health care benefits, treatment of equity awards, and pension plan benefits. (Am. Compl. ¶ 25; Exh. B to Am. Compl.)  According to plaintiff, the terms of this proposed Separation Agreement were based upon termination packages that MMC "regularly and consistently" provided to other terminated partners and senior officers over the years. (Am. Compl. ¶ 25.)

On December 7, 2004, MMC supposedly asked plaintiff to vacate the premises and denied him access to its offices, his MMC email account, and his files. (Am. Compl. ¶ 26.)  Egan now claims that these actions constituted a constructive termination. (*Id.* ¶ 26.)  Two weeks later, Egan claims that Cherkasky informed him that "negotiations of the Separation Agreement would have to wait until after MMC settled with the NYS AG." (*Id.* ¶ 27.)

MMC settled with the New York State Attorney General on January 31, 2005. (*Id.* ¶ 29.)  On February 8, 2005, Cherkasky supposedly "reiterated MMC's obligations to Egan, telling him that MMC was ready to negotiate the Separation Agreement and that negotiations could be concluded in ten days." (*Id.* ¶ 30.)  Cherkasky allegedly asked plaintiff to have his counsel contact Mike Petrullo, MMC's Chief Administrative Officer, and Egan's counsel supposedly sent the alleged Separation Agreement to Petrullo two days later. (*Id.*)

A week later, Cherkasky allegedly "changed course" and told Egan that MMC could no longer talk to him about the Separation Agreement. (*Id.* ¶ 31.)  About two months later, on April 8, 2005, Egan chose to resign from MMC, citing the need to "get on with [his] life."

(Holtzman Decl., Exh. F.)[5]  Just a few days later – on or about April 15, 2005 – it was announced

that plaintiff would serve as the Chief Executive Officer of Integro, a newly-formed insurance

brokerage and risk management firm that directly competes with Marsh.

Plaintiff allegedly attempted to "reopen discussions with MMC" more than six

months later by sending the Separation Agreement to Leon Lichter, Vice President in MMC's

Legal Department, on about November 4, 2005.  (Am. Compl. ¶ 32)   On November 22, 2005,

Egan allegedly discussed the matter with Jack Sinnott, MMC's Vice Chairman, Office of the

CEO, who supposedly "again made clear that MMC would fulfill its obligations to Egan." (*Id.*

¶ 33.)  Finally, on or about March 16, 2007, Cherkasky allegedly "reiterated that MMC was

prepared to fulfill its obligations and advised Egan that he would get back to him within thirty

days." (*Id.* ¶ 34.)  Egan alleges that Cherkasky did not contact him.

### D.     The Claims in this Case

On July 11, 2007, plaintiff bypassed all administrative claims procedures and

sued MMC in state court, alleging in three common law breach of contract claims that he was

entitled to benefits under MMC's formal severance plans (SSPP, SPP, and Restructuring SPP),

the Stock Award Plan, and MMC's retirement program.  He also pleaded a promissory estoppel

claim based upon Cherkasky's supposed promise that MMC would provide Egan with a

"generous settlement." (Compl. ¶¶ 46-65.)

On August 10, 2007, MMC removed the action to this Court and shortly

thereafter moved to dismiss the majority of plaintiff's claims because the claims were preempted

by ERISA or otherwise failed to state a claim upon which relief may be granted.  On October 10,

---

[5]      Plaintiff fails to mention this central fact in his Amended Complaint even though he
pleaded this critical incident in his initial Complaint and even incorporated by reference his
resignation letter. (Compl. ¶ 37.)

8

2007, the day that his response to MMC's motion to dismiss was due, plaintiff filed an Amended

Complaint with thirteen causes of action. Notwithstanding the preview of MMC's defenses,

plaintiff's Amended Complaint remains deficient for many of the same reasons set forth in

MMC's original motion to dismiss.

## ARGUMENT

To survive dismissal under Fed. R. Civ. P. 12(b)(6), "plaintiff must provide the

grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief

above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d

Cir. 2007) (citation omitted). While a motion to dismiss requires that the Court accept as true the

allegations in the Complaint, "conclusory allegations unsupported by factual assertions . . . fail[]

even the liberal standard of Rule 12(b)(6)." *Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d

295, 307 (2d Cir. 2006) (citation omitted). This Court may consider documents that are integral

to the Complaint but if "plaintiff's allegations are contradicted by such a document, those

allegations are insufficient to defeat a motion to dismiss." *Matusovsky v. Merrill Lynch*, 186 F.

Supp. 2d 397, 400 (S.D.N.Y. 2002) (citations omitted).

## I.     PLAINTIFF'S SECOND CAUSE OF ACTION FAILS TO STATE A CLAIM BASED UPON THE PLAIN LANGUAGE OF THE APPLICABLE RESTRICTED STOCK AND RSU AWARDS

In his Second Cause of Action, plaintiff alleges that MMC breached the

"restricted stock and restricted stock unit awards" by forfeiting Egan's shares and refusing to pay

dividends on the forfeited shares. (Am. Compl. ¶¶ 45-46.) This cause of action should be

dismissed because it is clear from the face of the Stock Award Plan and attendant award

agreements that MMC is not in breach.

As a threshold matter, plaintiff's initial Complaint set forth in detail the two

restricted stock and RSU awards under which plaintiff is claiming benefits. (Compl. ¶¶ 13-21.)

Defendant thereafter filed a motion to dismiss, detailing how the plain language of the stock award plans warranted dismissal.   Presumably in an effort to avoid the fatal language of the documents, plaintiff amended his Complaint to delete the specific references to the particular equity plans.  (Am. Compl. ¶¶ 10, 35, 36.)  Plaintiff clearly cannot thwart a motion to dismiss simply by deleting references to the documents that plainly show the deficiency of his claim and instead cloaking his Complaint in generalities. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F. 2d 42, 47-48 (2d Cir. 1991) (holding that "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attacking the complaint for its failure to state a claim because plaintiff should not so easily be allowed to escape the consequences of its own failure").

