# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

ROGER EGAN,                                   :        Index No.
                                              :
                              Plaintiff,       :
                                              :        **VERIFIED COMPLAINT**
              v.                              :
                                              :
MARSH & McLENNAN COMPANIES, INC.,             :
                                              :
                              Defendant.       :
                                              :
------------------------------------------------------------------X

Plaintiff, ROGER EGAN ("Egan"), by his attorneys, Foley & Lardner LLP, for

his Complaint, alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for breach of contract.  Plaintiff was employed by Defendant for

32 years—from September 1972 until December 2004.  In April 2004, the New York State

Attorney General ("NYS AG") commenced an investigation of Defendant, and in October 2004,

the NYS AG filed a civil complaint against Defendant.  Although Defendant made clear to

Plaintiff -- and to the public -- that Plaintiff was not responsible for the problems which underlay

the investigation, Defendant used the investigation as an excuse to terminate Plaintiff, and

thereafter to refuse to make payments that it owed to Plaintiff.

### PARTIES

2.      Egan is an individual residing at 2 Hartley Farms Road, Morristown, New Jersey.

3.      Defendant Marsh & McLennan Companies, Inc. ("MMC") is a Delaware

corporation with its principal place of business at 1166 Avenue of the Americas, New York,

New York.  MMC is a global professional services firm which owns companies active in the

sectors of risk and insurance services, risk consulting and technology, and investment management.

<b>JURISDICTION AND VENUE</b>

4.    This Court has personal jurisdiction over defendant pursuant to CPLR § 301.

5.    Venue lies in this county pursuant to CPLR § 503(a), (c).

<b>FACTUAL BACKGROUND</b>

6.    Egan was employed by MMC from September 1972 through December 2004, ultimately becoming president and chief operating officer of Marsh, Inc. ("Marsh"), the risk and insurance services subsidiary of MMC. As an employee of MMC, periodically Egan became entitled to certain benefits, including, among other things, equity awards and the right to receive pension and severance payments upon retirement or termination.

**Severance Plans**

7.    On or about November 21, 1996, MMC issued a plan for severance payments for MMC executives who terminate from MMC for reasons other than cause, death, total and permanent disability or normal retirement, and who at the time of termination have at least ten years of service with MMC and are grantees of certain types of restricted stock awards ("Special Severance Pay Plan," attached hereto as Exhibit A).

8.    Section 4 of the Special Severance Pay Plan provides that the total severance amount shall be based on a percentage of the shares and units subject to the executive's outstanding awards (other than any supplemental awards) which were forfeited at the executive's termination of employment, with such percentage to be determined by the executive's years of service at termination. The Special Severance Pay Plan's severance amount, as a percentage of forfeited awards, for executives with 25 years or more of service, is 90%.

2

9.    Section 5 of the Special Severance Pay Plan provides that "[d]ividends or dividend equivalents as appropriate, shall be paid on all shares or share equivalents remaining unpaid under this Plan at the normal times that dividends are paid to other Company common stock owners."

10.    Section 6 of the Special Severance Pay Plan provides that payments under the Plan shall be made in shares of MMC common stock in three annual installments commencing one year following termination of employment.

11.    In addition to and separate from the Special Severance Pay Plan, MMC provided a standard severance plan for its managing directors pursuant to which departing managing directors would be eligible to receive a certain number of years of salary based on years of service to MMC ("Standard Severance Plan").

12.    On information and belief, in or about November 2004, MMC filed with the Delaware Department of Labor a Reduction in Force plan ("RIF") containing severance provisions. The RIF provided that MMC would pay its employees a certain number of weeks of salary for every year of service to MMC.

**Equity Awards**

13.    On or about January 16, 2003, MMC granted Egan an award of restricted stock units pursuant to the MMC 2000 Senior Executive Incentive and Stock Award Plan ("2003 Restricted Stock Unit Award").

14.    Sections I and IV of the 2003 Restricted Stock Unit Award define the vesting schedule as the earlier of January 16, 2006 or the date of termination of employment, provided that such termination is not for "misappropriation of the assets of the Company; willful

3

misconduct in the performance of your duties; your refusal to perform the duties of your position; or your conviction of a felony."

15.　Section I of the 2003 Restricted Stock Unit Award obligates MMC to deliver the restricted stock units to Egan as soon as practicable after the date of vesting, free of restriction.

16.　Section II of the 2003 Restricted Stock Unit Award obligates MMC to pay Egan "dividend equivalent payments" on the restricted stock units.

17.　On or about March 17, 2004, MMC granted Egan another award of restricted stock pursuant to the MMC 2000 Senior Executive Incentive and Stock Award Plan ("2004 Restricted Stock Award").

18.　Section I.A of the 2004 Restricted Stock Award directs that Egan's restricted stock is scheduled to vest on the earlier of January 1, 2012 or the later of Egan's Normal or Deferred Retirement Date, as such terms are defined in MMC's primary retirement plan applicable to Egan.

19.　Section I.B of the 2004 Restricted Stock Award obligates MMC to distribute Egan's shares as soon as practicable after the vesting.

20.　Section II of the 2004 Restricted Stock Award obligates MMC to pay Egan dividends on the restricted stock.

21.　In or about November 2005, MMC stopped paying dividends to Egan on Egan's restricted stock.

**Pension**

22.　On or about August 19, 2005, MMC's Retirement Service Center sent Egan a letter outlining the benefits payable to Egan from MMC's U.S. Retirement Program ("Retirement Program").

4

23.    The Retirement Program obligates MMC to pay Egan a monthly straight life annuity benefit for Egan's lifetime, commencing, at a reduced amount, on October 1, 2005, when Egan reached the age of 55 ("Qualified Plan").

24.    The Retirement Program also obligates MMC to pay Egan certain amounts, in either monthly payments commencing on October 1, 2005, or in a lump sum distribution ("Benefit Equalization Plan").

25.    The Retirement Program also includes an obligation for MMC to pay Egan certain monthly benefits under the Supplemental Retirement Program ("SERP"), commencing on October 1, 2005.

## Egan's Constructive Termination and MMC's Failure to Pay Amounts Due

26.    On or about November 8, 2004, MMC issued a press release announcing that Egan had been asked to step down from his position as president and chief operating officer of Marsh, but that Egan would be helping with transition.

27.    Within the press release, Michael Cherkasky, president and chief executive officer of MMC and chairman and chief executive officer of Marsh, was quoted as saying that the decision to ask Egan to step down was "not based on any suggestion of culpability," but was based on Egan's accountability as a senior officer of the business units that the NYS AG was investigating.

28.    Cherkasky further told Egan, in a personal meeting between the two sometime shortly after Egan was asked to step down, that Egan should get an attorney and that MMC would come up with a generous settlement for him.

29.    On or about November 12, 2004, Joseph Bachelder, an attorney retained by Egan -- at the express advice of MMC -- for the purpose of facilitating the negotiation of a fair

5

settlement agreement between Egan and MMC, presented Cherkasky with a proposed separation

agreement ("Separation Agreement"). The Separation Agreement (attached hereto as Exhibit B),

contained provisions for, among other things, a cash severance package, treatment of equity

awards, and pension plan benefits.

30.     On or about December 7, 2004, MMC asked Egan to vacate MMC premises.

Egan was given approximately six hours to pack his belongings, following which he was denied

access to MMC's offices and to his MMC e-mail account and personal files. MMC's actions

represent a constructive termination of Egan by MMC.

31.     Approximately two weeks after Egan was asked to vacate MMC premises,

Cherkasky told Egan that negotiations of the Separation Agreement would have to wait until

after MMC settled with the NYS AG.

32.     While awaiting negotiations of the Separation Agreement, and at all times prior

and subsequent, and despite having been denied access to his MMC e-mail account, Egan

cooperated fully with both the MMC internal investigation led by outside counsel and the NYS

AG investigation.

33.     On or about January 31, 2005, MMC settled with the NYS AG.

34.     On or about February 8, 2005, Peter Beshar, Senior Vice President and General

Counsel at MMC, wrote Egan to tell him that MMC would not be reimbursing Egan for the legal

fees incurred by Bachelder to negotiate Egan's Separation Agreement.

