Peter N. Wang (PW 9216)
Jeremy L. Wallison (JW 6707)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329

*Attorneys for Roger Egan*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ROGER EGAN,                                    :

                      Plaintiff,     :     No. 07 Civ. 7134 (SAS)

           v.                          :

MARSH & McLENNAN COMPANIES, INC.,              :
MARSH USA INC. SEVERANCE PAY PLAN,             :
MARSH INC. FALL 2004 RESTRUCTURING             :
SEVERANCE PAY PLAN,                            :

              Defendants.     :

-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' PARTIAL MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND .................................................................................................. 1

ARGUMENT ........................................................................................................ 6

I.    MMC's Arguments For Dismissal of Egan's Second
Cause of Action Are Meritless.................................................................... 7

II.   MMC's Arguments For Dismissal of Egan's Third
Through Eleventh Causes of Action Are Meritless ................................. 13

    A.  Arguments Applicable to Each of The Third
Through Eleventh Causes of Action ................................................. 13

    B.  Arguments Specific to The Fifth, Eighth And
Eleventh Causes of Action................................................................ 16

    C.  Arguments Specific to The Third, Sixth and Ninth
Causes of Action ............................................................................... 18

    D.  Further Arguments Specific to The Ninth, Tenth
And Eleventh Causes of Action......................................................... 21

III.  MMC's Arguments For Dismissal of Egan's Twelfth
And Thirteenth Causes of Action Are Meritless...................................... 25

    A.  Egan's Failure to Allege Exhaustion of Administrative
Remedies Cannot be Grounds for Dismissal .................................... 25

    B.  MMC's Eligibility Arguments Are Unavailing ................................ 26

CONCLUSION................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

Alston v. Atlantic Elec. Co.,
    962 F.Supp. 616 (D.N.J. 1997) .................................................................. 14

Aramony v. United Way Replacement Benefit Plan,
    191 F.3d 140 (2d Cir. 1999)..................................................................... 23

Arthurs v. Metropolitan Life Ins. Co.,
    760 F.Supp. 1095 (S.D.N.Y. 1991)........................................................... 14

Bell v. Pfizer, Inc.,
    499 F.Supp.2d 404 (S.D.N.Y. 2007)......................................................... 23

Bernheim v. Litt,
    79 F.3d 318 (2d Cir. 1996)......................................................................... 6

Blessing v. J.P. Morgan Chase & Co.,
    394 F.Supp.2d 569 (S.D.N.Y. 2005)......................................................... 28

Burgie v. Euro Brokers, Inc.,
    482 F.Supp.2d 302 (E.D.N.Y. 2007) ........................................................ 14

Caiola v. Citibank, N.A., New York,
    295 F.3d 312, 323 (2d Cir. 2002)........................................................ 6-7, 8

Chertkova v. Connecticut General Life Ins. Co.,
    92 F.3d 81 (2d Cir. 1996)......................................................................... 11

Conley v. Gibson,
    355 U.S. 41 (1957).................................................................................... 6

Crews v. General American Life Ins. Co.,
    274 F.3d 502 (8th Cir. 2001) .................................................................... 21

Criscuolo v. Joseph E. Seagram & Sons, Inc.,
    No. 02 Civ. 1302, 2003 WL 22415753 (S.D.N.Y. Oct. 21, 2003) .............. 29

Devlin v. Empire Blue Cross & Blue Shield,
    274 F.3d 76 (2d Cir. 2001)....................................................................... 24

Devlin v. Transp. Commc'ns Int'l Union,
    173 F.3d 94 (2d Cir. 1999)....................................................................... 23

**TABLE OF AUTHORITIES**
**(cont'd)**

<u>**Cases**</u>                                                                    <u>**Page(s)**</u>

Engler v. Cendant Corp.,
    434 F.Supp.2d 119 (E.D.N.Y. 2006) ........................................................ 14

Ferdik v. Bonzelet,
    963 F.2d 1258 (9th Cir. 1992) .................................................................. 9

Fischer v. KPMG Peat Marwick,
    607 N.Y.S.2d 309 (N.Y. App. Div. 1st Dep't 1994) .................................... 10

Funkhouser v. Wells Fargo Bank, N.A.,
    289 F.3d 1137 (9th Cir. 2002) .................................................................. 17

Glugover v. Coca-Cola Bottling Co. of N.Y., Inc.,
    No. 91 Civ. 6331, 1993 WL 312269 (S.D.N.Y. Aug. 12, 1993) ................... 22

Gresham v. Lumbermen's Mut. Cas. Co.,
    404 F.3d 253 (4th Cir. 2005) .................................................................... 20

Guggenheimer v. Bernstein Litowitz Berger & Grossmann LLP,
    810 N.Y.S.2d 880 (N.Y. Sup. Ct., N.Y. County 2006) ........................... 22-23

Harman v. Valley National Bank of Arizona,
    339 F.2d 564 (9th Cir. 1964) ..................................................................... 8

James v. Fleet/Norstar Financial Group, Inc.,
    992 F.2d 463 (2d Cir. 1993) ..................................................................... 14

In re J.P. Morgan Chase Cash Balance Lit.,
    460 F.Supp.2d 479 (S.D.N.Y. 2006) ......................................................... 26

Karl v. Asarco, Inc. and/or its Pension Bd.,
    No. 93 Civ. 3819, 1998 WL 107113 (S.D.N.Y. March 11, 1998) ................ 27

Keiser v. CDC Inv. Mgmt. Corp.,
    No. 99 Civ. 12101, 2004 WL 516212 (S.D.N.Y. Mar. 17, 2004) ................ 23

Marks v. Newcourt Credit Group, Inc.,
    342 F.3d 444 (6th Cir. 2003) .................................................................... 17

iv

## TABLE OF AUTHORITIES
### (cont'd)

**Cases**                                                                                    **Page(s)**

Miller v. Rite Aid Corp.,
    504 F.3d 1102 (9th Cir. 2007) ................................................................... 15

Newman & Schwartz v. Asplundh Tree Expert Co., Inc.,
    102 F.3d 660 (2d Cir. 1996)..................................................................... 13

Paese v. Hartford Life Accident Ins. Co.,
    449 F.3d 435 (2d Cir. 2006)..................................................................... 25

Pearce v. Manhattan Ensemble Theater, Inc.,
    No. 06 Civ. 1535, 2007 WL 707068 (S.D.N.Y. Mar. 6, 2007) .................................. 22

Pelosi v. Schwab Capital Markets, L.P.,
    462 F.Supp.2d 503 (S.D.N.Y. 2006)............................................................ 28

Pizlo v. Bethlehem Steel Corp.,
    884 F.2d 116 (4th Cir. 1989) .................................................................... 18

Ramos v. SEIU Local 74 Welfare Fund,
    No. 01 Civ. 2700, 2002 WL 519731 (S.D.N.Y. Apr. 5, 2002)................................... 24

Robinson v. Sheet Metal Workers' Nat'l Pension Fund, Plan A,
    441 F.Supp.2d 405 (D.Conn. 2006) ........................................................ 23-24

Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,
    748 F.2d 774 (2d Cir. 1984)...................................................................... 6

Shain v. Ctr. for Jewish History, Inc.,
    No. 04 Civ. 1792, 2006 WL 3549318 (S.D.N.Y. Dec. 7, 2006)................................. 22

Shapira v. Charles Schwab & Co., Inc.,
    225 F.Supp.2d 414 (S.D.N.Y. 2002)............................................................ 22

Smith v. Dunham-Bush, Inc.,
    959 F.2d 6 (2d Cir. 1992)....................................................................... 18

Sorosky v. Burroughs Corp.,
    826 F.2d 794 (9th Cir. 1987) ................................................................. 19-20

## TABLE OF AUTHORITIES
### (cont'd)

**Cases**                                                                                      **Page(s)**

Streit v. Bushnell,
    424 F.Supp.2d 633 (S.D.N.Y. 2006)............................................................................ 9

Subaru Distributors v. Subaru of America,
    425 F.3d 119 (2d Cir. 2005)................................................................................... 7,13