### A.   Plaintiff's Restricted Stock and Unpaid Dividends Properly Were Forfeited Upon Plaintiff's Termination

The Stock Award Plan states that "[u]pon termination of employment (as determined by the Committee) during the applicable restriction period, Restricted Stock, and any accrued but unpaid dividends or Dividend Equivalents, that is or are then subject to a risk of forfeiture shall be forfeited."  (Holtzman Decl., Exh. D § 6(d)(ii) at 8.)  In addition, the 2004 Restricted Stock Award Agreement governing the restricted stock at issue here confirms that plaintiff's restricted stock properly was forfeited.  The restricted stock awarded in that agreement was scheduled to vest on January 1, 2012.  (Holtzman Decl., Exh. B § I.A at 1; Compl. ¶ 18.) Prior to such vesting, if plaintiff "cease[s] to be an active employee of the Company . . . for any reason other than death, permanent disability, or normal or deferred retirement . . . , all of [his] rights, title and interest in and to the restricted stock shall be forfeited."  (Holtzman Decl., Exh. B § IV.D at 2.)  Thus, for example, the restricted stock is to be forfeited even if the employee's

employment is terminated involuntarily and without cause. It is undisputed that plaintiff ceased to be an active employee of MMC prior to the applicable vesting date for reasons other than death, permanent disability or retirement. Therefore, his restricted stock and unpaid dividends properly were forfeited. *See Welland v. Citigroup, Inc.*, 2003 WL 22973574, at *12 (S.D.N.Y. Dec. 17, 2003), *aff'd*, 116 Fed. Appx. 321 (2d Cir. 2004) (rejecting breach of contract claim because Stock Incentive Plan expressly provided for forfeiture of unvested restricted stock upon employee's termination).

### B.      Plaintiff's Restricted Stock Units Rightfully Were Forfeited Upon Plaintiff's Termination

Similarly, the 2003 Restricted Stock Award Agreement sets forth a vesting date of January 16, 2006 but states that the employee shall not be entitled to receive any RSUs not theretofore vested if his or her employment is terminated due to, among other things, the employee's resignation, unless the resignation is the result of total disability, retirement or for "Good Reason." (Holtzman Decl., Exh. C §§ I, IV at 1-2.) As plaintiff resigned on April 8, 2005, prior to the January 16, 2006 vesting date, his RSUs were forfeited under the plain language of the award agreement.

Plaintiff attempts to avoid this clear dismissal ground — highlighted in defendant's initial motion to dismiss — by simply amending his Complaint to omit the fact that he resigned on April 8, 2005 and any mention of his resignation letter. (Compl. ¶ 37.) As the court held in *Wallace v. New York City Dep't of Corrections*, 1996 WL 586797, at *2 (E.D.N.Y. Oct. 9, 1996), such gamesmanship is not permitted. In *Wallace*, the plaintiff amended his complaint by "blatantly chang[ing] his statement of the facts in order to respond to the defendant's motion to dismiss," and set forth allegations "directly contradict[ing] the facts set forth in his original complaint." *Id.* The court rejected this maneuvering, accepted as true the

11

facts alleged in the initial complaint, and granted defendant's motion to dismiss. *Id.* Similarly, here, plaintiff cannot skirt a motion to dismiss by simply excising any reference to his admitted resignation and resignation letter in his initial complaint. *See also Andrews v. Metro North Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) (holding that "[t]he amendment of a pleading does not make it any the less an admission of the party").

This Court should also reject any claim by plaintiff that he is entitled to his RSUs because he was constructively discharged. Absent resignation because of total disability or retirement, factors not present here, the 2003 Restricted Stock Unit Award Agreement sets forth the specific circumstances for accelerated vesting of RSUs that qualify as "Good Reason" and the procedures that employees must follow if they seek to resign for "Good Reason." (Holtzman Decl., Exh. C § IV.B(3) at 2.) Specifically, any employee who resigns for "Good Reason" must submit the resignation in writing and deliver it to a particular administrator within sixty days of becoming aware of any circumstances that fall within the meaning of "Good Reason" as defined in Section IV.B(3). (*Id.*) The notice of resignation must specify which of the Good Reason circumstances the employee is relying upon and must be effective no earlier than 30 days later, as the Company is permitted a 30-day cure period. (*Id.*) Plaintiff does not plead that he left MMC due to any of the circumstances set forth in the Good Reason provision, that he followed the required procedures, or that he provided MMC thirty days notice and an opportunity to cure. To the contrary, plaintiff's resignation letter indicates that his resignation was effective immediately. (Holtzman Decl., Exh. F.)

*Haft v. Dart Group Corp.*, 841 F. Supp. 549 (D. Del. 1993), is instructive.[6] There, the plaintiff claimed that his employer breached an Incentive Stock Agreement by seeking

---

[6]    Pursuant to a choice of law provision, Delaware law controls plaintiff's second cause of action for breach of the Stock Award Plan. (Holtzman Decl., Exh. D § 10(j) at 17.)

to repurchase certain shares from him and refusing to issue new unrestricted certificates. *Id.* at 561. The Incentive Stock Agreement set forth only two events triggering defendant's right to repurchase plaintiff's shares — (1) if plaintiff voluntarily terminated his employment or (2) if the corporation terminated plaintiff's employment for "good cause." *Id.* at 567. Noting that "central to contract law is the notion that the parties are bound by the terms of their agreement," *id.* at 564, the Court held that the Incentive Stock Agreement unambiguously provided that only the two aforementioned events would trigger defendant's repurchase rights. *Id.* at 566. Therefore, the Court rejected defendant's argument that plaintiff's alleged breach of a separate Employment Agreement constituted "voluntary termination" for purposes of the Inventive Stock Agreement, holding that this would impermissibly "add a new and different 'triggering event' to the plain language of the [Incentive Stock Agreement]." *Id.*