35.     Also on or about February 8, 2005, Cherkasky told Egan that MMC was ready to

negotiate Egan's Separation Agreement and that said negotiations could be concluded in ten

days. Cherkasky told Egan to have Bachelder contact Mike Petrullo, MMC's chief

administrative officer. Two days later, Bachelder sent Petrullo the Separation Agreement.

36.    Despite having promised Egan on or about February 8, 2005 that MMC was ready to negotiate Egan's Separation Agreement, Cherkasky changed course one week later and, at that time, told Egan that MMC could no longer talk to Egan about the Separation Agreement.

37.    In response to Cherkasky's about-face regarding MMC's willingness to discuss Egan's proposed Separation Agreement, on or about April 8, 2005, Egan submitted his resignation from employment by MMC to Cherkasky. Egan wrote in his resignation letter that he hoped MMC would be willing to engage in discussions about a fair separation agreement in the near future.

38.    On or about April 18, 2005, outside counsel for MMC wrote to Bachelder to propose that MMC and Egan enter into an agreement which included, among other things, a provision stating that the parties would agree that Egan's employment with MMC terminated at the close of business on December 31, 2004, and that such termination "will have no impact on any right he might otherwise have for compensation or indemnification and will not be considered as an admission of wrongdoing or be relevant to any issue regarding the termination of his employment." ("Standstill Agreement," attached hereto as Exhibit C).

39.    On or about November 4, 2005, after receiving no response from MMC about the Separation Agreement, Bachelder made a third attempt to open negotiations with MMC about Egan's Separation Agreement by sending the Agreement to Leon Lichter, Vice President in MMC's Legal Department.

40.    Given that MMC appeared unwilling to negotiate the Separation Agreement with Egan, on or about November 22, 2005, Egan reached out to Jack Sinnott, Vice Chairman, Office of the CEO, and an MMC director. By this time, MMC had stopped paying Egan dividends on his MMC restricted stock, claiming that Egan had "forfeited" his restricted shares.

7

41.     MMC has failed to pay Egan any amounts under the Severance Plan.

42.     MMC has failed to pay Egan dividends on his restricted stock since November 2005.

43.     MMC has failed to pay Egan any retirement benefits pursuant to the Retirement Program, the Benefits Equalization Plan, or SERP.

44.     All conditions precedent to Egan's right to recover on the causes of action alleged herein have been performed or have occurred or been excused.

45.     On information and belief, MMC has provided other of its former executives who were similarly situated to Egan at MMC and who left MMC at or about the same time as Egan with generous settlement packages, well in excess of the amounts Egan has received.

### FIRST CAUSE OF ACTION

(Breach of Contract - Severance Plans)

46.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45, inclusive, as if fully set forth herein.

47.     Pursuant to Sections 4, 5, and 6 of the Special Severance Pay Plan, MMC is obligated to pay Egan 90% of the shares and units subject to Egan's outstanding awards (other than any supplemental awards) which were forfeited at Egan's termination of employment, to be paid in three annual installments commencing one year after Egan's termination of employment, as well as dividends, to be paid at the normal time dividends are paid to other MMC common stock owners.

48.     Despite due demand, MMC has refused to pay these amounts to Egan. MMC's failure to fulfill this obligation is a breach of the Special Severance Pay Plan.

8

49.     Egan was also entitled, by virtue of his position as a managing director at MMC and his years of service with MMC, to receive severance payments under the Standard Severance Plan and the RIF.

50.     Despite due demand, MMC has refused to pay any amounts to Egan pursuant to the Standard Severance Plan or the RIF.

51.     By virtue of the foregoing, Egan has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

(Breach of Contract - Stock Award Plan)

52.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45, inclusive, as if fully set forth herein.

53.     Pursuant to the MMC 2000 Senior Executive Incentive and Stock Award Plan and the grants of restricted stock and restricted stock units made to Egan pursuant to the Plan, MMC is obligated to effect the vesting of the shares granted to Egan upon Egan's termination, and to pay Egan dividends (or dividend equivalent payments) on these shares.

54.     Egan was constructively terminated by MMC on December 7, 2004.

55.     Despite due demand, MMC has refused to consider Egan's restricted stock and restricted stock unit awards to be vested, insisting that Egan has "forfeited" his shares.  MMC has also refused to pay Egan dividends on these shares since November 2003.  MMC's failure to fulfill this obligation is a breach of the 2000 Senior Executive Incentive and Stock Award Plan.

56.     By virtue of the foregoing, Egan has been damaged in an amount to be determined at trial.

9

## THIRD CAUSE OF ACTION

(Breach of Contract – Retirement Program)

57.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45, inclusive, as if fully set forth herein.

58.     Pursuant to MMC's Retirment Program, MMC must confer on Egan certain retirement benefits under three individual retirement plans, commencing on October 1, 2005.

59.     MMC has not conferred these benefits.  Consequently, it has breached the Retirement Program.

60.     By virtue of the foregoing, Egan has been damaged in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION

(Promissory Estoppel)

61.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45, inclusive, as if fully set forth herein.

62.     MMC, speaking through Cherkasky, made a clear and unambiguous promise to Egan that it would provide Egan with a generous settlement commensurate with his 32 years of service to MMC.

63.     Egan reasonably and foreseeably relied on this promise, and his reliance was particularly reasonable and foreseeable in light of the treatment being afforded other former MMC employees who had been similarly situated to Egan at MMC and who left MMC at or about the same time as Egan did.

64.     MMC breached this promise by failing to offer Egan a settlement agreement and by failing to accept the settlement agreements that Egan proffered to MMC.

10

65.     As a result of its reliance on MMC's promise, Egan has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff requests judgment as follows:

(a)     On the First Cause of Action, damages in an amount to be determined at trial;

(b)     On the Second Cause of Action, damages in an amount to be determined at trial;

(c)     On the Third Cause of Action, damages in an amount to be determined at trial;

(d)     On the Fourth Cause of Action, damages in an amount to be determined at trial; and

(e)     The costs and disbursements of this action, including attorney's fees, together with such other and further relief as this Court deems just, proper and equitable.

Dated: New York, New York
       July 10, 2007

FOLEY & LARDNER LLP

By: _____
    Peter N. Wang
    Emily R. Sausen
    90 Park Avenue
    New York, New York 10016
    (212) 682-7474
    Attorneys for Plaintiff Roger Egan

11

# EXHIBIT B

This Document Constitutes Part Of A Prospectus Covering Securities That Have Been Registered Under Securities Act of 1933.

## MARSH & McLENNAN COMPANIES
## 2000 SENIOR EXECUTIVE INCENTIVE AND STOCK AWARD PLAN

### Terms and Conditions of 7-Year Restricted Stock Awards to U.S. Grant Recipients

This award of restricted stock, granted on March 17, 2004 under the Marsh & McLennan Companies ("MMC") 2000 Senior Executive Incentive and Stock Award Plan (the "Plan"), is subject to the terms and conditions below. This award is intended to serve as recognition of your potential for future contributions to the success of MMC and to provide an appropriate additional incentive to remain with the Company so as to influence future outcomes in carrying out your professional and executive responsibilities.

I.    AWARD VESTING AND DISTRIBUTION

   A.    Vesting Period

      Your award of restricted stock is scheduled to vest on the earlier of (1) January 1, 2012 or (2) the later of your Normal or Deferred Retirement Date (as such terms are defined in MMC's primary retirement plan applicable to you).

   B.    Stock Distribution

      The shares will be distributed as soon as practicable after the vesting, except for employees expected to be covered under Section 162(m)(3) of the U.S. Internal Revenue Code of 1986, as amended. For covered employees, MMC may exchange the restricted stock for restricted stock units prior to vesting and defer distribution until the date that would result from applying clause (2) from Section IA herein, or such earlier date pursuant to Sections IVA, IVB or VA herein.

      Employees covered under 162(m)(3), according to U.S. Internal Revenue Service regulations, include (1) the chief executive officer of MMC as of the last day of the year of distribution and (2) the four highest-paid executive officers of MMC, other than the chief executive officer, who are employed on the last day of the year of distribution.