Thompson v. Gen. Elec. Co.,
    No. 01 Civ. 4438, 2002 WL 482862 (S.D.N.Y. Mar. 29, 2002) ................................ 23

Thurman v. Pfizer, Inc.,
    484 F.3d 855 (6th Cir. 2007) .................................................................................... 19

Totton v. New York Life Ins. Co.,
    685 F.Supp. 27 (D.Conn. 1987)................................................................................. 18

Two Guys From Harrison-N.Y., Inc. v. S.F.R. Realty Associates,
    63 N.Y.2d 396 (N.Y. 1984) ...................................................................................... 12

U.S. v. Space Hunters, Inc.,
    429 F.3d 416 (2d Cir. 2005)...................................................................................... 26

Valentine Properties Associates, LP v. U.S. Dept. of Housing and Urban Development,
    No. 05 Civ. 2033, 2007 WL 3146698 (S.D.N.Y. Oct. 12, 2007) .............................. 12

Wigell v. Nappi,
    485 F.Supp.2d 142 (N.D.N.Y. 2007)........................................................................ 20

Wilcott v. Matlack, Inc.,
    64 F.3d 1458 (10th Cir. 1995) .................................................................................. 19

**Federal Rules**                                                                              **Page(s)**

    Fed. R. Civ. P. 8(a) ..................................................................................................... 9

    Fed. R. Civ. P. 8(e) ..................................................................................................... 9

    Fed. R. Civ. P. 8(e)(2).................................................................................................. 16

    Fed. R. Civ. P. 12(b)(6)............................................................................................. 6, 8

    Fed. R. Civ. P. 12(e) .................................................................................................... 8

Fed. R. Civ. P. 15 .................................................................................................... 9

Fed. R. Civ. P. 15(a) ............................................................................................... 2

Plaintiff, Roger Egan ("Egan"), submits this memorandum of law in opposition to the motion of Defendants Marsh & McLennan Companies, Inc., Marsh USA Inc. Severance Pay Plan, and Marsh Inc. Fall 2004 Restructuring Severance Pay Plan (collectively, "MMC") to dismiss, in part, the Complaint.

## PRELIMINARY STATEMENT

This case seeks to hold MMC to commitments, contracts and promises it made to Egan over the course of – and even after – 32 years of loyal service to the company.  Having reaped the substantial benefits Egan provided MMC in reliance on these commitments, MMC now refuses to honor its obligations to him.  Indeed, as the arguments in its motion papers demonstrate, MMC now takes the position that the commitments it made to Egan, as he gave the better part of his working life to helping build it into the financial giant it now is, were illusory.  In what can only be characterized as a breathstopping display of arrogance, MMC tries to cloak – and even justify – its position in a fabric of falsehoods, risible assertions and untenable hyper-technicalities.  Quite apart from the shamefulness of refusing, at long last, to do right by the man who, as president, helped navigate MMC to its success, MMC's arguments are purely and totally meritless.  As is shown below, the law is firmly on Egan's side in this case and dismissal of his claims is unwarranted.

## BACKGROUND

Egan was employed by MMC for 32 years – from September 1972 until December 2004. During that period, Egan rose through the corporate ranks, ultimately becoming a managing director, President and Chief Operating Officer of Marsh, Inc. ("Marsh"), MMC's risk and insurance subsidiary, and joining the elite ranks of MMC's approximately fifty member partnership.  Amended Complaint ¶ 1.

As set forth more fully in the Amended Complaint[1], Egan, over the term of his employment, and in recognition of his valuable service to MMC, was awarded stock options, restricted stock, deferred stock units and restricted stock units – all on various vesting schedules. Id. ¶ 10.  He was also given assurances by MMC, both explicitly and through its longstanding conduct, that, as an MMC partner, Marsh managing director, and even simply as an MMC employee, Egan would be entitled, upon any involuntary termination of his employment without cause, to the severance payments particularized in the Amended Complaint.  See id. ¶ 12 (describing the severance amounts paid to MMC partners), ¶ 16 (describing the severance amounts paid to managing directors of MMC subsidiaries such as Marsh), ¶ 18 (describing the severance amounts paid under two formal severance plans – the Marsh USA Inc. Severance Pay Plan ("SSP") and the Marsh Inc. Fall 2004 Restructuring Severance Pay Plan ("Restructuring SPP")), and ¶ 19 (describing the severance payments made to all employees independent of the SPP and Restructuring SPP).

MMC's consistent practice and policy of paying the above-described severance amounts was well-known throughout the company – and in particular to those, like Egan, who were charged with designing and implementing that practice and policy.  Id. ¶ 13.  Moreover, Egan's entitlement to the above also was explicitly expressed to him on a number of occasions by senior MMC agents.  For example, at a dinner in 2001, Egan raised the idea of entering into an employment contract with MMC.  MMC's then-chairman, Jeffrey Greenberg, citing the above-described consistent practice and policy, assured him no contract was necessary.  MMC, Greenberg promised, would "take care" of Egan as it took care of all its senior people.  Id. ¶ 14.

---

[1] After commencement of this action in state court and MMC's removal of it to Federal court, Egan filed an Amended Complaint pursuant to Fed. R. Civ. P. 15(a).

In reliance on these explicit and implicit assurances, Egan dropped his demand for a written agreement, passed up lucrative job offers from other companies, and continued his employment with MMC.  Id. ¶¶ 15, 17, 19, 50, 55, 60, 65, 70, 75.

Such reliance, however, would later prove misplaced.

In April 2004, the New York State Attorney General ("NYS AG") commenced an investigation of MMC.  Id. ¶ 20.  To help contain the damage from the investigation (and the litigation that followed), MMC elevated Michael Cherkasky, a close personal friend of then-Attorney General Elliot Spitzer, to the chairmanship of the company.  Id. ¶ 21.  That decision set in motion the events that led to this action.

Soon after assuming the chairmanship, Cherkasky, although acknowledging Egan's lack of culpability in anything related to the NYS AG's investigation, asked Egan to step down from his position at Marsh.  Id. ¶ 22.  As part of this request, Cherkasky reiterated MMC's policy and promises with respect to the benefits Egan would be entitled to upon his termination – and advised Egan to hire a lawyer so that Egan and MMC swiftly could conclude a "generous settlement."  Id. ¶ 23.  On the basis of that promise, and the assurance provided by MMC's past conduct, Egan agreed to step down from his position at Marsh, stay on to help with the transition and, thereafter, if appropriate, to resign.  Id. ¶ 24.

As Cherkasky directed, Egan hired a lawyer.  On or about November 12, 2004, that lawyer, Joseph Bachelder, presented Cherkasky with a proposed separation agreement ("Separation Agreement") containing, in substance, the termination package MMC regularly and consistently provided to its other terminated partners and senior officers over the years.  Id. ¶ 25.

MMC responded, on or about December 7, 2004, by constructively terminating Egan – demanding that he vacate MMC premises, giving him approximately six hours to pack his

belongings, and, thereafter, denying him access to MMC's offices and to his MMC e-mail account and personal files. Id. ¶ 26. Moreover, approximately two weeks after his constructive termination, Cherkasky told Egan that negotiation of the Separation Agreement would have to wait until the resolution of MMC's litigation with the NYS AG. Id. ¶ 27.

Still believing that MMC would ultimately fulfill its obligations to him, Egan waited. Id. ¶ 28. That patience initially appeared to be vindicated when, soon after MMC settled with the NYS AG, Cherkasky came back to Egan and again reiterated MMC's intent to honor its commitments to him – telling him that MMC was ready to negotiate the Separation Agreement and that negotiations could be concluded in ten days. Id. ¶¶ 29-30. To this end, Cherkasky advised Egan to have Bachelder contact Mike Petrullo, MMC's chief administrative officer. Two days later, Bachelder sent Petrullo the Separation Agreement for his review and approval. Id. ¶ 30.