Likewise, in the case at hand, the 2003 Restricted Stock Unit Award Agreement sets forth the express provisions that govern plaintiff's rights in the event of a supposedly involuntary resignation. By framing his resignation as an alleged constructive discharge, plaintiff is impermissibly attempting to circumvent this Good Reason provision by adding a new "triggering event." Having failed to pursue his express contractual remedies, plaintiff cannot avoid forfeiture of his RSUs. Since forfeiture of plaintiff's restricted stock, unpaid dividends, and RSUs did not constitute a breach of the Stock Award Plan and associated agreements, the Second Cause of Action should be dismissed.

## II.    PLAINTIFF'S THIRD THROUGH ELEVENTH COMMON LAW CAUSES OF ACTION SHOULD BE DISMISSED

Plaintiff next sets forth nine common law causes of action that all boil down to a claim that he should receive certain severance benefits even if he does not qualify for such benefits under the written severance plans maintained by MMC. Specifically, plaintiff alleges

that MMC breached an implied contract (Third Cause of Action), a "regular and consistent practice and policy" (Sixth Cause of Action), and oral promises (Ninth Cause of Action) that he would receive at least the same package of termination benefits that MMC supposedly regularly and consistently provided to terminated MMC partners and senior officers who were terminated involuntarily and without cause, "notwithstanding the terms of any written plans and awards to the contrary," which included, among other things, severance payments, a continuation of the individual's health benefits, and the immediate payment of the individual's retirement pension at a "bridged" rate. (Am. Compl. ¶ 12.)

Similarly, plaintiff alleges that MMC breached an implied contract (Fourth Cause of Action), a "regular and consistent practice and policy" (Seventh Cause of Action), and oral promises (Tenth Cause of Action) that he would receive at least the same severance benefits that MMC regularly and consistently provided to terminated managing directors of MMC subsidiaries who were terminated involuntarily and without cause, of at least a year's salary plus bonus. (*Id.* ¶ 16.) Finally, plaintiff claims that MMC breached an implied contract (Sixth Cause of Action), a "regular and consistent practice and policy" (Eighth Cause of Action), and oral promises (Eleventh Cause of Action) that he would receive at least the same severance benefits that MMC regularly and consistently provided to *any* employee who was terminated involuntarily and without cause, namely severance payments equal to at least the severance provided under existing plans such as the SPP and the Restructuring SPP regardless of the eligibility requirements of such plans. (*Id.* ¶ 19.)

Not only does plaintiff's resignation render him ineligible for benefits that were supposedly customarily given to employees who were involuntarily terminated, but, more importantly, however framed, these common law claims are nothing but an attempt to

14

circumvent the express eligibility and procedural requirements of MMC's formal severance

plans and should be rejected by this Court.

**A.      Plaintiff's Common Law Claims are Preempted by ERISA
and Any Supposed Oral Promises or "Regular and Consistent
Practices" are Unenforceable Modifications to Existing ERISA
Severance Plans**

Plaintiff's nine common law claims for severance benefits and termination

packages should be dismissed because they are preempted by ERISA and involve unenforceable

alleged oral modifications to formal ERISA plans.  As plaintiff acknowledges, MMC has formal

severance plans in place, namely the SPP and the Restructuring SPP, which provide severance

benefits to eligible employees. (Am. Compl. ¶ 18.)  Indeed, plaintiff is seeking benefits under

both of these plans pursuant to his Twelfth and Thirteenth Causes of Action and his initial

Complaint sought benefits only under those plans.

Both severance plans, by their terms, are employee benefit plans that are governed

by ERISA.  The plans advise employees that they are "entitled to certain rights and protections

under [ERISA]," including the claims procedure by which review of any denial of benefits may

be sought.  (Holtzman Decl., Exh. G § 1 at 1, § 10 at 5, § 14 at 7, Exh. H § 1 at 1, § 10 at 6, § 14

at 8.)  The plans further state that "[u]nder ERISA, there are several steps an employee can take

to enforce his/her rights" and provide examples of such steps.  (Holtzman Decl., Exh. G § 14

at 7, Exh. H § 14 at 9.)  *See also Gilbert v. Burlington Indus., Inc.*, 765 F.2d 320, 325 (2d Cir.

1985) (severance pay policy constitutes an employee welfare benefit plan governed by ERISA),

*aff'd*, 477 U.S. 901 (1986).

To facilitate uniformity with respect to the regulation of employee benefit plans,

ERISA provides that "the provisions of [ERISA] shall supersede any and all State laws insofar as

they may now or hereafter relate to any employee benefit plan[.]"  29 U.S.C. § 1144(a).  "[A]ny

state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).   State law claims to recover benefits under the severance plans clearly "relate to" employee benefit plans and are preempted by ERISA. *See, e.g., Nelson v. Nielsen Media Research Inc.*, 207 F. Supp. 2d 300, 303 (S.D.N.Y. 2002) (dismissing state law claims, including breach of contract and promissory estoppel, to recover severance benefits because they were preempted by ERISA). Similarly, claims based upon promises, such as those alleged here, that an employee would receive "severance benefits comparable to those of other senior executives," including extended medical and dental coverage, earned bonus and stock options, and insurance, also are preempted by ERISA. *Deutsch v. Kroll Associates, Inc.*, 2003 WL 367884, at *1 (S.D.N.Y. Feb. 20, 2003).