II.    RIGHTS OF RESTRICTED STOCK

   You will receive dividends on the restricted stock, and you can vote your shares. The shares may not be transferred or assigned by you unless and until the restriction period has ended and the shares have been registered to you.

III.    TAXES

   The value of restricted stock generally is not taxable on the date of grant. During the restriction period, the receipt of dividends on the shares is taxable as additional compensation and reported on a current basis as W-2 income. When the shares vest and are distributed, you will be given further information regarding the tax consequences of your receipt of the shares, and you must pay all withholding taxes required by law. It is recommended that you consult with your personal tax advisor for more detailed information regarding the tax treatment of the award.

TERMINATION OF EMPLOYMENT

If your employment with MMC or any of its subsidiaries or affiliates (the "Company") terminates, your right to the restricted stock shall be as follows:

A.   Death

If you die, the restricted stock will vest immediately to the person or persons to whom your rights shall pass by will or the laws of descent and distribution.

B.   Permanent Disability

If you become totally and permanently disabled as determined under MMC's long-term disability program, the restricted stock will vest immediately.

C.   Retirement

As stated in Section IA, if the shares are restricted until your retirement, then the restricted stock will vest on the later of your Normal or Deferred Retirement Date.

D.   All Other Employment Terminations

If you cease to be an active employee of the Company before the end of the restriction period for any reason other than death, permanent disability, or normal or deferred retirement, or you fail to perform any condition precedent in a manner satisfactory to the Compensation Committee of the MMC Board of Directors (the "Committee"), all of your rights, title and interest in and to the restricted stock shall be forfeited.

V.   CHANGE IN CONTROL PROVISIONS

A.   Change in Control

Upon the occurrence of a "change in control" of MMC, as defined in the Plan, the restricted stock will vest on the date of the change in control, and the shares will be distributed to you as soon as practicable thereafter.

B.   Additional Payment

Should you receive shares from the vesting of restricted stock that has been accelerated because of a change in control, all or part of the value (the total market price of the shares on the date of vesting) of those shares (the Accelerated Shares) may be subject to a 20% federal excise tax. The excise tax is imposed when the value of the Accelerated Shares (plus any other payments which are determined to be contingent on a change in control) is more than 2.999 times the average of your last five years W-2 earnings.

If a change in control occurs and you receive Accelerated Shares, MMC will determine if the 20% federal excise tax is payable. If it is payable, MMC will pay to you, within five days of making the computation, an amount of money (the Additional Payment) equal to the excise tax plus additional amounts for federal, state and local taxes so that the excise tax and income taxes on the excise tax payment will not cost you any money. If the Additional Payment is later determined to be less than the amount of taxes you owe, a further payment will be made to you. If the Additional Payment is more than the amount you owe, you will be required to reimburse MMC for the difference.

## VI.  OTHER PROVISIONS

A.  This award of restricted stock does not give you any right to continue to be employed by the Company, or limit, in any way, the right of your employer to terminate your employment, at any time, for any reason not specifically prohibited by law.

B.  MMC is not liable for the non-issuance or non-transfer, nor for any delay in the issuance or transfer of any shares of common stock due you, which results from the inability of MMC to obtain, from each regulatory body having jurisdiction, all requisite authority to issue or transfer shares of MMC common stock, if counsel for MMC deems such authority necessary for the lawful issuance or transfer of any such shares. Your acceptance of this award constitutes your agreement that the shares of common stock acquired hereunder, if any, will not be sold or otherwise disposed of by you in violation of any applicable securities laws or regulations.

C.  This award is subject to all of the terms and conditions herein and the provisions of the Plan, and your acceptance hereof shall constitute your agreement to the administrative regulations of the Committee. In the event of any inconsistency between these terms and conditions and the provisions of the Plan, the provisions of the Plan shall prevail. You may obtain a copy of the Plan by making a request to MMC.

D.  The restricted stock is awarded in accordance with such additional administrative regulations as the Committee may, from time to time, adopt. All decisions of the Committee upon any questions arising under these terms and conditions or the Plan shall be conclusive and binding.

E.  During your lifetime, no right hereunder related to the restricted stock shall be transferable except by will or the laws of descent and distribution.

INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Annual Report on Form 10-K of MMC for its last fiscal year, MMC's Registration Statement on Form 8 dated February 3, 1987, describing MMC common stock, including any amendment or reports filed for the purpose of updating such description, and MMC's Registration Statement on Form 8-A/A dated January 26, 2000, describing the Preferred Stock Purchase Rights attached to the common stock, including any further amendment or reports filed for the purpose of updating such description, which have been filed by MMC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are incorporated by reference herein.

All documents subsequently filed by MMC pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, subsequent to the end of MMC's last fiscal year and prior to the filing of a post-effective amendment which indicates that all securities offered have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference herein and to be a part hereof from the date of filing of such documents.

Participants may receive without charge, upon written or oral request, a copy of any of the documents incorporated herein by reference and any other documents that constitute part of this Prospectus by contacting Ms. Kelly Gamble, Senior Manager, Global Compensation, at 212/948-3523 or via internal electronic mail (Lotus Notes) or the internet (kelly.gamble@mmc.com).

t&c\03172004senior-restrict stock-7yr

# EXHIBIT C

This Document Constitutes Part Of A Prospectus Covering Securities That Have Been Registered Under The Securities Act of 1933.

## MARSH & McLENNAN COMPANIES
## 2000 SENIOR EXECUTIVE INCENTIVE AND STOCK AWARD PLAN

### Terms and Conditions of Restricted Stock Unit Awards to U.S. Grant Recipients

This award of restricted stock units, granted on January 16, 2003 under the Marsh & McLennan Companies (MMC) 2000 Senior Executive Incentive and Stock Award Plan (the Plan), is subject to the following terms and conditions:

I.   VESTING PERIOD

Your award of restricted stock units is scheduled to vest on the earlier of (1) January 16, 2006 or (2) such other date as may be applicable pursuant to the provisions of Section IV below. The shares will be delivered to you as soon as practicable after the date of vesting, free of restriction.

II.   RIGHTS OF RESTRICTED STOCK UNITS

You will receive dividend equivalent payments on the restricted stock units. Unless and until both the vesting conditions of the award have been satisfied and the shares have been registered to you in accordance with the terms and conditions described herein, you have none of the attributes of ownership to such shares of stock (e.g., units cannot be used as payment for stock option exercises; units may not be transferred or assigned; units have no voting rights).

III.   TAXES

The value of restricted stock units generally is not taxable on the date of grant. During the restriction period, the receipt of dividend equivalents is taxable on a current basis as additional compensation and will be included in your payroll checks. When the units vest and are distributed, you will be given further information regarding the tax consequences of your receipt of the shares; at that time you will be required to pay all withholding taxes required by law. It is recommended that you consult with your personal tax advisor for more detailed information regarding the tax treatment of the award.

IV.   TERMINATION OF EMPLOYMENT

If, prior to the vesting of all restricted stock units as provided above, you should cease to be employed by MMC or any of its subsidiaries or affiliates (the Company), all restricted stock units shall, except as provided in the next succeeding paragraph, forthwith vest in you or, in the event of your death, to the person or persons to whom your rights shall pass by will or the laws of descent and distribution.

You shall not be entitled to receive any restricted stock units not theretofore vested, and all rights pertaining to any such unvested restricted stock units shall cease, should your employment be terminated under any of the following conditions:

A. Termination by your employer for any of the following reasons: misappropriation of the assets of the Company; willful misconduct in the performance of your duties; your refusal to perform the duties of your position; or your conviction of a felony.