MMC, however, soon changed course again. Despite his promises that MMC was prepared to fulfill its obligations, Cherkasky, one week later, came back and abruptly advised Egan that MMC could no longer talk to him about the Separation Agreement. Id. ¶ 31.

Egan had Bachelder attempt to reopen discussions with MMC by sending the Separation Agreement to Leon Lichter, Vice President in MMC's Legal Department. Id. ¶ 32. Egan also discussed the matter with Jack Sinnott, MMC's Vice Chairman, Office of the CEO. Sinnott again made clear that MMC would fulfill its obligations to Egan. Id. ¶ 33. Finally, Egan went back to discuss the matter with Cherkasky, who this time seemed willing, finally, to do the right thing. He reiterated again MMC's intention to make good on its obligations to Egan and promised Egan that he would get back to him within thirty days. Id. ¶ 34.

Cherkasky never contacted Egan again. Ibid.

4

Adding insult to injury, MMC also stripped Egan of his unvested equity and option awards, claiming that he "forfeited" them, and has refused to pay the required dividends on his unvested restricted stock and restricted stock units. Id. ¶ 35.

This action followed. In it, Egan seeks damages under thirteen causes of action. The first cause of action (Amended Complaint ¶¶ 38-41) seeks damages for MMC's breach of an agreement (the Special Severance Pay Plan) pursuant to which Egan was entitled to receive MMC stock equal in value to 90% of any unvested restricted equity MMC properly deemed forfeited upon his termination. The second cause of action (id. ¶¶ 42-47) seeks damages for MMC's violation of Egan's rights in all the unvested restricted stock and restricted stock units Egan held at the time of his involuntary termination. The third, sixth and ninth causes of action (id. ¶¶ 48-52, 63-67, 78-82) seek damages under implied contract, implied policy and promissory estoppel theories, respectively, for MMC's refusal to honor its commitment to provide Egan with at least the same termination package it regularly and consistently gave other terminated MMC partners and senior officers upon their involuntary termination without cause. The fourth, seventh and tenth causes of action (id. ¶¶ 53-57, 68-72, 83-87) seek damages under implied contract, implied policy and promissory estoppel theories, respectively, for MMC's refusal to honor its commitment to provide Egan with at least the same severance it regularly and consistently gave other managing directors of MMC subsidiaries upon their involuntary termination without cause. The fifth, eighth and eleventh causes of action (id. ¶¶ 58-62, 73-77, 88-92) seek damages under implied contract, implied policy and promissory estoppel theories, respectively, for MMC's refusal to honor its commitment to provide Egan with the same severance it regularly and consistently gave all employees it involuntarily terminated without cause – namely, severance equal in amount to the severance provided under any formal plans

5

covering the time period during which such employees were involuntarily terminated. Phrased

another way, the third through eleventh causes of action of the Amended Complaint outline how

other employees, managing directors, and partners were consistently treated, and demonstrate

how Egan – as president and chief operating officer, as well as a managing director and partner –

was entitled to be treated similarly or better. The twelfth cause of action (id. ¶ 93-97) seeks

damages for MMC's breach of the SPP. The thirteenth cause of action (id. ¶ 98-102) seeks

damages for breach of the Restructuring SPP.

MMC now moves to dismiss the second through thirteenth causes of action – claiming

each fails to state a claim as a matter of law. As shown below, its arguments are completely

meritless.

## ARGUMENT

When evaluating a motion to dismiss for failure to state a claim under Fed. R. Civ. P.

12(b)(6), a court must accept the facts pleaded in a complaint as true and give the complaint

every possible favorable inference. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).

Dismissal of a complaint pursuant to 12(b)(6) is not warranted "unless it appears beyond doubt

that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The task of the court in ruling on a

12(b)(6) motion "is merely to assess the legal feasibility of the complaint, not to assay the weight

of the evidence which might be offered in support thereof." Ryder Energy Distribution Corp. v.

Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984) (internal quotation marks

omitted). Moreover, in performing that task, two further well-settled principles are relevant to

the arguments asserted in MMC's motion. First, any ambiguity in the allegations of the

Amended Complaint must be resolved in Egan's favor. See e.g. Caiola v. Citibank, N.A., New

York, 295 F.3d 312, 323 (2d Cir. 2002) (stating and applying rule that complaint ambiguities must be resolved in plaintiff's favor on a motion to dismiss). Second, where, as here, the motion to dismiss is based in part of contract interpretation, any ambiguities in the relevant contracts must also be resolved in Egan's favor. Subaru Distributors v. Subaru of America, 425 F.3d 119, 122 (2d Cir. 2005).

Measured against those exacting standards, MMC's motion to dismiss must be denied in its entirety.

## I.    MMC's Arguments For Dismissal of Egan's Second Cause of Action Are Meritless

Although styled as an argument for the dismissal of the Amended Complaint's second cause of action, MMC's argument is not that at all. The Amended Complaint makes clear that Egan's second cause of action relates to *all* the unvested restricted stock and restricted stock units that MMC treated as forfeited upon Egan's termination. Amended Complaint ¶¶ 8, 40, 42. Yet, rather than attacking Egan's entitlement to relief on that claim, MMC attacks Egan's entitlement to relief only under two of the roughly 18 relevant awards. On this basis alone, MMC fails to satisfy its burden of showing that Egan's second cause of action *as actually pled in the Amended Complaint* fails to state a claim upon which relief can be granted.

No doubt aware of that dispositive defect, MMC tries to fit Egan's claim to its argument, deliberately misreading the allegations of the Amended Complaint to be claiming benefits only under the two awards MMC addresses, the 2004 Restricted Stock Award (the "2004 Award") and the 2003 Restricted Stock Unit Award (the "2003 Award"). MMC Br. at 9-10. This cynical gambit is impermissible for a number of reasons.

First, the Amended Complaint itself is quite clear that its claims extend beyond the two awards MMC addresses. As noted above, the Amended Complaint makes clear that Egan's

7

second cause of action relates to all the unvested shares MMC treated as forfeited upon Egan's termination. Amended Complaint ¶¶ 8, 40, 42. The willfulness of MMC's misreading is obvious, especially in light of the fact that MMC certainly knows that such shares relate to roughly 18 different awards made over the course of a decade – not just the two awards made in 2003 and 2004.

Second, even if there were any ambiguity in the Amended Complaint's allegations regarding the relief sought in the second cause of action, it is axiomatic that, on a motion to dismiss, the Court is required to resolve any such ambiguities in Egan's – not MMC's – favor. See e.g. Caiola, 295 F.3d at 323. Thus, it would be impermissible for the Court to adopt MMC's improperly narrow reading of the Amended Complaint.

Third, if MMC actually professes to be uncertain about the awards at issue in the second cause of action (which, again, would be astonishing in light of the fact that MMC knows full well the number of awards with respect to which it declared Egan's rights to be forfeited upon termination), the proper procedure for clarifying the Amended Complaint's allegations is not a motion to dismiss under Fed. R. Civ. P. 12(b)(6) but a motion for a more definite statement under Fed. R. Civ. P. 12(e). See e.g. Harman v. Valley National Bank of Arizona, 339 F.2d 564, 567 (9th Cir. 1964) ("mere vagueness or lack of detail is not ground for a motion to dismiss, but should be attacked by a motion for a more definite statement") (internal quotations and citation omitted).