ERISA also mandates that every "employee benefit plan," which includes severance plans, must be established and maintained pursuant to a written instrument. *See* 29 U.S.C. § 1102(a)(1); *Algie v. RCA Global Commc'n, Inc.*, 891 F. Supp. 839, 859 (S.D.N.Y. 1994) (holding that 29 U.S.C. § 1102(a)(1) applies to severance benefit plans). This writing requirement "essentially operates as a strong integration clause, statutorily inserted in every plan document." *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002) (citation omitted). Therefore, "oral promises are unenforceable under ERISA and . . . cannot vary the terms of an ERISA plan." *Perreca v. Gluck*, 295 F.3d 215, 225 (2d Cir. 2002).

In addition to this statutory integration clause, the severance plans at issue here contain express provisions foreclosing reliance upon any prior or inconsistent oral assurance or supposed practice with regard to severance benefits.  Both the SPP and the Restructuring SPP provide right at the outset that, "[t]his Plan supersedes all previous policies, practices, programs or plans that may have been followed by the Company (or any predecessor, merged or acquired

16

entity) for employees covered by this Plan." (Holtzman Decl., Exh. G § 1 at 1, H § 1 at 1.)  In

addition, both plans state that "[i]n the event of any conflict between the provisions of this

document and any other communication, the provisions of this document will govern." (*Id.*)

The SPP further states that "[i]n no event will an employee be entitled to receive benefits under

both [an] employment agreement, other contractual arrangement, or under law, and this Plan."

(Holtzman Decl., Exh. G § 2 at 2.)  Finally, the Restructuring SPP states that "[a]n employee

may not receive severance benefits under both this Plan and any other Company or Company

affiliate plan, program, policy or practice providing similar benefits with respect to the same

period of employment preceding the employee's Termination Date." (Holtzman Decl., Exh. H

§ 2(c) at 2.)

        Plaintiff essentially claims (in nine different iterations) that he is entitled to the

severance benefits set forth in the SPP and the Restructuring SPP regardless of whether he

actually qualifies for these benefits (as well as additional benefits) because he relied upon

MMC's supposed oral assurances and informal MMC policies or practices that he would be

given termination benefits which were — "upon information and belief" — regularly and

consistently given to certain groups of MMC employees.  These state law claims should be

dismissed because they are preempted by ERISA as they relate to ERISA severance plans and

supposed oral modifications to existing formal ERISA severance plans are unenforceable

regardless of promises allegedly made or the supposed practice at MMC.[7]

        The Second Circuit's decision in *Smith v. Dunham-Bush, Inc.*, 959 F.2d 6 (2d Cir.

1992), mandates dismissal of plaintiff's claims.  In *Dunham-Bush*, the plaintiff worked for

---

[7]    Plaintiff's claim to termination benefits also relate to ERISA employee benefit plans as
he is seeking retirement pension at a bridged rate and continued health benefits. (Am. Compl.
¶ 12.)

17

Dunham-Bush in England for over thirty years, rising to the level of managing director, and was then asked to transfer to its United States affiliate. *Id.* at 7. When plaintiff expressed concern about the inferiority of the United States affiliate's pension plan, the president of Dunham-Bush allegedly assured him that Dunham-Bush would provide plaintiff with a "benefits package" comparable to what he would have received if he were to retire in the United Kingdom. *Id.* According to plaintiff, he agreed to relocate to the United States on the basis of that oral assurance. *Id.* When Dunham-Bush refused to provide those benefits, plaintiff brought suit in Connecticut state court asserting common law claims of breach of contract and negligent misrepresentation. *Id.* Dunham-Bush removed the action to federal court and the district court rejected the state law claims on preemption grounds. *Id.*

Plaintiff argued on appeal that preemption was not appropriate because "he neither challenges his benefits under the terms of the ERISA plan, nor seeks recovery from its assets." *Id.* at 8. The Second Circuit disagreed, holding that " [i]n reality, [plaintiff's] suit represents an attempt to supplement the plan's express provisions and secure an additional benefit." *Id.* at 10. Therefore, the court held, the causes of action "relate to" the ERISA employee benefit plan and were preempted. *Id.*

The Second Circuit was unmoved by plaintiff's plea that he was induced by his employer's oral assurances of increased benefits in relocating to the United States, holding that this "does not significantly distinguish him from other employees and plan participants seeking to supplement their pension plans with orally promised benefits." *Id.* at 10. The court stressed that ERISA requires that employee benefit plans be in writing. *Id.* (citing 29 U.S.C. §1102(a)(1).) This requirement "protects employees from having their benefits eroded by oral modifications" and "protects the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to such under the express terms of the

18

plan." *Id.* Therefore, the court held, "a plan participant's claim for add-on benefits necessarily

falls within the intended scope of the civil enforcement provisions of section 501(a)(1)(B)" and

is preempted. *Id.* at 11.

> The Second Circuit's final admonition resonates here:

> > Ultimately, [plaintiff] is no different from any other plan
> > participant suing for added benefits under a claim that the
> > employer promised additional monies to the participant. Such a
> > claimant could argue, as [plaintiff] does, that he or she was content
> > with the plan benefits, but was merely suing for additional benefits
> > from the employer, rather than the plan. In this case, [plaintiff]
> > presents   the   claim   attractively,   if   not   sympathetically.
> > Nevertheless, an understanding of ERISA and its underlying
> > congressional purpose emphatically shows that despite its surface
> > appeal, [plaintiff's] position is without merit. To accommodate
> > such a claim would countermand Congress's express directives. It
> > would irreparably undermine ERISA and would seriously
> > discourage employers from adopting such plans. Eventually, it
> > would reduce the level of financial security for working people.

*Id.* at 12. Just as the Second Circuit rejected plaintiff's common law claims for "add-on

benefits" in *Dunham-Bush*, this Court should similarly dismiss Egan's various state law claims

seeking certain severance benefits above and beyond — and notwithstanding the written

requirements of — MMC's formal severance plans.