B. Your resignation, except:

   (1) upon total disability, as defined in the Company's long-term disability program; or

   (2) upon retirement within the meaning of the Company's retirement program; or

   (3) for Good Reason (as defined below) if the Company fails to cure the circumstances giving rise to such Good Reason within 30 days. "Good Reason" means:

      (a) termination of your present position in the Company or of any position subsequently held;

      (b) reduction in your annual base salary as in effect from time to time, except for across-the-board salary reductions similarly and generally affecting a recognized group of senior executives that includes you;

      (c) relocation of your office to a place not within the New York City metropolitan area; or

      (d) the discontinuance or reduction in level of your participation (exclusive of an ad hoc reduction conforming to the general principles under which a plan is administered) in any compensation plan in which you have been participating, provided that other senior executives constituting a recognized group that includes you are not also and similarly affected.

   Any resignation pursuant to Section IV.B.(3) must be submitted in writing and delivered to the Senior Vice President, Human Resources and Administration of MMC within 60 days of your becoming aware of any circumstances set forth in (a), (b), (c) or (d) above. Such notice of resignation must specify which of the circumstances set forth above you are relying on, and your resignation must be effective no later than 90 days, but no earlier than 30 days, from your delivery of the written notice.

It is understood that any future agreement between you and the Company may include provisions that differ from the terms contained herein and, if so, the provisions of such future agreement shall govern.

## V. CHANGE IN CONTROL PROVISIONS

A. Change in Control

   Upon the occurrence of a "change in control" of MMC, as defined in the Plan, the restricted stock units will vest on the date of the change in control, and the shares will be distributed to you as soon as practicable thereafter.

B.    Additional Payment

Should you receive shares from the vesting of restricted stock units that have been accelerated because of a change in control, all or part of the value (the total market price of the shares on the date of vesting) of those shares (the Accelerated Shares) may be subject to a 20% federal excise tax. The excise tax is imposed when the value of the Accelerated Shares (plus any other payments which are determined to be contingent on a change in control) is more than 2.999 times the average of your last five years W-2 earnings.

If a change in control occurs and you receive Accelerated Shares, MMC will determine if the 20% federal excise tax is payable. If it is payable, MMC will pay to you, within five days of making the computation, an amount of money (the Additional Payment) equal to the excise tax plus additional amounts for federal, state and local taxes so that the excise tax and income taxes on the excise tax payment will not cost you any money. If the Additional Payment is later determined to be less than the amount of taxes you owe, a further payment will be made to you. If the Additional Payment is more than the amount you owe, you will be required to reimburse MMC for the difference.

VI.    OTHER PROVISIONS

A.    This award of restricted stock units does not give you any right to continue to be employed by the Company, or limit, in any way, the right of your employer to terminate your employment, at any time, for any reason not specifically prohibited by law.

B.    MMC is not liable for the non-issuance or non-transfer, nor for any delay in the issuance or transfer of any shares of common stock due to you, which results from the inability of MMC to obtain, from each regulatory body having jurisdiction, all requisite authority to issue or transfer shares of MMC common stock, if counsel for MMC deems such authority necessary for the lawful issuance or transfer of any such shares. Your acceptance of this award constitutes your agreement that the shares of common stock subsequently acquired hereunder, if any, will not be sold or otherwise disposed of by you in violation of any applicable securities laws or regulations.

C.    This award is subject to all of the terms and conditions herein and the provisions of the Plan, and your acceptance hereof shall constitute your agreement to the administrative regulations of the Compensation Committee of the MMC Board of Directors (the Committee). In the event of any inconsistency between these terms and conditions and the provisions of the Plan, the provisions of the Plan shall prevail. You may obtain a copy of the Plan by making a request to the Senior Vice President, Human Resources and Administration of MMC.

D.    The restricted stock units are awarded in accordance with such additional administrative regulations as the Committee may, from time to time, adopt. All decisions of the Committee upon any questions arising under these terms and conditions or the Plan shall be conclusive and binding.

E.    During your lifetime, no right hereunder related to these restricted stock units shall be transferable except by will or the laws of descent and distribution.

- 3 -

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Annual Report on Form 10-K of MMC for its last fiscal year, MMC's Registration Statement on Form 8 dated February 3, 1987, describing MMC common stock, including any amendment or reports filed for the purpose of updating such description, and MMC's Registration Statement on Form 8-A/A dated January 26, 2000, describing the Preferred Stock Purchase Rights attached to the common stock, including any further amendment or reports filed for the purpose of updating such description, which have been filed by MMC under the Securities Exchange Act of 1934, as amended (the Exchange Act), are incorporated by reference herein.

All documents subsequently filed by MMC pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, subsequent to the end of MMC's last fiscal year and prior to the filing of a post-effective amendment which indicates that all securities offered have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference herein and to be a part hereof from the date of filing of such documents.

Participants may receive without charge, upon written or oral request, a copy of any of the documents incorporated herein by reference and any other documents that constitute part of this Prospectus by contacting Suzette L. Lhérisson, Manager, Executive Compensation Administration at (212)345-5659.

t&c/01162003rsu-usa

# EXHIBIT D

MARSH & McLENNAN COMPANIES, INC.

## 2000 SENIOR EXECUTIVE INCENTIVE AND STOCK AWARD PLAN

Page

1.  Purposes ........................................................................................... 1

2.  Definitions ........................................................................................ 1

3.  Administration

    (a)    Authority of the Committee ........................................................ 3
    (b)    Manner of Exercise of Committee Authority ...................................... 4
    (c)    Limitation of Liability ................................................................ 5

4.  Eligibility

    (a)    Generally.............................................................................. 5
    (b)    Annual Per-Person Limitation Applicable to Certain Awards.................. 5

5.  Stock Subject to the Plan; Adjustments

    (a)    Shares Reserved .................................................................... 5
    (b)    Manner of Counting Shares ........................................................ 6
    (c)    Type of Shares Distributable ...................................................... 6
    (d)    Adjustments .......................................................................... 6

6.  Specific Terms of Awards

    (a)    General ................................................................................ 7
    (b)    Options ................................................................................ 7
    (c)    SARs .................................................................................. 7
    (d)    Restricted Stock .................................................................... 8
    (e)    Restricted Stock Units............................................................... 9
    (f)    Stock Bonuses and Stock Awards in Lieu of Cash Awards .................. 9
    (g)    Dividend Equivalents ............................................................... 9
    (h)    Other Stock-Based Awards ........................................................ 9
    (i)    Unit-Based Awards ................................................................. 10

MARSH & McLENNAN COMPANIES, INC.

## 2000 SENIOR EXECUTIVE INCENTIVE AND STOCK AWARD PLAN

Page

7.  Certain Provisions Applicable to Awards

    (a)  Stand-Alone, Additional, Tandem and Substitute Awards .................. 10
    (b)  Terms of Awards ................................................................. 10
    (c)  Form of Payment Under Awards ............................................... 10
    (d)  Buyouts ........................................................................... 10
    (e)  Cancellation and Rescission of Awards ...................................... 10
    (f)  Awards to Participants Outside the United States .......................... 11

8.  Performance Awards

    (a)  Performance Conditions.......................................................... 11
    (b)  Performance Awards Granted to Designated Covered Employees....... 11
    (c)  Written Determinations.......................................................... 12
    (d)  Status of Section 8(b) Awards Under Code Section 162(m)............... 13

9.  Change in Control Provisions

    (a)  Acceleration Upon Change in Control.......................................... 13
    (b)  "Change in Control" Defined ................................................... 13
    (c)  "Change in Control Price" Defined............................................. 14
    (d)  Additional Payments............................................................. 14
    (e)  Pooling of Interests............................................................. 15

10. General Provisions

    (a)  Compliance with Legal and Exchange Requirements....................... 15
    (b)  Nontransferability................................................................ 15
    (c)  No Right to Continued Employment ........................................... 16
    (d)  Taxes.............................................................................. 16
    (e)  Changes to the Plan and Awards .............................................. 16
    (f)  No Rights to Awards; No Stockholder Rights................................. 16
    (g)  Unfunded Status of Awards and Trusts....................................... 16
    (h)  Nonexclusivity of the Plan...................................................... 17
    (i)  No Fractional Shares............................................................. 17
    (j)  Governing Law.................................................................... 17
    (k)  Effective Date and Approval Date.............................................. 17
    (l)  Titles and Hearings; Certain Terms............................................ 17

MARSH & McLENNAN COMPANIES, INC.