Fourth, MMC states that the basis for its misreading of the Amended Complaint's second cause of action is that "plaintiff's *initial Complaint* set forth in detail the two restricted stock and RSU awards under which plaintiff is claiming benefits." MMC Br. at 9-10 (emphasis added). This is an absolutely prohibited use of Egan's initial complaint. Although not clearly stated,

8

MMC's argument can be read to be advancing one of two propositions – either that the allegations of the initial complaint in some way limit Egan's ability to change those allegations in the Amended Complaint, or that the allegations of the initial Complaint must be read into the Amended Complaint. Either way, MMC's argument is contrary to law. If the former, the argument runs afoul of Fed. R. Civ. P. 8(a), 8(e) and 15. See e.g. Streit v. Bushnell, 424 F.Supp.2d 633, 639-40 n.4 (S.D.N.Y. 2006) (rejecting defendant's argument that the court should disregard changes in factual statements made in amended pleadings on the ground that such a rule "runs against the letter and spirit of the flexible pleading standards embodied in Federal Rules of Civil Procedure 8(a) and 8(e) with regard to original complaints and Rule 15 as to amended pleadings"). If the latter, it runs afoul of "the well-established doctrine that an amended pleading supersedes the original pleading" and that, upon amendment, "the original pleading no longer performs any function and is 'treated thereafter as non-existent.'" Ferdik v. Bonzelet, 963 F.2d 1258, 1262 (9th Cir. 1992) (rejecting on this ground the argument that certain information deleted in an amended complaint could be filled-in by reference to information contained in the original complaint).

Given the foregoing, it is clear that MMC does not satisfy its burden of showing that the second cause of action in the Amended Complaint fails to state a claim. Indeed, as shown above, MMC simply ignores the allegations of the Amended Complaint in this regard.

Although purely academic in light of MMC's failure to justify (or even argue for) dismissal of the Amended Complaint's second cause of action *as actually pled*, it is also worth noting that MMC's arguments with respect to the 2003 Award are entirely meritless.

The 2003 Award provides that the unvested restricted stock units granted under the award either vest or are forfeited upon certain termination events. Relevant to MMC's argument, the

9

2003 Award provides as the *default* rule that the units vest upon termination of employment. Declaration of Robert N. Holtzman in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint ("Holtzman Decl."), Ex. C § IV at 1 ("If, prior to the vesting of all restricted stock units as provided above, you should cease to be employed by MMC or any of its subsidiaries or affiliates ... *all restricted stock units shall, except as provided in the next succeeding paragraph, forthwith vest in you...*") (emphasis added). It then specifies as the exceptions to that default rule termination for cause and "resignation." Properly read, therefore, the 2003 Award provides for vesting upon every termination of employment except those that constitute terminations for cause or "resignations."

In order to attack Egan's entitlement to the vesting of the relevant units, MMC necessarily is forced to characterize the termination of Egan's employment as a "resignation" for purposes of the 2003 Award. Each of MMC's arguments in this regard depends on contentions that cannot possibly be resolved against Egan on a motion to dismiss.

MMC first tries to argue that Egan's termination was a run-of-the-mill voluntary resignation. MMC Br. at 11-12. Given that Egan alleges in the Amended Complaint that he was constructively terminated (Amended Complaint ¶¶ 26, 44), this argument amounts to nothing more than a contention that Egan's allegation is factually incorrect. Clearly, that is improper on a motion to dismiss. Nor is there any argument that Egan's termination could be deemed a voluntary resignation as a matter of law. Whether Egan was constructively terminated or voluntarily resigned is a pure question of fact that must be left to the ultimate fact finder. See e.g. Fischer v. KPMG Peat Marwick, 607 N.Y.S.2d 309, 311-12 (N.Y. App. Div. 1st Dep't 1994) (holding that the question of whether a person voluntarily resigned or was constructively discharged is a question that should be left to the trier of fact).

10

To distract from this basic problem in its argument, MMC accuses Egan of gamesmanship, citing allegations of Egan's initial complaint that MMC takes to constitute an admission that he voluntary resigned. MMC Br. at 11-12. This is a red herring. MMC cites as the supposed admission allegations in the initial complaint to the effect that Egan resigned on April 8, 2005 and submitted a resignation letter. That in no way constitutes an admission that Egan voluntarily resigned nor contradicts Egan's contention that he was constructively terminated. Hidden in MMC's logic is the premise that there is some incompatibility between resigning and being constructively terminated. There is not. Indeed, constructive termination always results in the employee's resignation – the law recognizes, however, that resignation under such circumstances is involuntary and, essentially, the equivalent of getting fired. See e.g. Chertkova v. Connecticut General Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996) ("Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily").[2] Moreover, contrary to MMC's assertion, Egan has not changed – let alone contradicted – the position he advanced in his initial complaint on the circumstances of his termination. As he does in the Amended Complaint, Egan maintained in his initial complaint that he was constructively discharged. Holtzman Decl., Ex. A ¶¶ 30, 54. The only gamesmanship here is MMC's.

Perhaps recognizing that it cannot win on the argument that Egan voluntarily resigned, MMC advances the alternative argument that a constructive termination must be deemed a

---

[2] It is difficult to view MMC's arguments in this regard as made in good faith. Indeed, later in its brief, it takes the exact opposite position, claiming that "the effective date of a constructive termination is the date *that the employee actually resigns…*" MMC Br. at 30 (emphasis added).

11

"resignation" for purposes of the 2003 Award's vesting and forfeiture provision. This argument fares no better.

To begin with, as noted above, the default rule of the 2003 Award is that unvested units vest upon termination. The 2003 Award lists only two exceptions to that rule – termination for cause and resignation. Constructive termination is neither. Thus, under the doctrine of *inclusio unius est exclusio alterius*, a well-recognized canon of contract interpretation, it would be improper to read the 2003 Award as implicitly excepting constructive terminations from the default rule that unvested units vest. By listing certain termination events as exceptions, the 2003 Award impliedly excludes all others. See Two Guys From Harrison-N.Y., Inc. v. S.F.R. Realty Associates, 63 N.Y.2d 396, 403-4 (N.Y. 1984) (holding, on the basis of the doctrine, that a lease specifying certain prohibited activities impliedly permits those activities not listed).

Moreover, in order for MMC to prevail at the motion to dismiss stage on its argument that a constructive termination must be treated as a "resignation" for purposes of the 2003 Award, MMC would have to be able to show that the 2003 Award unambiguously requires that interpretation. See e.g. Valentine Properties Associates, LP v. U.S. Dept. of Housing and Urban Development, No. 05 Civ. 2033, 2007 WL 3146698, *14 (S.D.N.Y. Oct. 12, 2007) (noting the rule that a breach of contract claim can be dismissed on a motion to dismiss "only where the agreement's language is unambiguous and conveys a definite meaning"). For all the reasons shown above, it cannot – indeed, as shown above, the 2003 Award unambiguously requires the opposite interpretation. Accordingly, any question about the proper treatment of constructive terminations under the 2003 Award must, for purposes of MMC's motion to dismiss, be resolved

12

in Egan's favor.  Subaru Distributors, 425 F.3d at 122 (noting that, at the motion to dismiss

stage, any ambiguities in relevant contracts should be resolved in favor of the plaintiff).[3]

## II.  MMC's Arguments For Dismissal of Egan's Third Through Eleventh Causes of Action Are Meritless

Egan's third through eleventh causes of action seek damages, under three alternative

common law theories, for MMC's refusal to make certain payments to which Egan is entitled by

virtue of MMC's past conduct and promises.  MMC makes a variety of arguments for dismissal

of these causes of action.  All are unavailing.

### A.  Arguments Applicable to Each of The Third Through Eleventh Causes of Action

MMC first argues that each of the third through eleventh causes of action should be

dismissed because Egan's "resignation" renders him "ineligible for benefits that were supposedly

customarily given to employees who were involuntarily terminated..." MMC Br. at 14.  This

argument has been dealt with exhaustively above.  If an employee's resignation is caused by

constructive termination, the law recognizes that such an employee was, in every relevant

respect, fired.

Although not easily discerned from its papers, the gravamen of MMC's next argument

for dismissal of Egan's third through eleventh causes of action appears to be that ERISA

preempts such claims because those claims "relate to" and seek merely to enforce oral

---

[3] It is also significant in this regard that the 2003 Award was drafted and prepared entirely by MMC.  This fact, pursuant to the doctrine of *contra proferentum*, provides another reason any ambiguities in the 2003 Award should be construed against MMC.  See e.g. Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 663 (2d Cir. 1996) (admonishing the trial court, in reversing its grant of a motion to dismiss, that it "ought to have construed the facts and the law in favor of N & S for purposes of the motion to dismiss, both because pleadings are to be liberally construed and because, under the principle of *contra proferentum*, courts are to construe ambiguous contract terms against the drafter").