> Indeed, courts consistently reject claims such as plaintiff's where employees

attempt to argue, under some state law formulation, that they are entitled to employee benefits

despite being ineligible under an ERISA plan. For example, in *Sandler v. Marconi Circuit Tech.

Corp.*, 814 F. Supp. 263 (E.D.N.Y. 1993), plaintiff alleged that his employer orally represented

that he would be entitled to retirement benefits after three years of service when in fact the plan

provided otherwise. *Id.* at 264. The court held that plaintiff's state law claims such as

promissory estoppel and breach of contract were preempted by ERISA and that any supposed

oral agreements or modifications to an employee benefit plan were "insufficient to support a

claim for recovery under ERISA." *Id.* at 265.  Citing the "overwhelming body of case law refusing to allow oral modifications to written retirement plans," the court granted defendant's motion to dismiss, holding that it was "clear" that plaintiff's claims were preempted and barred by ERISA. *Id.* at 267. *See also Owen v. Georgia-Pacific Corp.*, 389 F. Supp. 2d 382, 389 (D. Conn. 2005) (promissory estoppel claim based on "oral assurances" regarding eligibility for severance benefits preempted by ERISA because it related to a severance plan).

       This court similarly should reject any argument by Egan that he is somehow entitled to termination benefits in excess of those set forth in the written formal severance plans because he relied on supposed oral assurances and informal practices in rejecting other offers of employment and continuing his employment with MMC.  (Am. Compl. ¶¶ 15 17, 19.)  As the Second Circuit has held, such supposed detrimental reliance, whether or not "sympathetic," is irrelevant. *See Dunham-Bush*, 959 F.2d at 12.

       In *Adams v. AT&T Corp.*, 2007 WL 1655668 (N.D.N.Y. June 5, 2007), for example, plaintiff argued that when he was recruited by his employer into a management position, he was orally assured by the Operations Manager that his pension benefits would be "as if there was never a break in service" and "everything would be as if [he] never left [his prior position]." *Id.* at *1.  Despite plaintiff's urgings that he was not alleging a breach of an ERISA plan or seeking benefits under that plan but rather was claiming a breach of a collateral agreement with the Operations Manager, the court nonetheless relied upon *Dunham-Bush* and held that plaintiff's state law claims, including breach of contract, were preempted by ERISA. *Id.* at *3.  Any such claim under ERISA was also rejected because "no matter what [the Operations Manager] orally promised Plaintiff, it is well-established that such promises are unenforceable and cannot alter the written terms of an ERISA plan." *Id.* at *4. *See also Ullrich v. Linotype-Hell Co.*, 187 F. Supp. 2d 68, 73 (E.D.N.Y. 2002) (holding that plaintiff's common

law claim that he was induced to recommence employment based upon oral and written assurances regarding a particular severance package was preempted by ERISA); *Morlino v. Staten Island Univ. Hosp.*, 1998 WL 160937, at *9 (E.D.N.Y. Apr. 1, 1998) (rejecting claim of promissory estoppel where plaintiff claimed that "the alleged breach [was] of the separation agreement, not of the defendant's ERISA plan," finding that even though "plaintiff relie[d] on the separation agreement for his contractual rights, they are not independent of the rights and duties created by defendant's ERISA plan"), *aff'd*, 173 F.3d 845 (2d Cir. 1999); *Weingold v. Western Union World Commc'ns Inc.*, 1991 WL 90742 (S.D.N.Y. May 23, 1991) (rejecting plaintiff's breach of contract and estoppel claim that he was promised severance benefits in excess of the current termination pay policy if he agreed to a transfer because the claims were preempted by ERISA and "oral promises cannot modify written agreements under ERISA").

      Finally, plaintiff's invocation of a supposed "regular and consistent" practice within MMC of providing certain additional termination benefits is unavailing. In *Zydel v. Dresser Indus., Inc.*, 764 F. Supp. 277 (W.D.N.Y. 1991), for example, former union members asserted that when they transferred to non-union management positions they were led to believe that if their new positions were ever abolished, they could return to their union positions without loss of benefits. *Id.* at 278. When the plant closed, they claimed that they were orally assured by the Director of Human Services that they could collect union pensions. *Id.* Plaintiffs also claimed that their employer had a "policy and practice" of guaranteeing former union members who accepted promotions to management positions the greater of union or management pension benefits upon retirement. *Id.* at 284. As here, plaintiffs claimed that they were entitled to union benefits under the state law doctrine of promissory estoppel. *Id.* at 279. In addition to finding that plaintiffs' promissory estoppel claims were preempted, the court noted that formal written pension plans for union members existed. Therefore, "to the extent plaintiffs are unable to show,

in writing, that they are entitled to benefits under these plans, their claim that the company's 'policy and practice' established an entitlement to pension benefits is an assertion that these plans were modified *orally* to bring plaintiffs within the plans' ambit." *Id.* at 285 (emphasis provided). There can be no cause of action, the court held, for such an oral modification. *Id.* In support of its holding, the court cited to earlier cases explaining that if oral modifications of ERISA plans were permitted, employees would be unable to rely on these plans because their expected benefits could be radically affected by funds dispersed to other employees pursuant to oral agreements that may have even been made many years before any attempt to enforce them. *Id.* at 284-85 (citing to *Nachwalter v. Christie*, 805 F.2d 956, 959-60 (11th Cir. 1986)). *See also Tappe v. Alliance Capital Mgmt. L.P.*, 177 F. Supp. 2d 176, 187-88 (S.D.N.Y. 2001) (Scheindlin, J.) (dismissing state common law claims, including breach of an implied contract, for severance benefits pursuant to a "long standing policy and practice of paying severance to terminated employees" because such claims are preempted by ERISA) (emphasis omitted); *Snyder v. Elliot W. Dann Co., Inc.*, 854 F. Supp. 264, 269-70, 274-75 (S.D.N.Y. 1994) ("dismiss[ing] as a matter of law" plaintiff's breach of contract claim alleging that there was a "custom and practice" established with respect to paying benefits without reference to the plan's definition of considered compensation because it was preempted by ERISA).