## 2000 SENIOR EXECUTIVE INCENTIVE AND STOCK AWARD PLAN

1.    *Purposes*.  The purposes of the 2000 Senior Executive Incentive and Stock Award Plan are to advance the interests of Marsh & McLennan Companies, Inc. and its stockholders by providing a means to attract, retain, and motivate senior executives of the Company and its Subsidiaries and Affiliates, and to strengthen the mutuality of interest between such senior executives and the Company's stockholders.  This Plan shall be the successor to the Marsh & McLennan Companies, Inc. 1997 Senior Executive Incentive and Stock Award Plan.

2.    *Definitions*.  For purposes of the Plan, the following terms shall be defined as set forth below:

(a)    "Affiliate" means any entity other than the Company and its Subsidiaries that is designated by the Committee as a participating employer under the Plan, provided that the Company directly or indirectly owns at least 20% of the combined voting power of all classes of voting stock of such entity or at least 20% of the ownership interests in such entity.

(b)    "Award" means any Option, SAR, Restricted Stock, Restricted Stock Unit, Stock Bonus or Stock Award in Lieu of Cash, Dividend Equivalent, Other Stock-Based Award, or Unit-Based Award, including Performance Awards granted to a Participant under the Plan.

(c)    "Award Agreement" means any written agreement, contract, or other instrument or document evidencing an Award.

(d)    "Beneficiary" means the person, persons, trust or trusts which have been designated by such Participant in his or her most recent written beneficiary designation filed with the Company to receive the benefits specified under this Plan upon the death of the Participant, or, if there is no designated Beneficiary or surviving designated Beneficiary, then the person, persons, trust or trusts entitled by will or the laws of descent and distribution to receive such benefits.

(e)    "Board" means the Board of Directors of the Company.

(f)    "Change in Control" means Change in Control as defined with related terms in Section 9.

(g)    "Code" means the Internal Revenue Code of 1986, as amended from time to time.  References to any provision of the Code shall be deemed to include successor provisions thereto and regulations thereunder.

(h)    "Committee" means the Compensation Committee of the Board, or such other Board committee as may be designated by the Board to administer the Plan.  The Committee shall consist solely of two or more directors of the Company.

(i)    "Company" means Marsh & McLennan Companies, Inc., a corporation organized under the laws of the State of Delaware, or any successor corporation.

(j)    "Dividend Equivalent" means a right, granted to a Participant under Section 6(g), to receive cash, Stock, or other property equal in value to dividends paid with respect to a specified number of shares of Stock or to periodic distributions on other specified equity securities of the Company or any Subsidiary or Affiliate.  Dividend Equivalents may be awarded on a free-standing basis or in connection with another Award and may be paid currently or on a deferred basis.

(k)    "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time.  References to any provision of the Exchange Act shall be deemed to include successor provisions thereto and regulations thereunder.

(l)    "Fair Market Value" means, with respect to Stock, Awards, or other property, the fair market value of such Stock, Awards, or other property determined by such methods or procedures as shall be established from time to time by the Committee.  Unless otherwise determined by the Committee in good faith, the Fair Market Value of Stock as of any given date shall mean the per share value of Stock as determined by using the mean between the high and low selling prices of such Stock on the immediately preceding date (or, if the NYSE was not open that day, the next preceding day that the NYSE was open for trading and the Stock was traded) as reported for such date in the table titled "NYSE--Composite Transactions," contained in The Wall Street Journal or an equivalent successor table.

(m)    "ISO" means any Option intended to be and designated as an incentive stock option within the meaning of Section 422 of the Code.

(n)    "NQSO" means any Option that is not an ISO.

(o)    "Option" means a right, granted to a Participant under Section 6(b), to purchase Stock. An Option may be either an ISO or an NQSO.

(p)    "Other Stock-Based Award" means a right, granted to a Participant under Section 6(h), that is denominated or payable in, valued in whole or in part by reference to, or otherwise based on, or related to, Stock or other securities of the Company or any Subsidiary or Affiliate, including, without limitation, rights convertible or exchangeable into Stock or such other securities, purchase rights for Stock or such other securities, and Awards with value or payment contingent upon performance of the Company, a Subsidiary, or Affiliate, or upon any other factor or performance condition designated by the Committee.

(q)    "Participant" means a person who, as an officer or employee of the Company, a Subsidiary or Affiliate, has been granted an Award under the Plan.

(r)    "Performance Award" means an Award of one of the types specified in Section 6 the grant, exercise, or settlement of which is subject to achievement of performance goals and other terms specified under Section 8.

(s)    "Plan" means this 2000 Senior Executive Incentive and Stock Award Plan, as amended from time to time.

(t)     "Preexisting Plans" mean the Marsh & McLennan Companies, Inc. 1997 Senior Executive Incentive and Stock Award Plan and any other Company plan adopted prior to 1997 and approved by the Company's stockholders that provides for the grant or award of equity-based compensation.

(u)     "Qualified Member" means a member of the Committee who is a "Non-Employee Director" within the meaning of Rule 16b-3(b)(3) and an "outside director" within the meaning of Treasury Regulation 1.162-27(e)(3) under Code Section 162(m).

(v)     "Restricted Stock" means an award of shares of Stock to a Participant under Section 6(d) that may be subject to certain restrictions and to a risk of forfeiture.

(w)     "Restricted Stock Unit" means an award, granted to a Participant under Section 6(e), representing the right to receive either Stock or cash or any combination thereof at the end of a specified deferral period.

(x)     "Rule 16b-3" means Rule 16b-3, as from time to time in effect and applicable to the Plan and Participants, promulgated by the Securities and Exchange Commission under Section 16 of the Exchange Act.

(y)     "Stock" means the Common Stock, $1.00 par value per share, of the Company or such other securities as may be substituted or resubstituted therefor pursuant to Section 5.

(z)     "SAR" or "Stock Appreciation Right" means the right, granted to a Participant under Section 6(c), to be paid an amount measured by the appreciation in the Fair Market Value of Stock from the date of grant to the date of exercise of the right, with payment to be made in cash, Stock, other Awards, or other property as specified in the Award or determined by the Committee.

(aa)     "Subsidiary" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations (other than the last corporation in the unbroken chain) owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in the chain.

(bb)     "Unit-Based Award" means a unit, granted to a Participant under Section 6(i), with value or payment contingent upon performance of the Company, a Subsidiary, or Affiliate, or upon any other factor or performance condition designated by the Committee.

3.     *Administration.*

(a)     *Authority of the Committee.*  The Plan shall be administered by the Committee. The Committee shall have full and final authority to take the following actions, in each case subject to and consistent with the provisions of the Plan:

(i)     to select Participants to whom Awards may be granted;

(ii)     to designate Affiliates;

(iii)     to determine the type or types of Awards to be granted to each Participant;

(iv)    to determine the type and number of Awards to be granted, the number of shares of Stock to which an Award may relate, the terms and conditions of any Award granted under the Plan (including any exercise price, grant price, or purchase price, any restriction or condition, any schedule for lapse of restrictions or conditions relating to transferability or forfeiture, exercisability, or settlement of an Award, and waivers or accelerations thereof, and waivers of performance conditions relating to an Award, based in each case on such considerations as the Committee shall determine), and all other matters to be determined in connection with an Award;

(v)    to determine whether, to what extent, and under what circumstances an Award may be settled, or the exercise price of an Award may be paid, in cash, Stock, other Awards, or other property, or an Award may be canceled, forfeited, exchanged, or surrendered;

(vi)    to determine whether, to what extent, and under what circumstances cash, Stock, other Awards, or other property payable with respect to an Award will be deferred either automatically, at the election of the Committee, or at the election of the Participant, and whether to create trusts and deposit Stock or other property therein;

(vii)    to prescribe the form of each Award Agreement, which need not be identical for each Participant;

(viii)    to adopt, amend, suspend, waive, and rescind such rules and regulations and appoint such agents as the Committee may deem necessary or advisable to administer the Plan;

(ix)    to correct any defect or supply any omission or reconcile any inconsistency in the Plan and to construe and interpret the Plan and any Award, rules and regulations, Award Agreement, or other instrument hereunder; and

(x)    to make all other decisions and determinations as may be required under the terms of the Plan or as the Committee may deem necessary or advisable for the administration of the Plan.