13

modifications of the SPP and Restructuring SPP.[4]  MMC Br. At 15-22.  This argument, too, suffers from a number of defects.

The most fundamental defect is the following.  The SPP was issued in 2003.  Holtzman Decl., Ex. G.  The Restructuring SPP was issued in 2004.  Holtzman Decl., Ex. H.  Egan's claims, on the other hand, are based on conduct and promises that occurred well before that time – and even continued after it.  See e.g. Amended Complaint ¶ 14.  Certainly, there is no basis in logic – let alone law – for the proposition that Egan's claims "relate to" and seek orally to modify rights conferred under severance plans that did not even exist at the time of the supposedly modifying conduct and promises.  In fact, the relevant case law establishes the exact opposite.  See e.g. Engler v. Cendant Corp., 434 F.Supp.2d 119, 130-31 (E.D.N.Y. 2006) (plaintiff's state law claims did not "relate to" an ERISA plan, and thus ERISA did not preempt

---

[4] MMC does not appear to argue for ERISA preemption on the basis that the promises and conduct on which Egan's claims are based create their own unwritten ERISA-governed plans separate and distinct from the SPP and Restructuring SPP.  To the extent MMC's brief can be read to make such an argument, however, it is easily disposed of.  There is nothing in the record to establish, and MMC has not even attempted to argue, that these promises and conduct placed a sufficient administrative and discretionary burden on MMC necessary to create an ERISA-governed plan.  See James v. Fleet/Norstar Financial Group, Inc., 992 F.2d 463, 467-68 (2d Cir. 1993).  See also Alston v. Atlantic Elec. Co., 962 F.Supp. 616, 623 (D.N.J. 1997) (holding that issue of whether certain severance promises constituted an ERISA plan was not amenable to resolution on a motion to dismiss).  Moreover, even assuming *arguendo* that these promises and conduct did create unwritten ERISA-governed plans, that would still not be grounds for dismissal of Egan's claims.  It is well-recognized that ERISA preemption of state-law claims does not warrant dismissal of those claims if they could have been brought under ERISA.  See e.g. Burgie v. Euro Brokers, Inc., 482 F.Supp.2d 302, 308 (E.D.N.Y. 2007) ("where a complaint characterizes a claim as a common law breach of contract, but sets forth the elements of a claim under ERISA § 502(a)(1), the court's proper course is to recharacterize the claim as a claim under ERISA § 502(a)(1)(B) rather than dismiss the complaint under the preemption doctrine"); Arthurs v. Metropolitan Life Ins. Co., 760 F.Supp. 1095, 1097-1098 (S.D.N.Y. 1991) ("Metropolitan seeks to dismiss Arthurs' state law claim for breach of the insurance contract as preempted by ERISA.  While the preemption analysis is correct, the appropriate remedy is not to dismiss the claim but rather treat is as a claim made under ERISA").

14

such claims, where claims were based on representations made to plaintiff two years before

plaintiff became eligible to participate in relevant ERISA plan).[5]

A further defect in MMC's argument that Egan's third through eleventh causes of action

"relate to" the SPP and Restructuring SPP is that, later in its brief, in attacking Egan's twelfth

and thirteenth causes of action (which seek, in the alternative, benefits directly under the SPP

and restructuring the SPP), MMC argues strenuously that Egan is not even an eligible participant

under those plans. MMC Br. at 28-30. That, too, defeats its argument. The law is well-settled

that if an employee is not an eligible participant in an ERISA plan, ERISA does not preempt the

employee's state law claims. See e.g. Miller v. Rite Aid Corp., 504 F.3d 1102, 1106 (9th Cir.

2007) ("ERISA does not preempt the claims of parties who do not have the right to sue under

ERISA because they are neither participants in nor beneficiaries of an ERISA plan ... Unlike the

Chesire [sic] Cat, one cannot have the smile of preemption without the stripes of participation")

(internal quotations and citations omitted).

This defect also fatally undermines MMC's argument that the third through eleventh

causes of action are barred by integration language in the SPP and Restructuring SPP. MMC Br.

At 15. MMC cannot have it both ways. By their terms, the integration clauses in both the SPP

and Restructuring SPP apply only to "employees covered by this Plan." Holtzman Decl., Exs. G

§ 1 at 1, H § 1 at 1. Yet, as noted above, MMC, in attacking Egan's alternative claims for

benefits under those plans, contends that Egan is not an "employee covered by" the SPP or

Restructuring SPP. In a similar vein, MMC also cites language from both plans to the effect that

"in the event of any conflict between the provisions of this document and any other

---

[5] The case law cited by MMC in this section of its brief does not hold otherwise. In each case, the court held only that an ERISA-governed severance plan *that existed prior* to certain conduct or promises could not be modified by such conduct or promises.

communication, the provisions of this document will govern." Again, since MMC is denying

that the SPP and Restructuring SPP apply to Egan at all, clearly this language cannot prevent

Egan from stating alternative claims, independent of the SPP and Restructuring SPP, for benefits

based on MMC's past conduct and promises. Further, MMC cites language from the SPP stating

that "in no event will an employee be entitled to receive benefits under both [an] employment

agreement, other contractual arrangement, or under law, and this Plan," and language from the

Restructuring SPP to the effect that "[a]n employee may not receive severance benefits under

both this Plan and any other Company or Company affiliate plan, program, policy or practice

providing similar benefits with respect to the same period of employment preceding the

employee's Termination Date." In citing this language, MMC appears to want to imply that

Egan cannot at the same time seek benefits, in the alternative, under the SPP, the Restructuring

SPP and on the basis of MMC's conduct and promises. In addition to suffering from the same

defect identified above (that MMC claims Egan is not even eligible for benefits under the SPP

and Restructuring SPP), this argument also is clearly foreclosed by Fed. R. Civ. P. 8(e)(2).

### B.    Arguments Specific to The Fifth, Eighth And Eleventh Causes of Action

Three of Egan's causes – the fifth, eighth and eleventh – seek damages "at least equal to

the severance provided under any severance plans in force at the time of his termination."

Amended Complaint ¶¶ 19, 58-62, 73-77, 88-92. MMC clearly wants to read these claims as

making an explicit demand for the benefits provided under, and therefore as "related to," the SPP

and Restructuring SPP. For all the reasons cited above – that Egan's claim is based on conduct

and promises made before MMC issued the SPP and Restructuring SPP and that MMC refuses to

treat Egan as eligible for participation in such plans – ERISA cannot preempt these claims. A

further point is also worth making, however.

16

The fifth, eighth and eleventh causes of action only seek damages "equal to" the severance provided under the SPP and Restructuring SPP – they do not seek the severance provided under those ERISA plans. In other words, the reference to the amounts provided under the SPP and Restructuring SPP is made only as a way of articulating specific and ascertainable damages for breach of obligations that arose wholly separately from, and in no way depend on, the SPP and Restructuring SPP. This is an important distinction.

First, it is well-recognized that where, as here, reference to benefits provided under an ERISA plan serves merely to articulate specific and ascertainable damages on a state law cause of action, such reference to plan benefits does not warrant ERISA preemption. See e.g. Marks v. Newcourt Credit Group, Inc., 342 F.3d 444, 453 (6th Cir. 2003) ("Because he seeks damages equaling the benefits he would have received under the plan, it seems at first glance that his claims relate to an ERISA benefit plan. However, a close reading of Marks's complaint reveals that the reference to plan benefits was only a way to articulate specific, ascertainable damages." On that basis, the circuit court reversed the district court's finding of preemption, holding that the plaintiff's state law claims would have only a "tenuous, remote or peripheral" effect on the relevant ERISA plan) (internal citations and quotations omitted); Funkhouser v. Wells Fargo Bank, N.A., 289 F.3d 1137, 1143 (9th Cir. 2002) (rejecting the argument that ERISA preempted employees' breach of contract claim even though a court would have to refer to an ERISA plan in calculating damages: "a claim does not 'relate to' an ERISA employee benefit plan simply because a court would refer to the plan in calculating damages").