Just as in these cases, plaintiff's common law claims seeking severance benefits above and beyond those set forth in MMC's formal ERISA plans — and notwithstanding any eligibility or procedural requirements of the plans — should be dismissed as a matter of law.[8]

---

[8]     Setting aside preemption, plaintiff's state law promissory estoppel claims cannot stand as a matter of law because "New York law does not recognize promissory estoppel as a valid cause of action in the employment context." *Weinberg v. Mizuho Capital Mkts. Corp.*, 2003 WL 22462022, at *7 (S.D.N.Y. Oct. 30, 2003) (Scheindlin, J.) (citation omitted) (dismissing promissory estoppel claim for severance benefits). *See also Bessemer Trust Co. v. Branin*, 498 F. Supp. 2d 632, 639 (S.D.N.Y. 2007); *Deutsch*, 2003 WL 22203740, at *4 (dismissing claim of

**B.     Even if Construed as ERISA claims, Plaintiff's Promissory Estoppel Claims Should Be Dismissed Because He Fails to Allege "Extraordinary Circumstances"**

Even if construed as ERISA claims, rather than state law claims, plaintiff's promissory estoppel claims nonetheless should be dismissed.  The Court of Appeals for the Second Circuit has held that the principles of promissory estoppel may be applicable to an ERISA claim but only if plaintiff has pleaded the presence of "extraordinary circumstances." *See, e.g., Aramony v. United Way Replacement Benefit Plan,* 191 F.3d 140, 151 (2d Cir. 1999). Courts in this Circuit have found "extraordinary circumstances only in cases where an employer reneged on a promise made with the intention of inducing employees to take actions benefiting the employer, such as joining the company or accepting early retirement." *Bell v. Pfizer Inc.,* 499 F. Supp. 2d 404, 409 (S.D.N.Y. 2007) (citations omitted).   To qualify as "extraordinary circumstances," the actions by an employer must be "beyond the ordinary" and rise above the basic elements of a promissory estoppel claim. *See, e.g., Keiser v. CDC Inv. Mgmt. Corp.,* 2004 WL 516212, at *3 (S.D.N.Y. March 17, 2004) (rejecting plaintiff's argument that her reliance on her employer's representations concerning disability coverage in deciding to resign constituted extraordinary circumstances because reliance is one of the basic elements of promissory estoppel and there was no evidence that the employer "intentionally induced or deceived her" with respect to her benefits); *Devlin v. Transp. Commc'ns Int'l Union,* 173 F.3d 94, 102 (2d Cir. 1999) (rejecting promissory estoppel claim due to lack of extraordinary circumstances even though some plaintiffs may have relied on the alleged promises in timing their retirement because

---

promissory estoppel for failure to pay severance benefits based upon alleged oral promises); *Phansalkar v. Anderson Weinroth & Co., L.P.,* 2002 WL 1402297, *17 (S.D.N.Y. June 26, 2002) (Scheindlin, J.), *vacated & remanded in part on other grounds,* 344 F.3d 184 (2d Cir. 2003); *Miller v. Citicorp,* 1997 WL 96569, at *1, *10 (S.D.N.Y. Mar. 4, 1997).

reliance is one of the four basic elements of estoppel and there was no suggestion that employer

intended to induce plaintiff's retirement).

For example, in *Thompson v. General Elec. Co.*, 2002 WL 482862 (S.D.N.Y.

Mar. 29, 2002), plaintiff alleged that he was wrongfully denied benefits under his employer's

deferred salary plan ("the Plan") and brought assorted claims such as promissory estoppel,

breach of contract and denial of benefits in violation of ERISA. *Id.* at *2. Defendant moved to

dismiss all the claims. The court held that the breach of contract claim was preempted by ERISA

and that "if the cause of action for promissory estoppel were viewed as a state law cause of

action, it would [also] be barred by preemption[.]" *Id.* at *6. However, even if the court were to

construe the promissory estoppel allegations as applicable to the ERISA claim in support of an

argument that defendant should be estopped from denying the claims sought by plaintiff, there

were no factual allegations that would support a claim of "extraordinary circumstances" because

the plaintiff did not claim that the defendant used the alleged promise to induce the plaintiff to

leave his job. *Id.* at *8. The court then granted plaintiff's motion to dismiss the entire

complaint, including the promissory estoppel claim. *Id.*

Plaintiff's supposed vague discussions with Greenberg and Cherkasky that he

would be "take[n] care of" and that MMC was prepared to "fulfill its obligations" toward

plaintiff are not clear and unambiguous promises sufficient to meet the first element of a

promissory estoppel claim. (Am. Compl. ¶¶ 14, 31.) *See, e.g., Zikakis v. Staubach Retail

Services, Inc.*, 2005 WL 2347852, at *6 (S.D.N.Y. Sept. 26, 2005) (dismissing promissory

estoppel claim because there were no allegations of a "clear and unambiguous promise"). More

importantly, however, plaintiff has not pleaded (nor could he plead) "extraordinary

circumstances" sufficient to warrant the application of promissory estoppel in the ERISA

context. He does not allege that MMC intentionally sought to deceive plaintiff or induce him to

24

change the circumstances of his employment.   Moreover, plaintiff does not allege that MMC's

supposed promises of termination benefits actually caused him to resign or take any action with

respect to his employment, other than simply to continue it which is hardly "extraordinary."