Other provisions of the Plan notwithstanding, the Board may perform any function of the Committee under the Plan, including for the purpose of ensuring that transactions under the Plan by Participants who are then subject to Section 16 of the Exchange Act in respect of the Company are exempt under Rule 16b-3. In any case in which the Board is performing a function of the Committee under the Plan, each reference to the Committee herein shall be deemed to refer to the Board, except where the context otherwise requires.

(b)    *Manner of Exercise of Committee Authority*. At any time that a member of the Committee is not a Qualified Member, any action of the Committee relating to an Award to be granted to a Participant who is then subject to Section 16 of the Exchange Act in respect of the Company, or relating to an Award intended to constitute "qualified performance-based compensation" within the meaning of Code Section 162(m) and regulations thereunder, may be taken either (i) by a subcommittee composed solely of two or more Qualified Members, or (ii) by the Committee but with each such member who is a not Qualified Member abstaining or recusing himself or herself from such action, provided that, upon such abstention or recusal, the Committee remains composed solely of two or more Qualified Members. Such action, authorized by such a subcommittee or by the Committee upon the abstention or recusal of such non-Qualified Member(s), shall be the action of the Committee for purposes of the Plan. Any

4

action of the Committee with respect to the Plan shall be final, conclusive, and binding on all persons, including the Company, Subsidiaries, Affiliates, Participants, any person claiming any rights under the Plan from or through any Participant, and stockholders. The express grant of any specific power to the Committee, and the taking of any action by the Committee, shall not be construed as limiting any power or authority of the Committee. The Committee may delegate to officers or managers of the Company or any Subsidiary or Affiliate the authority, subject to such terms as the Committee shall determine, to perform administrative functions and such other functions as the Committee may determine, to the extent permitted under applicable law and, with respect to any Participant who is then subject to Section 16 of the Exchange Act in respect of the Company, to the extent performance of such function will not result in a subsequent transaction failing to be exempt under Rule 16b-3(d).

(c)    *Limitation of Liability*. Each member of the Committee shall be entitled to, in good faith, rely or act upon any report or other information furnished to him or her by any officer or other employee of the Company or any Subsidiary or Affiliate, the Company's independent certified public accountants, or other professional retained by the Company to assist in the administration of the Plan. No member of the Committee, nor any officer or employee of the Company acting on behalf of the Committee, shall be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the Plan, and all members of the Committee and any officer or employee of the Company acting on their behalf shall, to the fullest extent permitted by law, be fully indemnified and protected by the Company with respect to any such action, determination, or interpretation.

4.    **Eligibility.**

(a)    *Generally*. Senior executives of the Company and Subsidiaries and Affiliates (including any director who is also an employee but excluding directors of the Company who are not employees) are eligible to be granted Awards under the Plan. In addition, any person who has been offered employment as a senior executive of the Company or a Subsidiary or Affiliate is eligible to be granted awards under the Plan, provided that such prospective executive may not receive any payment or exercise any right relating to an Award until such person has commenced employment with the Company or a Subsidiary or Affiliate.

(b)    *Annual Per-Person Limitation Applicable to Certain Awards*. In each fiscal year during any part of which the Plan is in effect, a Participant may be granted (i) Options under Section 6(b), (ii) SARs under Section 6(c), and (iii) Performance Awards pursuant to Section 8(b), involving Awards under Sections 6(d), 6(e), 6(f), or 6(h), relating, in the aggregate, to no more than two million shares of Stock, subject to adjustment as provided in Section 5(d). With respect to Performance Awards pursuant to Section 8(b) not relating to Stock at the date of grant (including Unit-Based Awards), the maximum amount payable to a Participant in settlement of such an Award in any fiscal year shall be the greater of the Fair Market Value of the number of shares of Stock specified in the preceding sentence (subject to adjustment) at the date of grant or at the date of settlement of the Performance Award (this limitation is separate and not affected by the limitation on shares of Stock set forth in the preceding sentence).

5.    **Stock Subject to the Plan; Adjustments.**

(a)    *Shares Reserved*. Subject to adjustment as hereinafter provided, the total number of shares of Stock reserved for issuance in connection with Awards under the Plan shall be four million (4,000,000), plus (for Awards other than ISOs) the additional number of shares of Stock specified in the succeeding sentence. There shall be added to the number of shares of Stock reserved for issuance under this Section 5(a) the number of shares authorized and

5

reserved for awards under the Preexisting Plans to the extent (A) that such shares were available for grants of awards under the Preexisting Plans immediately prior to the Approval Date or (B) that such shares were subject to outstanding awards under the Preexisting Plans on the Approval Date and thereafter an event occurs (including expiration or forfeiture) which would result in such shares again being available for Awards under the Plan (as determined pursuant to Section 5(b)). No Award may be granted if the number of shares to which such Award relates, when added to the number of shares previously issued under the Plan and the number of shares to which other then-outstanding Awards relate, exceeds the number of shares reserved under this Section 5(a). Shares of Stock issued under the Plan shall be counted against this limit in the manner specified in Section 5(b).

(b)  *Manner of Counting Shares.* If any shares subject to an Award or Preexisting Plan award are forfeited, canceled, exchanged, or surrendered or such Award or award is settled in cash or otherwise terminates without a distribution of shares to the Participant, including (i) the number of shares withheld in payment of any exercise or purchase price of or tax obligation relating to such an Award or award and (ii) the number of shares equal to the number surrendered in payment of any exercise or purchase price of or tax obligation relating to any Award or award, such number of shares will again be available for Awards under the Plan. The Committee may make determinations and adopt regulations for the counting of shares relating to any Award to ensure appropriate counting, avoid double counting (in the case of tandem or substitute awards), and provide for adjustments in any case in which the number of shares actually distributed differs from the number of shares previously counted in connection with such Award.

(c)  *Type of Shares Distributable.* Any shares of Stock distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued shares or treasury shares, including shares acquired by purchase in the open market or in private transactions.

(d)  *Adjustments.* In the event that any large, special and non-recurring dividend or other distribution (whether in the form of cash or property other than Stock), recapitalization, forward or reverse split, Stock dividend, reorganization, merger, consolidation, spin-off, combination, repurchase, share exchange, liquidation, dissolution or other similar corporate transaction or event affects the Stock such that an adjustment is determined by the Committee to be appropriate under the Plan, then the Committee shall, in such manner as it may deem equitable, adjust any or all of (i) the number and kind of shares of Stock which may thereafter be issued in connection with Awards, (ii) the number and kind of shares of Stock issued or issuable in respect of outstanding Awards or, if deemed appropriate, make provisions for payment of cash or other property with respect to any outstanding Award, (iii) the exercise price, grant price, or purchase price relating to any Award, and (iv) the number and kind of shares of Stock set forth in Section 4(b) as the annual per-person limitation; provided, however, in each case that, with respect to ISOs, such adjustment shall be made in accordance with Section 424(h) of the Code, unless the Committee determines otherwise. In addition, the Committee is authorized to make adjustments in the terms and conditions of, and the criteria and performance objectives included in, Awards (including Performance Awards and performance goals) in recognition of unusual or non-recurring events (including events described in the preceding sentence, as well as acquisitions and dispositions of assets or all or part of businesses) affecting the Company or any Subsidiary, Affiliate, or business unit, or the financial statements thereof, or in response to changes in applicable laws, regulations, accounting principles, tax rates and regulations, or business conditions or in view of the Committee's assessment of the business strategy of the Company, a Subsidiary, Affiliate, or business unit thereof, performance of comparable organizations, economic and business conditions, personal performance of a Participant, and any other circumstances deemed relevant; provided that, unless otherwise determined by the

Committee, no such adjustment shall be made if and to the extent that such adjustment would cause Options, SARs, or Performance Awards granted pursuant to Section 8(b) hereof to Participants designated by the Committee as Covered Employees (as defined in Section 8(d) hereof) to fail to qualify as "performance-based compensation" under Code Section 162(m) and regulations thereunder.