Second, it is also significant that Egan is not arguing that MMC's past conduct and promises amended the SPP and Restructuring SPP and that, in these causes of action, he is not suing the plans. Consequently, were Egan to prevail on these claims, the administration of the

17

SPP and Restructuring SPP would in no way be burdened. Under the relevant case law, that is sufficient to bar ERISA preemption. See e.g. Pizlo v. Bethlehem Steel Corp., 884 F.2d 116, 120-21 (4th Cir. 1989) (holding that ERISA does not preempt employees' state law claims even where the damages would be measured by lost benefits under an ERISA-governed pension plan, since "the pension trust itself would not be liable and the administrators of the pension plan would not be burdened in any way"); Totton v. New York Life Ins. Co., 685 F.Supp. 27, 31 (D.Conn. 1987) (court reconsidered and reversed its own earlier decision that ERISA preempted employee's breach of contract claim, reasoning that "[r]ecovery of [benefits equal to those provided under an ERISA plan] will not affect the administration of the benefits plan nor will payment be made by the plan fiduciary. The recovery of benefits will be at the expense of the defendant-employer. While the amount of the recovery could thus, in part, be determined, or measured, by what benefits the plan would have provided, it would not become an allegation [sic] of the plan. It would effect neither this [sic] administration of the plan nor the financial status or obligations of the plan. The connection to the plan is too attenuated to bring the claim within the preemptive provision of ERISA").[6]

### C.    Arguments Specific to The Third, Sixth and Ninth Causes of Action

MMC also argues that ERISA preempts Egan's third, sixth and ninth causes of action, which seek amounts to which Egan is entitled by virtue of MMC's promises and its treatment of

---

[6] Smith v. Dunham-Bush, Inc., 959 F.2d 6 (2d Cir. 1992), is not to the contrary. In that case, the plaintiff was not asking for a one-time payment of damages – but for an alteration in his future pension benefits. Id. at 8 ("As a suit brought by a plan participant to clarify future benefits in relation to a covered plan…"). Clearly this, unlike Egan's claim for damages, would place a sufficient ongoing administrative burden on the employer's ERISA-governed plan to justify preemption. Smith, of course, is also inapplicable to the present case for the independent reason, already noted above, that the promises on which plaintiff premised his claims were made after an ERISA plan applicable to plaintiff was already in existence. Supra at 15, n. 5.

18

other MMC partners, because those claims "relate to ERISA employee benefit plans as he is seeking retirement pension at a bridged rate and continued health benefits." MMC Br. at 17 n.7. This fundamentally misconceives Egan's claims. Egan is not suing to alter his future payments of pension benefits, nor to reinstate his health benefits, nor is he claiming that MMC is misapplying the terms of the plans. See e.g. Amended Complaint ¶¶ 52, 67, 82. Rather, he is suing MMC for *a one-time payment of damages* for its breach of obligations created by certain promises and conduct – obligations that in no way arose from or depend on any ERISA plans. As already shown above, the mere fact that reference might need be made to numbers contained in the pension and medical plans in order to calculate certain components of that damage award (e.g. the present value of the "bridge") is, under the law, too tenuous and peripheral a connection to such plans to justify ERISA preemption. See supra at 17-18.

Two other points should also be noted with respect to these causes of action.

First, MMC appears to be arguing that Egan's claim for damages equal to the value of a bridged retirement benefit and for the value of his terminated health benefits justifies ERISA preemption of *every part* of the third, sixth and ninth causes of action. That is not the law. It is well-settled that ERISA only preempts those parts of a claim that actually relate to an ERISA plan. See e.g. Thurman v. Pfizer, Inc., 484 F.3d 855, 862-65 (6th Cir. 2007) (holding that ERISA preempted plaintiff only from recovering certain types of damages sought under two causes of action, not the causes of action themselves); Wilcott v. Matlack, Inc., 64 F.3d 1458, 1464 (10th Cir. 1995) (holding that plaintiff's state law promissory estoppel claim is not preempted by ERISA to the extent it is based on certain alleged promises, but that it is preempted to the extent based on other alleged promises); Sorosky v. Burroughs Corp., 826 F.2d 794, 800 (9th Cir. 1987) (holding, with respect to a single breach of contract claim, that it is preempted by ERISA to the

extent it "refers to the employee benefit plan," but "is not preempted to the extent it relies on

theories independent of the benefit plan"). Thus, even assuming, contrary to fact, that ERISA

applies to the portion of the third, sixth and ninth causes of action involving the value of a

bridged retirement benefit and discontinued health coverage, ERISA still would not preempt the

remaining aspects of the causes of action involving severance, bonus, vesting of restricted stock

and restricted stock unit awards, etc. ERISA preemption is not as blunt an instrument as MMC

suggests.

Second, Egan's third, sixth and ninth causes of action seek amounts that are vastly

different from those provided under the SPP, Restructuring SPP, and the retirement plans, and

MMC, in engaging in the conduct and making the promises on which these claims are based,

never once indicated that MMC partners' entitlement to the payments Egan seeks would be in

any way premised upon or limited by the terms of any plans. These facts alone are sufficient to

preclude ERISA preemption of Egan's claims. See e.g. Wigell v. Nappi, 485 F.Supp.2d 142,

145-46 (N.D.N.Y. 2007) (rejecting preemption argument because (i) "[w]here significant

differences exist between a company's existing severance plan and the promised benefits, it is

appropriate to find that the promised benefits were free-standing and were not premised in any

way on the existing plan" and (ii) "[a] company's failure to explain that a promised severance

benefit is related to an existing severance plan may be proof that the two plans are different")

(internal quotations and citations omitted); Gresham v. Lumbermen's Mut. Cas. Co., 404 F.3d

253, 259 (4th Cir. 2005) (holding that ERISA did not preempt a breach of contract claim based

on a promise of severance where (i) "the substantial differences between the severance provision

of Gresham's employment agreement and the terms of the Severance Plan – most notably the

significantly greater amount of the benefit promised to Gresham and the absence of any

20

conditions other than termination without cause – make clear that Kemper's promise to pay

Gresham severance operated independently of the Severance Plan" and (ii) "there is no

indication in the record that severance pay awarded to Gresham pursuant to his employment

agreement would be paid out of funds allocated to the Severance Plan"); Crews v. General

American Life Ins. Co., 274 F.3d 502, 505 (8th Cir. 2001) (lower court granted summary

judgment on ERISA preemption grounds, reasoning that the promises of severance constituted

unenforceable oral amendments to the company's severance plans; Court of Appeals reversed,

holding that "the significant differences between the company's existing plan and the promised

benefits, as well as the lack of any evidence linking them to each other, lead us to conclude that

the promised benefits were free-standing and were not premised in any way on the existing

plan").

### D.    Further Arguments Specific to The Ninth, Tenth And Eleventh Causes of Action

MMC also argues that Egan's ninth, tenth, and eleventh causes of action, which

sound in promissory estoppel, fail for the independent reason that New York law does not

recognize promissory estoppel as a valid cause of action in the employment context.  MMC Br.

at 22-23 n.8.  This is incorrect for several reasons.

First, many of the promises forming the basis of Egan's promissory estoppel claim were

made *after* the termination of his employment.  See Amended Complaint ¶ 30 (Cherkasky's

promise that MMC would fulfill its severance obligations to Egan), ¶ 33 (Sinnott's promise that

MMC would fulfill its severance obligations to Egan), ¶ 34 (Cherkasky's reiterated promise that

MMC would fulfill its severance obligations to Egan).[7]  Accordingly, even if it were correct that

---

[7] MMC acknowledges elsewhere that Egan has "alleg[ed] reliance on promises made . . . after termination," but contends that "there can clearly be no reliance . . . on promises supposedly

New York does not recognize promissory estoppel in the employment context, that rule would be inapplicable to Egan's claims. See e.g. Shain v. Ctr. for Jewish History, Inc., No. 04 Civ. 1792, 2006 WL 3549318, at *6 n.11 (S.D.N.Y. Dec. 7, 2006) ("Defendant points to, *inter alia*, Shapira v. Charles Schwab & Co., Inc., 225 F.Supp.2d 414, 419 (S.D.N.Y. 2002), for the proposition that 'New York does not apply the doctrine of promissory estoppel in the employment context.' However, this case discusses alleged promises made by the employer *before* entering into an employer-employee relationship, not promises allegedly made upon the termination of such a relationship").