(Am. Compl. ¶¶ 15, 17, 19.)  *See Robinson v. Sheet Metal Workers' Nat'l Pension Fund, Plan A*,

441 F. Supp. 2d 405, 433 n.17 (D. Conn. 2006) (refusing to find "extraordinary circumstances"

where employer allegedly promised benefits to intentionally induce plaintiff to continue working

at the company because to hold otherwise "would render the 'extraordinary circumstances'

requirement meaningless, since *all* employees rely upon the benefits their employer offers when

choosing to continue working for the employer") (emphasis provided).  In addition, there can

clearly be no reliance, let alone "extraordinary circumstances," on promises supposedly made to

plaintiff *after* his termination.  (Am. Compl. ¶¶ 79, 84, 89 (alleging reliance on promises made

before and after termination).)  Therefore, any claim of promissory estoppel in the ERISA

context should be rejected.  *See, e.g., Ramos v. SEIU Local 74 Welfare Fund*, 2002 WL 519731,

at *6 (S.D.N.Y. April 5, 2002) (Scheindlin, J.) (rejecting estoppel argument in ERISA case

because there was "no hint of deception or intentional inducement").

III.    **PLAINTIFF'S TWELFTH AND THIRTEENTH CAUSES OF
        ACTION SHOULD BE DISMISSED BECAUSE PLAINTIFF
        FAILED TO EXHAUST ADMINISTRATIVE REMEDIES
        AND IS INELIGIBLE IN ANY EVENT**

In his initial Complaint, plaintiff set forth breach of contract claims seeking

benefits under the SPP and the Restructuring SPP.  MMC filed a motion to dismiss these claims

(as well as others) because, among other things, they were preempted by ERISA.  Presumably in

response to this, plaintiff has now amended his Complaint to insert a sentence within each of

these claims that "Egan is empowered to bring suit for such relief under 29 U.S.C. § 1132," the

general civil enforcement provision governing actions by participants, beneficiaries and the

Secretary of Labor for all types of civil actions.  (Am. Compl. ¶¶ 97, 102.)  Assuming that

plaintiff is now asserting ERISA claims to recover benefits under the plans pursuant to 29 U.S.C.

§ 1132(a)(1)(B), such a claim is still inadequate as a matter of law because plaintiff has failed to

exhaust his administrative remedies and is, in any event, ineligible for benefits.

A.    **Plaintiff's Claims for Benefits Under ERISA Are Deficient Because Plaintiff Failed to Exhaust the Required Administrative Claims Procedure**

Exhaustion of administrative remedies is a necessary prerequisite to civil

litigation of an ERISA claim because it "uphold[s] Congress' desire that ERISA trustees be

responsible for their actions, not the federal courts" and "provide[s] a sufficiently clear record of

administrative action if litigation should ensue[.]"  *Kennedy v. Empire Blue Cross & Blue Shield*,

989 F.2d 588, 594 (2d Cir. 1993) (recognizing "firmly established federal policy favoring

exhaustion of administrative remedies in ERISA cases").  Exhaustion also "help[s] reduce the

number of frivolous lawsuits under ERISA; . . . promote[s] the consistent treatment of claims for

benefits; . . . provide[s] a nonadversarial method of claims settlement; and . . . minimize[s] the

costs of claims settlement for all concerned."  *Id.* (citations omitted).

Your Honor's decision in *Greifenberger v. Hartford Life Ins. Co.*, 2003 WL

22990093 (S.D.N.Y. Dec. 18, 2003) (Scheindlin, J.), *aff'd*, 131 Fed. Appx. 756 (2d Cir. 2005), is

directly on point.  In *Greifenberger*, plaintiff brought an ERISA claim for long term disability

benefits against her employer and insurance company. *Id.* at *1.  Noting that "[i]f a plaintiff

fails to allege that he or she has exhausted administrative remedies, the claim must be

dismissed," Your Honor dismissed plaintiff's claim for benefits without leave to amend because

plaintiff did not allege that she had exhausted the administrative appeals set forth in the policy.

*Id.* at *5. *See also Welland*, 2003 WL 22973574, at **14-15 (rejecting state law claim for breach

of a severance plan because ERISA preempted and plaintiff had failed to exhaust administrative remedies).

In the case at hand, both the SPP and the Restructuring SPP contain express claims procedures that must be followed in order to obtain benefits under the plans. The SPP and the Restructuring SPP instruct employees who believe that they are eligible for benefits to submit their claims to the Plan Administrator within thirty days of their Termination Date. (Holtzman Decl., Exh. G § 10 at 5, Exh. H § 10 at 6.) The plans also set forth detailed claims procedures by which an individual may obtain review of a denial of a claim for benefits, requiring an initial level of consideration and an appeal process before an individual may proceed to court. (Holtzman Decl., Exh. G § 10 at 5-6, Exh. H § 10 at 6-7.) Indeed, the Restructuring SPP clearly states that "[n]o action for benefits may be brought by any Plan Participant or beneficiary unless the Plan's claims review procedure has been exhausted (that is, all appeals of adverse determination have been made and decided)." (Holtzman Decl., Exh. H § 10 at 7.)

Plaintiff has not pled that he submitted a claim to the Plan Administrator under either the SPP or the Restructuring SPP at any time, let alone within thirty days of his Termination Date, nor could he amend to so plead given that no claim has ever been submitted. Plaintiff's supposed vague discussions with Greenberg and Cherkasky are no substitute as they do not satisfy the purpose of exhaustion — namely to provide a clear record of the administrative interpretation of plan documents to ensure effective judicial review. (Am. Compl. ¶¶ 14, 31.) *See Shamoun v. Bd. of Trustees*, 357 F. Supp. 2d 598, 606 (E.D.N.Y. 2005) (dismissing ERISA claim for failure to exhaust notwithstanding plaintiff's allegations of discussions with President of the company because to hold otherwise would "render the exhaustion requirement meaningless").