6.     *Specific Terms of Awards.*

(a)     *General.* Awards may be granted on the terms and conditions set forth in this Section 6. In addition, the Committee may impose on any Award or the exercise thereof, at the date of grant or thereafter (subject to Section 10(e)), such additional terms and conditions, not inconsistent with the provisions of the Plan, as the Committee shall determine, including terms regarding forfeiture of Awards or continued exercisability of Awards in the event of termination of employment by the Participant.

(b)     *Options.* The Committee is authorized to grant Options to participants on the following terms and conditions:

(i)     Exercise Price. The exercise price per share of Stock purchasable under an Option shall be determined by the Committee; provided, however, that, except as provided in Section 7(a), such exercise price shall be not less than the Fair Market Value of a share on the date of grant of such Option, and in no event shall the exercise price for the purchase of shares be less than par value.

(ii)     Time and Method of Exercise. The Committee shall determine at the date of grant or thereafter the time or times at which an Option may be exercised in whole or in part, the methods by which such exercise price may be paid or deemed to be paid, the form of such payment, including cash, Stock, other Awards, shares or units valued by reference to shares issued under any other plan of the Company or a Subsidiary or Affiliate (including shares or units subject to restrictions, so long as an equal number of shares issued upon exercise of the Option are subject to substantially similar restrictions), or notes or other property, and the methods by which Stock will be delivered or deemed to be delivered to Participants (including deferral of delivery of shares under a deferral arrangement).

(iii)     ISOs. The terms of any ISO granted under the Plan shall comply in all respects with the provisions of Section 422 of the Code.

(c)     *SARs.* The Committee is authorized to grant SARs to Participants on the following terms and conditions:

(i)     Right to Payment. An SAR shall confer on the Participant to whom it is granted a right to receive with respect to each share subject thereto, upon exercise thereof, the excess of (1) the Fair Market Value of one share of Stock on the date of exercise (or, if the Committee shall so determine in the case of any such right other than one related to an ISO, the Fair Market Value of one share at any time during a specified period before or after the date of exercise, or the Change in Control Price as defined in Section 9(c)) over (2) the grant price of the SAR as of the date of grant of the SAR, which shall be not less than the Fair Market Value of one share of Stock on the date of grant of such SAR (or, in the case of an SAR granted in tandem with an Option, shall be equal to the exercise price of the underlying Option).

7

(ii)     Other Terms. The Committee shall determine, at the time of grant or thereafter, the time or times at which an SAR may be exercised in whole or in part, the method of exercise, method of settlement, form of consideration payable in settlement, method by which Stock will be delivered or deemed to be delivered to Participants, whether or not an SAR shall be in tandem with any other Award, and any other terms and conditions of any SAR. Unless the Committee determines otherwise, an SAR (1) granted in tandem with an NQSO may be granted at the time of grant of the related NQSO or at any time thereafter or (2) granted in tandem with an ISO may only be granted at the time of grant of the related ISO.

(d)     *Restricted Stock.* The Committee is authorized to grant Restricted Stock to Participants on the following terms and conditions:

(i)     Issuance and Restrictions. Restricted Stock shall be subject to such restrictions on transferability and other restrictions, if any, as the Committee may impose at the date of grant or thereafter, which restrictions may lapse separately or in combination at such times, under such circumstances, in such installments, or otherwise, as the Committee may determine. Except to the extent restricted under the Award Agreement relating to the Restricted Stock, a Participant granted Restricted Stock shall have all of the rights of a stockholder including the right to vote Restricted Stock and the right to receive dividends thereon.

(ii)     Forfeiture. Upon termination of employment (as determined by the Committee) during the applicable restriction period, Restricted Stock, and any accrued but unpaid dividends or Dividend Equivalents, that is or are then subject to a risk of forfeiture shall be forfeited; provided, however, that the Committee may provide, by rule or regulation or in any Award Agreement, or may determine in any individual case, that restrictions or forfeiture conditions relating to Restricted Stock and any accrued but unpaid dividends or Dividend Equivalents will be waived in whole or in part in the event of terminations resulting from specified causes, and the Committee may in other cases waive in whole or in part the forfeiture of Restricted Stock and any accrued but unpaid dividends or Dividend Equivalents.

(iii)     Certificates for Stock. Restricted Stock granted under the Plan may be evidenced in such manner as the Committee shall determine. If certificates representing Restricted Stock are registered in the name of the Participant, such certificates shall bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Stock, the Company shall retain physical possession of the certificate, and the Company may require the Participant to deliver a stock power, endorsed in blank, relating to the Restricted Stock.

(iv)     Dividends. Dividends paid on Restricted Stock shall be either paid at the dividend payment date in cash or in shares of unrestricted Stock having a Fair Market Value equal to the amount of such dividends, or the payment of such dividends shall be deferred or the amount or value thereof automatically reinvested in additional Restricted Stock, Restricted Stock Units, other Awards, or other investment vehicles, as the Committee shall determine or permit the Participant to elect. Stock distributed in connection with a Stock split or Stock dividend, and other property distributed as a dividend, shall be subject to restrictions and a risk of forfeiture to the same extent as the Restricted Stock with respect to which such Stock or other property has been distributed.

(e)    *Restricted Stock Units*.  The Committee is authorized to grant Restricted Stock Units to Participants, subject to the following terms and conditions:

(i)    Award and Restrictions.  Delivery of Stock or cash, as the case may be, will occur upon expiration of the deferral period specified for Restricted Stock Units by the Committee (or, if permitted by the Committee, as elected by the Participant).  In addition, Restricted Stock Units shall be subject to such restrictions as the Committee may impose, if any, at the date of grant or thereafter, which restrictions may lapse at the expiration of the deferral period or at earlier or later specified times, separately or in combination, in installments or otherwise, as the Committee may determine.

(ii)    Forfeiture.  Upon termination of employment (as determined by the Committee) during the applicable deferral period or portion thereof to which forfeiture conditions apply (as provided in the Award Agreement evidencing the Restricted Stock Units), or upon failure to satisfy any other conditions precedent to the delivery of Stock or cash to which such Restricted Stock Units relate, all Restricted Stock Units, and any accrued but unpaid Dividend Equivalents, that are at that time subject to a risk of forfeiture shall be forfeited; provided, however, that the Committee may provide, by rule or regulation or in any Award Agreement, or may determine in any individual case, that restrictions or forfeiture conditions relating to Restricted Stock Units and any accrued but unpaid Dividend Equivalents will be waived in whole or in part in the event of termination resulting from specified causes, and the Committee may in other cases waive in whole or in part the forfeiture of Restricted Stock Units and any accrued but unpaid Dividend Equivalents.

(f)    *Stock Bonuses and Stock Awards in Lieu of Cash Awards*.  The Committee is authorized to grant Stock as a bonus, or to grant other Awards, in lieu of Company commitments to pay cash under other plans or compensatory arrangements.  Stock or Awards granted hereunder shall have such other terms as shall be determined by the Committee.

(g)    *Dividend Equivalents*.  The Committee is authorized to grant Dividend Equivalents to Participants.  The Committee may provide, at the date of grant or thereafter, that Dividend Equivalents shall be paid or distributed when accrued or shall be deemed to have been reinvested in additional Stock, or other investment vehicles as the Committee may specify.

(h)    *Other Stock-Based Awards*.  The Committee is authorized, subject to limitations under applicable law, to grant to Participants Other Stock-Based Awards that are deemed by the Committee to be consistent with the purposes of the Plan.  The Committee shall determine the terms and conditions of such Awards at the date of grant or thereafter.  Stock or other securities or property delivered pursuant to an Award in the nature of a purchase right granted under this Section 6(h) shall be purchased for such consideration, paid for at such times, by such methods, and in such forms, including, without limitation, cash, Stock, other Awards, notes or other property, as the Committee shall determine, subject to any required corporate action.

(i)    *Unit-Based Awards*.  The Committee is authorized to grant to Participants Unit-Based Awards that are deemed by the Committee to be consistent with the purposes of the Plan.  Such Awards may be paid or settled in cash, Stock, other Awards or property.