Moreover, although there is admittedly language in certain Southern District decisions to the contrary, New York law *does* recognize promissory estoppel in the employment context. See e.g. Pearce v. Manhattan Ensemble Theater, Inc., No. 06 Civ. 1535, 2007 WL 707068, at *4 (S.D.N.Y. Mar. 6, 2007) (holding that a former employee stated a claim for promissory estoppel based on the employer's promise to pay a bonus); Glugover v. Coca-Cola Bottling Co. of N.Y., Inc., No. 91 Civ. 6331, 1993 WL 312269, at *7-8 (S.D.N.Y. Aug. 12, 1993) (holding that a former employee "alleged all of the necessary components of a promissory estoppel claim" based on the employer's promise of certain severance pay); Guggenheimer v. Bernstein Litowitz Berger & Grossmann LLP, 810 N.Y.S.2d 880, 887-88 (N.Y. Sup. Ct., N.Y. County 2006) (holding that a former employee had a viable cause of action for promissory estoppel where her employer promised to reward her with a bonus if she expended certain efforts that resulted in

---

made to plaintiff *after* his termination." MMC Br. at 25. MMC offers neither citation nor explanation in support of this contention and, in fact, it is incorrect: Egan expressly alleges that he relied on MMC's post-termination promises by forgoing suit during this time, by continuing to spend legal fees on a lawyer hired at MMC's urging to negotiate his Separation Agreement, and by not following the administrative claims procedures set forth in MMC's formal severance plans. See Amended Complaint ¶¶ 28, 80, 85, 90. Under any standard, that is sufficient reliance to support a promissory estoppel claim.

fees earned by the firm). In fact, promissory estoppel has been found viable in exactly the circumstances alleged by Egan. Compare Guggenheimer, 810 N.Y.S.2d at 883 (upholding former employee's promissory estoppel claim based in part on employer's reassurances that "everything was fine" and that she "shouldn't worry" about receiving compensation owed to her) with Amended Complaint ¶ 14 (alleging that MMC reassured Egan that it "would 'take care' of Egan as it took care of all its senior people").

Finally, MMC argues that Egan's promissory estoppel claims fail when construed as ERISA claims because Egan has not pled the requisite "extraordinary circumstances." MMC Br. at 23-25. This, too, is incorrect for several reasons. First, this issue generally is not properly resolved on a motion to dismiss. Where, as here, a plaintiff has alleged reasonable reliance on a promise, whether the reliance rises to the level of "extraordinary circumstances" should clearly be treated as a question of fact. Tellingly, MMC fails to cite a single case that holds the opposite. See Aramony v. United Way Replacement Benefit Plan, 191 F.3d 140, 143 (2d Cir. 1999) (appeal of a five-day bench trial); Bell v. Pfizer, Inc., 499 F.Supp.2d 404, 407 (S.D.N.Y. 2007) (summary judgment); Keiser v. CDC Inv. Mgmt. Corp., No. 99 Civ. 12101, 2004 WL 516212, at *1 (S.D.N.Y. Mar. 17, 2004) (summary judgment); Devlin v. Transp. Commc'ns Int'l Union, 173 F.3d 94, 96 (2d Cir. 1999) (reviewing grant of summary judgment with respect to ERISA claims including ERISA promissory estoppel claim, and reviewing grant of motion to dismiss with respect to other claims); Thompson v. Gen. Elec. Co., No. 01 Civ. 4438, 2002 WL 482862, at *7-8 (S.D.N.Y. Mar. 29, 2002)[8]; Robinson v. Sheet Metal Workers' Nat'l Pension

---

[8] Thompson does reach the question of "extraordinary circumstances" in *dicta* on a motion to dismiss, but only after concluding that plaintiff had failed to allege *any* reasonable reliance on a promise. Thompson, 2002 WL 482862, at *7-8. The case at bar is sharply distinguishable because MMC concedes that Egan *has* "alleg[ed] reliance on promises." MMC

<u>Fund, Plan A</u>, 441 F.Supp.2d 405, 410 (D.Conn. 2006) (judgment based on the stipulated record); <u>Ramos</u> v. <u>SEIU Local 74 Welfare Fund</u>, No. 01 Civ. 2700, 2002 WL 519731, at *1 (S.D.N.Y. Apr. 5, 2002) (summary judgment).  Second, Egan *has* alleged extraordinary circumstances.  The Second Circuit has held that extraordinary circumstances exist where an employer induces employees to stay by promising certain future benefits, then reneges on its promise.  <u>See</u> <u>Devlin</u> v. <u>Empire Blue Cross & Blue Shield</u>, 274 F.3d 76, 86-87 (2d Cir. 2001). Egan has alleged, if anything, even more extraordinary circumstances:  MMC's series of promises that it would provide future payments not only induced Egan to continue his employment at MMC, but also induced other forms of reliance, including forgoing a formal employment agreement, spending legal fees on a lawyer to negotiate his Separation Agreement, leaving MMC amicably and helping with the transition.  <u>See</u> Amended Complaint ¶¶ 14-15, 24, 80, 85, 90.[9]

---

Br. at 25.  Because "extraordinary circumstances" requires substantial reliance, the failure to allege reliance makes the absence of extraordinary circumstances a foregone conclusion.  In contrast, where, as here, the parties agree that Plaintiff *has* alleged reliance, determining whether that reliance rises to the level of "extraordinary circumstances" is a factual inquiry not properly resolved on a motion to dismiss.

[9] MMC also argues that Greenberg's promise to "take care" of Plaintiff as it took care of all its senior people and Cherkasky's promises that MMC would "fulfill its obligations" to Plaintiff were not sufficiently clear and unambiguous to justify promissory estoppel.  MMC Br. at 24; <u>see also</u> Am. Compl. ¶¶ 14, 31, 34.  In context, however, those promises were perfectly clear:  MMC had a "consistent and regular policy" of giving a standard termination package to its partners and senior officers, and both Egan and the MMC representatives who made the promises were well aware of that policy.  <u>Id.</u> ¶ 12, 13.  Greenberg's promise to "take care" of Egan, after noting that MMC awarded these termination packages, was a clear and unambiguous promise that Egan would receive this same package.  <u>Id.</u> at ¶ 14.  Similarly, in context, Cherkasky's promise that MMC would fulfill its obligations was a clear promise to pay the standard termination package.  <u>Id.</u> at ¶¶ 31, 43.

III.    **MMC's Arguments For Dismissal of Egan's Twelfth And Thirteenth Causes of Action Are Meritless**

Egan's twelfth and thirteenth causes of action are ERISA claims seeking benefits under the SPP and Restructuring SPP. Amended Complaint ¶¶ 93-102. MMC makes two arguments for why those causes of action fail to state a claim and should be dismissed. Both are meritless.

A.    **Egan's Failure to Allege Exhaustion of Administrative Remedies Cannot be Grounds For Dismissal**

MMC first argues that Egan's failure to plead that he exhausted the administrative remedies set forth in the relevant ERISA plans bars his twelfth and thirteenth causes of action as a matter of law. In support of this proposition, MMC cites a number of district court decisions, including some by this Court, that might be read to demand such a result. MMC Br. at 26-28. The fundamental and dispositive defect in MMC's argument, however, is that the proposition MMC advances, and the case law on which it relies, *is no longer good law.* In 2006, the Second Circuit finally made clear that failure to exhaust administrative remedies is not, as MMC would have it, a jurisdictional bar to a plaintiff's claims – but rather an affirmative defense subject to waiver, estoppel, futility and similar equitable considerations. <u>Paese</u> v. <u>Hartford Life Accident Ins. Co.</u>, 449 F.3d 435, 439 (2d Cir. 2006) ("we clarify that a plaintiff's failure to exhaust administrative remedies when bringing a claim for benefits pursuant to the Employee Retirement Income Security Act [citation omitted], does not mean we lack subject matter jurisdiction, but rather is an affirmative defense, subject to waiver, estoppel, futility, and similar equitable considerations").