Moreover, plaintiff's allegation — buried in a single line of one of his promissory estoppel claims — that he relied "by not following the administrative claims procedures" (Am. Compl. ¶ 90) on unspecified MMC promises that he would receive at least the severance provided for under the SPP and the Restructuring SPP cannot excuse his failure to exhaust.  As set forth previously, a claim of estoppel in the ERISA context requires a showing of "extraordinary circumstances."   Far from being intentionally induced to retire early or relocate, plaintiff's claim that he simply continued his employment with MMC, *see* Am. Compl. ¶ 19, is certainly not "extraordinary." *See supra* at 23-25.  As Your Honor has recognized, the purpose of the added element of extraordinary circumstances is to lessen "the danger that commonplace communications from employer to employee will routinely be claimed to give rise to employees' rights beyond those contained in formal benefit plans." *See Ramos*, 2002 WL 519731, at *6. Plaintiff's allegations of unspecified promises that he would be "taken care of" or that MMC would "fulfill its obligations" are precisely the "commonplace communications" that cannot, and should not, give rise to rights beyond those contained in formal benefit plans or excuse their procedural requirements.  Because plaintiff has failed to exhaust the plans' administrative remedies, his purported ERISA claims for benefits therefore must be dismissed.  *See, e.g., Tamondong v. GMAC Commercial Credit LLC*, 2006 WL 3377592, at *2 (S.D.N.Y. Nov. 17, 2006) (Scheindlin, J.) ("If a plaintiff fails to allege that he or she has exhausted administrative remedies [under an ERISA plan], the claim must be dismissed.").

**B.    Plaintiff is Ineligible for SPP and Restructuring SPP Benefits**

In any event, plaintiff is ineligible for benefits under the SPP and the Restructuring SPP.  To receive benefits under these plans, an employee must be notified of his or her involuntarily termination on or after October 1, 2003 under the SPP or between November 1,

2004 and December 31, 2004 under the Restructuring SPP. (Holtzman Decl., Exh. G § 1 at 1, Exh. H § 1 at 1.) An individual may be eligible for benefits under the SPP only if "the Company has determined, in its sole discretion" that the employee lacks the job skills required for the job, the employee has been separated from the Company as a result of restructuring or downsizing or because the employee's position has been eliminated. (Holtzman Decl., Exh. G § 2 at 1.) Similarly, an individual is eligible for benefits under the Restructuring SPP only if "the Company has determined, in its sole discretion" that it is in the interest of the Company to include this employee in the group to be involuntarily terminated during the Fall 2004 restructuring, the employee's manager selects the employee for involuntary termination, and the Director of Human Resources approves that selection during the applicable time period due to the changing needs of the business, including but not limited to changes in the job skills required, downsizing, or the closing of a facility. (Holtzman Decl., Exh. H § 2 at 1.)

Plaintiff does not plead (nor could he) that he meets the conditions for eligibility under either the SPP or the Restructuring SPP, including a determination by MMC that Egan was being involuntarily terminated for one of the reasons set forth in the plans or approval of the termination by the Director of Human Resources. *See, e.g., Karl v. ASARCO, Inc.*, 1998 WL 107113, at *6 (S.D.N.Y. Mar. 11, 1998) (plaintiff ineligible for severance benefits because he was not "separated" from employment on the bases defined in the severance plan, despite his allegation of a constructive discharge), *aff'd*, 166 F.3d 1200 (2d Cir. 1998).

Plaintiff also is ineligible for benefits under the Restructuring SPP because it applies only to employees selected for and notified of their involuntary termination between November 1, 2004 and December 31, 2004. (Holtzman Decl., Exh. H § 1 at 1.) Even if plaintiff claims that he is eligible for severance benefits because he was constructively discharged — which clearly he is not, given that he does not in any event meet the other express eligibility

29

conditions set forth in the SSP and the RIF Plan — the effective date of a constructive

termination is the date that the employee actually resigns due to supposedly intolerable working

conditions. *See, e.g., Flaherty v. Metromail Corp.*, 235 F.3d 133, 138 (2d Cir. 2000) (*aff'd* 59

Fed. Appx. 352 (2002) (cause of action for constructive discharge accrued on the date that

employee gave notice of her intention to resign and "the rule should be the same in all cases of

constructive discharge"). Plaintiff resigned from MMC on April 8, 2005, well after the

eligibility period under the Restructuring SPP. (Compl. ¶ 37.)[9]

Plaintiff's demand for benefits under both plans therefore should be rejected.

## CONCLUSION

For the foregoing reasons, defendant MMC respectfully requests that this Court

dismiss the Second through Thirteenth Causes of Action and grant such other relief as the Court

may deem just and proper.

Dated:  New York, New York
        November 5, 2007

                                    KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                    By:_____/s/ Robert N. Holtzman_____
                                          Barry H. Berke (BB 1421)
                                          Robert N. Holtzman (RH 9525)
                                          Jennifer Rochon (JR 3097)
                                          1177 Avenue of the Americas
                                          New York, New York 10036
                                          (212) 715-9100
                                          Attorneys for Defendants Marsh &
                                          McLennan Companies, Inc., Marsh USA
                                          Inc. Severance Pay Plan, and Marsh Inc. Fall
                                          2004 Restructuring Severance Pay Plan

---

[9]     Plaintiff also cannot recover benefits under both the SPP and the Restructuring SPP.
(Holtzman Decl., Exh. H § 2(c) at 2 ("[a]n employee may not receive severance benefits under
both this Plan and any other Company or Company affiliate plan, program, policy or practice
providing similar benefits with respect to the same period of employment preceding the
employee's Termination Date"); Holtzman Decl., Exh. G § 2(c) at 2 ("[i]n no event will an
employee be entitled to receive benefits under both the employment agreement, other contractual
arrangement, or under law, and this Plan").