7.    **Certain Provisions Applicable to Awards**.

(a)    *Stand-Alone, Additional, Tandem and Substitute Awards*.  Awards granted under the Plan may, in the discretion of the Committee, be granted either alone or in addition to, in

9

respect to such excess) at the time that the amount of such excess is finally determined. Any Gross-Up Payment to be made to the Participant under this paragraph shall be payable within thirty (30) days of the date of the Change in Control.

(e) *Pooling of Interests*. Notwithstanding the provisions of this Section 9, in the event that consummation of a Change in Control is contingent on the ability to account for such Change in Control under "pooling of interests" accounting methodology, the provisions of Sections 9(a) and 9(d) hereof shall not be implemented to the extent such implementation would prevent the Change in Control transaction from being accounted for in such manner. In such event, the Committee may in its discretion take such action as it deems appropriate, without precluding the Change in Control transaction from being so accounted for, to enable holders of Awards to realize substantially similar economic results as would have been realized through application of Sections 9(a) and 9(d) hereof.

10. **General Provisions.**

(a) *Compliance with Legal and Exchange Requirements*. The Plan, the granting and exercising of Awards thereunder, and the other obligations of the Company under the Plan and any Award Agreement, shall be subject to all applicable federal and state laws, rules and regulations, and to such approvals by any regulatory or governmental agency as may be required. The Company, in its discretion, may postpone the issuance or delivery of Stock under any Award until completion of such stock exchange listing or registration or qualification of such Stock or other required action under any state, federal or foreign law, rule or regulation as the Company may consider appropriate, and may require any Participant to make such representations and furnish such information as it may consider appropriate in connection with the issuance or delivery of Stock in compliance with applicable laws, rules and regulations.

(b) *Nontransferability*. Except as otherwise provided in this Section 10(b), Awards shall not be transferable by a Participant other than by will or the laws of descent and distribution or pursuant to a designation of a Beneficiary, and Awards shall be exercisable during the lifetime of a Participant only by such Participant or his guardian or legal representative. In addition, except as otherwise provided in this Section 10(b), no rights under the Plan may be pledged, mortgaged, hypothecated, or otherwise encumbered, or subject to the claims of creditors. The foregoing notwithstanding, the Committee may, in its sole discretion, provide that Awards (or rights or interests therein) other than ISOs and Awards in tandem with ISOs shall be transferable, including permitting transfers, without consideration, to a Participant's immediate family members (i.e., spouse, children, grandchildren, or siblings, as well as the Participant), to trusts for the benefit of such immediate family members, and to partnerships in which such family members are the only parties, or other transfers deemed by the Committee to be not inconsistent with the purposes of the Plan.

(c) *No Right to Continued Employment*. Neither the Plan nor any action taken thereunder shall be construed as giving any employee the right to be retained in the employ of the Company or any of its Subsidiaries or Affiliates, nor shall it interfere in any way with the right of the Company or any of its Subsidiaries or Affiliates to terminate any employee's employment at any time.

(d) *Taxes*. The Company or any Subsidiary or Affiliate is authorized to withhold from any Award granted, any payment relating to an Award under the Plan, including from a distribution of Stock, or any payroll or other payment to a Participant, amounts of withholding and other taxes due in connection with any transaction involving an Award, and to take such other action as the Committee may deem advisable to enable the Company and Participants to

15

satisfy obligations for the payment of withholding taxes and other tax obligations relating to any Award. This authority shall include authority to withhold or receive Stock or other property and to make cash payments in respect thereof in satisfaction of a Participant's tax obligations. Other provisions of the Plan notwithstanding, only the minimum amount of Stock deliverable in connection with an Award necessary to satisfy statutory withholding requirements will be withheld.

(e)    *Changes to the Plan and Awards.*  The Board may amend, alter, suspend, discontinue, or terminate the Plan or the Committee's authority to grant Awards under the Plan without the consent of stockholders or Participants, except that any such amendment, alteration, suspension, discontinuation, or termination shall be subject to the approval of the Company's stockholders within one year after such Board action if such stockholder approval is required by any federal law or regulation or the rules of any stock exchange or automated quotation system on which the Stock may then be listed or quoted; provided, however, that, without the consent of an affected Participant, no amendment, alteration, suspension, discontinuation, or termination of the Plan may materially adversely affect the rights of such Participant under any Award theretofore granted to him or her.  The Committee may waive any conditions or rights under, or amend, alter, suspend, discontinue, or terminate any Award theretofore granted and any Award Agreement relating thereto; provided, however, that, without the consent of an affected Participant, no such amendment, alteration, suspension, discontinuation, or termination of any Award may materially adversely affect the rights of such Participant under such Award. Following the occurrence of a Change in Control, the Board may not terminate this Plan or amend this Plan with respect to Awards that have already been granted in any manner adverse to employees.

(f)    *No Rights to Awards; No Stockholder Rights.*  No Participant or employee shall have any claim to be granted any Award under the Plan, and there is no obligation for uniformity of treatment of Participants and employees.  No Award shall confer on any Participant any of the rights of a stockholder of the Company unless and until Stock is duly issued or transferred to the Participant in accordance with the terms of the Award.

(g)    *Unfunded Status of Awards and Trusts.*  The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation.  With respect to any payments not yet made to a Participant pursuant to an Award, nothing contained in the Plan or any Award shall give any such Participant any rights that are greater than those of a general creditor of the Company; provided, however, that the Committee may authorize the creation of trusts or make other arrangements to meet the Company's obligations under the Plan to deliver cash, Stock, other Awards, or other property pursuant to any Award, which trusts or other arrangements shall be consistent with the "unfunded" status of the Plan unless the Committee otherwise determines.  If and to the extent authorized by the Committee, the Company may deposit into such a trust Stock or other assets for delivery to the Participant in satisfaction of the Company's obligations under any Award.  If so provided by the Committee, upon such a deposit of Stock or other assets for the benefit of a Participant, there shall be substituted for the rights of the Participant to receive delivery of Stock and other payments under this Plan a right to receive the assets of the trust (to the extent that the deposited Stock or other assets represented the full amount of the Company's obligation under the Award at the date of deposit).  The trustee of the trust may be authorized to dispose of trust assets and reinvest the proceeds in alternative investments, subject to such terms and conditions as the Committee may specify and in accordance with applicable law.

(h)    *Nonexclusivity of the Plan.*  Neither the adoption of the Plan by the Board nor its submission to the stockholders of the Company for approval shall be construed as creating any

16

limitations on the power of the Board to adopt such other incentive arrangements as it may deem desirable, including the granting of stock options and other awards otherwise than under the Plan, and such arrangements may be either applicable generally or only in specific cases.

(i)     *No Fractional Shares.*  No fractional shares of Stock shall be issued or delivered pursuant to the Plan or any Award.  The Committee shall determine whether cash, other Awards, or other property shall be issued or paid in lieu of such fractional shares or whether such fractional shares or any rights thereto shall be forfeited or otherwise eliminated.

(j)     *Governing Law.*  The validity, construction, and effect of the Plan, any rules and regulations relating to the Plan, and any Award Agreement shall be determined in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of laws, and applicable federal law.

(k)     *Effective Date and Approval Date.*  The Plan shall become effective upon approval by the Board of Directors (the "Effective Date"); provided, however, that the Plan shall be subject to the subsequent approval by the Company's stockholders at a meeting of Company stockholders duly held in accordance with the Delaware General Corporation Law, or any adjournment thereof in accordance with applicable provisions of the Delaware General Corporation Law, such stockholder approval to be obtained not later than one year after the Effective Date (the date of such approval being referred to as the "Approval Date").  Any Awards granted under the Plan prior to such approval of stockholders shall be subject to such approval, and in the absence of such approval, such Awards shall be null and void.

(l)     *Titles and Headings; Certain Terms.*  The titles and headings of the sections in the Plan are for convenience of reference only.  In the event of any conflict, the text of the Plan, rather than such titles or headings, shall control.  The term "including," when used in the Plan, means in each case "including without limitation."