The law could not be clearer on this point. It could also not be clearer on the consequences of that rule in the context of a motion to dismiss. A court can only grant dismissal on the basis of an affirmative defense "if the facts supporting the defense appear on the face of the complaint and it appears beyond doubt that the plaintiff can prove no set of facts in support

25

of his claim that would entitle him to relief." U.S. v. Space Hunters, Inc., 429 F.3d 416, 426 (2d Cir. 2005) (internal quotations and citation omitted). See also In re J.P. Morgan Chase Cash Balance Lit., 460 F.Supp.2d 479, 483 (S.D.N.Y. 2006) (recognizing that, after Paese, failure to exhaust does not provide grounds for dismissal on the pleadings). That is self-evidently not the case here. The facts pleaded in the Amended Complaint unquestionably support waiver, estoppel and futility arguments that would defeat MMC's failure to exhaust affirmative defense – and certainly do so sufficiently to survive a motion to dismiss directed at the pleadings. For example, from the time Egan was asked to resign, through the two years the parties continued negotiations, he was in frequent contact with Michael Cherkasky, MMC's president and chief executive officer, as well as other high-level MMC managers, including MMC's general counsel and its chief administrative officer, regarding the financial and other terms of his departure from the company. Never once during any of those conversations did any MMC representative suggest to Egan that the procedure he was following was inadequate or inappropriate. Indeed, the idea that Egan should have cut off his negotiations with the CEO, the general counsel and the chief administrative officer of MMC to go talk with a low-level plan administrator, or that MMC, until this litigation, ever even thought that that was the appropriate course, is simply absurd.

### B.    MMC's Eligibility Arguments Are Unavailing

MMC next argues that, regardless of any exhaustion requirement, Egan is not eligible for benefits under the SPP or the Restructuring SPP. MMC Br. at 28-30. In support of its position, MMC first cites provisions of these plans limiting eligibility only to employees terminated for certain reasons and under certain circumstances and then simply asserts as fact that Egan cannot meet these eligibility criteria. This argument is unavailing for two reasons.

26

First, at this point, prior to discovery, information about the reasons for MMC's decision to terminate Egan – and whether those reasons satisfy the eligibility criteria of the plans – remains in MMC's exclusive possession. Instead of telling Egan its reasons – or, in the language of the plans, "notifying" him – MMC, without explanation, simply locked him out of his office one day in December 2004, demanded that he vacate MMC premises, and, thereafter, denied him any further access to MMC's offices and to his MMC e-mail account and personal files. Amended Complaint ¶ 26. Certainly, it would be inappropriate and unfair under these circumstances for the Court to conclude, as a matter of law and prior to any opportunity for discovery on the issue, that Egan cannot not satisfy the eligibility criteria of the plans. Tellingly, the only case MMC cites in support of its argument was decided after discovery on summary judgment – not on a motion to dismiss. See Karl v. Asarco, Inc. and/or its Pension Bd., No. 93 Civ. 3819, 1998 WL 107113, *1 (S.D.N.Y. March 11, 1998).[10]

---

[10] One fact that is known at this point, which certainly raises a strong inference that MMC terminated Egan for reasons that would make him eligible for benefits under the plans, is that MMC chose December 7, 2004 to lock Egan out of his office and kick him off MMC's premises. That is significant because December 7, 2004 falls squarely within the limited time periods covered by the plans. Anticipating this argument, MMC contends that Egan still would not be eligible for benefits under the Restructuring SPP, which requires that the employee be "notified of their involuntary termination between November 1, 2004 and December 31, 2004," because (i) Egan did not technically resign until April 8, 2005, and (ii) "the effective date of constructive termination is the date the employee actually resigns..." MMC Br. at 29-30. MMC's argument misses the point. The Restructuring SPP requires only that the employee be *notified* of his involuntary termination between the relevant dates. It does not require that the employee's employment actually terminate between the relevant dates. Indeed, quite the opposite – the Restructuring SPP has as another condition of eligibility that the employee notified of his or her termination actually stay on "in good standing" after such notification "until the last day of employment with the Company as designated by the Company." Holtzman Decl., Ex. H § 2(a)(ii) at 1. Given that focus on notification, rather than the date of actual termination, the events of December 7, 2004 certainly satisfy the Restructuring SPP's requirements. By any standard, giving Egan six hours to pack up his belongings and thereafter locking him out of his office and kicking him permanently off MMC's premises, provided clear, unmistakable and

27

Second, the fact that the SPP and Restructuring SPP both require for eligibility that the employee receive from MMC certain formal notifications that the employee was being terminated for certain stated reasons is also not dispositive. MMC appears to contend that, by constructively terminating an employee rather than following the termination procedures described in the plans, it can simply avoid its obligations under the plans. That is not the law. See e.g. Pelosi v. Schwab Capital Markets, L.P., 462 F.Supp.2d 503, 510-11 (S.D.N.Y. 2006) (severance plan provided that employee was entitled to severance in the event of involuntary termination, such as where the employee's job was eliminated and he was not offered a new position; after terminating employee, company offered employee a new position; on the basis that the new position was not comparable, employee resigned; court rejected company's argument that employee was not eligible for benefits under the plan in light of his resignation, reasoning that "[t]o credit the Schwab Defendants' reading of the Plan would allow them to deny an employee severance benefits in connection with a Corporate Transaction under any circumstances in which that employee did not want to accept the post-closing job offer, 'even if offered occasional employment by the new owner as a janitor at the minimum wage.' Such a reading of the Plan would clearly defeat its intended purpose") (internal citation omitted); Blessing v. J.P. Morgan Chase & Co., 394 F.Supp.2d 569, 584 (S.D.N.Y. 2005) (language of plan obligated company to pay severance upon elimination of employee's position unless the employee were offered another position; court held that the company could not avoid its severance obligations under the plan through the artifice of offering the employee a non-comparable position, reasoning that "[a]t some point, such an offer may constitute discrimination

---

unambiguous notice that MMC had decided to terminate his employment. Did MMC really expect him to go back to work the next day?

or a constructive discharge under ERISA § 510"); Criscuolo v. Joseph E. Seagram & Sons, Inc.,

No. 02 Civ. 1302, 2003 WL 22415753, *8 (S.D.N.Y. Oct. 21, 2003) ("In principle, there is no

reason why the constructive discharge doctrine should not apply in interpreting the meaning of

'involuntary termination' in an ERISA-governed benefits plan. Presumably, an employee forced

to resign because 'his employer, rather than discharging him directly, intentionally created a

work atmosphere so intolerable that he was forced to quit' … could claim to be eligible for

severance pay under the terms of an ERISA plan, like this one, that conditions eligibility on

involuntary termination") (internal citations omitted). Allowing MMC to avoid its obligations to

Egan under the plans simply by constructively terminating him would run afoul of this rule and

render the rights provided under the plans illusory.[11]

## CONCLUSION

For all of the foregoing reasons, Egan respectfully submits that MMC's motion should be

denied in its entirety.[12]

Dated: New York, New York
December 3, 2007

By: /s/ Peter N. Wang
Peter N. Wang (PW 9216)
Jeremy L. Wallison (JW 6707)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
(212) 682-7474

*Attorneys for Plaintiff Roger Egan*

---

[11] In a final footnote, MMC notes that, under the terms of the SPP and Restructuring SPP, Egan cannot recover under both plans. While that is certainly true, it is irrelevant on a motion to dismiss. See Fed. R. Civ. P 8(e)(2).

[12] In the event any portion of the Amended Complaint is found to be deficient, Egan respectfully requests leave to replead.