**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------- X

**ROGER EGAN,**                                   :
                                                  :
                      **Plaintiff,**              :
                                                  :            **OPINION AND ORDER**
           **- against -**                        :
                                                  :            **07 Civ. 7134 (SAS)**
**MARSH & McLENNAN COMPANIES,**    :
**INC., MARSH USA INC. SEVERANCE**  :
**PAY PLAN, MARSH INC. FALL 2004**   :
**RESTRUCTURING SEVERANCE**         :
**PAY PLAN,**                                     :
                                                  :
                      **Defendants.**            :
-------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Roger Egan, a former president and chief operating officer of Marsh,

Inc. ("Marsh"), brings this action against its parent company Marsh & McClennan

Companies, Inc. ("MMC") and two of its severance plans:  Marsh USA Inc.

Severance Pay Plan (the "SPP") and Marsh Inc. Fall 2004 Restructuring Severance

Pay Plan (the "Restructuring SPP").  Egan seeks, inter alia, to enforce termination

and severance benefits to which he is allegedly entitled, bringing claims for breach

of contract, breach of implied contract, "breach of policy," and promissory

estoppel.  These claims stem from Egan's alleged constructive termination from

Marsh in December 2004 following thirty-two years of employment, and in the

wake of the New York State Attorney General Office's investigation of MMC.

For the following reasons, defendants' motion to dismiss is granted in part and

denied in part.

## II.    BACKGROUND[1]

### A.    The Parties

Defendant MMC, a Delaware corporation with its principal place of

business in New York, New York, is a "global professional services firm which

owns companies active in the sectors of risk and insurance services, risk

consulting and technology, and investment management."[2]  Roger Egan began his

employment with MMC in September 1972 and eventually became a partner, as

well as a managing director, President, and Chief Operating Officer of Marsh,

MMC's risk and insurance subsidiary.[3]

Defendant SPP is a severance plan sponsored by Marsh USA Inc.[4]

---

[1]    The following facts are drawn from the Amended Complaint and are assumed to be true for purposes of this motion.

[2]    Amended Complaint ("Compl.") ¶ 6.

[3]    *See id.* ¶¶ 1, 9.

[4]    *See id.* ¶ 7.

Defendant Restructuring SPP is a severance plan sponsored by Marsh.[5]

### B.    Plaintiff's Alleged Benefits

As a partner and senior officer and "in recognition of his valuable service to MMC," Egan was "awarded stock options, restricted stock, deferred stock units and restricted stock units."[6] As an executive of MMC, Egan participated in its Special Severance Pay Plan,[7] which provided for the payment of a severance award of MMC shares equal to a percentage of the restricted stock and restricted stock units the executive forfeited upon termination.[8] Moreover, MMC had a:

> consistent and regular policy of paying, upon involuntary termination without cause, cash severance in an amount equal to a multiple of the individual's base salary and bonus (including stock bonus), a prorated portion of the individual's bonus in the year of his/her termination, immediate vesting of all restricted stock and restricted stock unit awards, an extension of the exercise period on the individual's stock option awards for the remainder of

---

[5]    *See id.* ¶ 8.

[6]    *Id.* ¶ 10.

[7]    Defendants have not moved to dismiss plaintiff's claim for breach of contract under the Special Severance Pay Plan.

[8]    *See id.* ¶ 11. Such termination could not be for cause, death, total and permanent disability or normal retirement, and participating executives must have had at least ten years of service with MMC at the time of termination and be grantees of certain types of restricted stock awards. *See id.*

> the exercise term of the awards, a continuation of the
> individual's health benefits, the immediate payment of the
> individual's retirement pension at a 'bridged' rate equal to
> the amount the individual would have been entitled to had
> he/she waited until the age of 62 to retire, and the
> continuation of indemnification/D&O liability insurance.[9]

This package of benefits was consistently awarded to MMC's partners and senior

officers upon their involuntary termination without cause.[10] As a manager, Egan

was often consulted regarding the termination packages to be offered to outgoing

partners and senior officers.[11]

Egan was told by superiors that he too would be entitled to these

benefits should he ever be involuntarily terminated without cause.[12] For example,

in 2001, Egan approached Jeffrey Greenberg, then-chairman of MMC, with the

prospect of entering into an employment contract[13] since the terms of his

employment, including his termination rights, were never reduced to a written

contract.[14] Greenberg told Egan that it was MMC's practice and policy not to have

---

[9]    *Id.* ¶ 12.

[10]   *See id.*

[11]   *See id.* ¶ 13.

[12]   *See id.* ¶ 14.

[13]   *See id.*

[14]   *See id.* ¶ 2.

employment contracts with its partners and senior officers because they were not necessary since MMC consistently awarded generous termination packages to its senior employees, especially its partners.[15]  Furthermore, Greenberg told Egan that MMC would "take care" of Egan in this same way.[16]  In reliance upon MMC's past treatment of its partners and senior officers as well as representations that he would be treated in at least the same way, Egan passed up lucrative job offers from other employers and continued to work for MMC.[17]

Egan further alleges that MMC also had a consistent policy and practice of paying at least a year's base salary plus bonus, upon involuntary termination without cause, to the managing directors of its subsidiaries.[18]  Egan relied upon this policy and practice in deciding to remain at MMC, believing that should he fail to receive severance benefits as a partner, he would still be entitled to receive such benefits as a managing director of Marsh.[19]

In addition to these policies and practices, MMC had at least two

---

[15]    *See id.* ¶ 14.

[16]    *See id.*

[17]    *See id.* ¶ 15.

[18]    *See id.* ¶ 16.

[19]    *See id.* ¶ 17.

formal severance plans: the SPP and the Restructuring SPP.[20]  Managing directors
are entitled to severance equal to one year's base salary under the SPP, or one
year's base salary plus sixty percent of the managing director's prior year bonus
(in Egan's case, his 2003 bonus) under the Restructuring SPP.[21]

Even if an employee was not eligible for severance benefits under the
SPP, the Restructuring SPP, or any other formal plan, Egan alleges that MMC had
a regular and consistent policy of "paying severance equal to the severance
provided under such plans to any employee involuntarily terminated without cause
during the time period covered by such plans."[22]  As such, Egan had reason to
believe that he would be entitled to severance benefits under this policy should he
fail to receive them under the policies governing partners and senior officers, or
managing directors, or pursuant to the terms of the SPP and the Restructuring
SPP.[23]

C.    **Plaintiff's Alleged Termination**

In April 2004, the Office of the Attorney General of the State of New

---

[20]    *See id.* ¶ 18.

[21]    *See id.*

[22]    *Id.* ¶ 19.

[23]    *See id.*

York (the "NYAG") commenced an investigation of MMC.[24]  Thereafter, Michael

Cherkasky was elevated to the head of MMC.[25]  Cherkasky asked Egan to resign

from MMC in the fall of 2004, but acknowledged that Egan was not responsible

for any of the activities being investigated by the NYAG.[26]  Further, Cherkasky

told Egan that he would be entitled to benefits upon his termination, consistent

with MMC's usual policy and practice.  Egan was instructed to retain a lawyer so

that MMC could reach a "generous settlement" with him.[27]  In reliance on these

representations and on the basis of MMC's past conduct with respect to employees

terminated without cause, Egan agreed to stay on at MMC to "help with the

transition and, thereafter, if appropriate, to resign."[28]

Subsequently, Egan retained an attorney, Joseph Bachelder, Esq., who

presented Cherkasky with a proposed separation agreement.[29]  The terms of this

separation agreement were entirely based on the termination packages that MMC

---

[24]    *See id.* ¶ 20.

[25]    *See id.* ¶ 21.

[26]    *See id.* ¶ 22.

[27]    *Id.* ¶ 23.

[28]    *Id.* ¶ 24.

[29]    *See id.* ¶ 25.

had regularly provided to other partners and senior officers who had been involuntarily terminated without cause.[30]  Egan alleges that, despite the agreement that he would remain to assist with the transition, he was constructively terminated on December 7, 2004 when he was told to vacate the premises, to gather his belongings within six hours, and was then denied access to MMC's offices, his email account, and his personal files.[31]

Approximately two weeks later, Cherkasky told Egan that the negotiation of his separation agreement could not occur until MMC resolved its pending litigation with the NYAG.[32]  A settlement between MMC and the NYAG was reached on January 31, 2005, and on February 8, 2005, "Cherkasky reiterated MMC's obligations to Egan, telling him that MMC was ready to negotiate the [s]eparation [a]greement and that negotiations could be concluded in ten days."[33] Cherkasky instructed Egan to have his attorney send the proposed separation agreement to Mike Petrullo, MMC's chief administrative officer, for his review

---

[30]     *See id.*

[31]     *See id.* ¶ 26.

[32]     *See id.* ¶ 27.

[33]     *Id.* ¶ 30.

-8-

and approval, which Bachelder did soon thereafter.[34]  One week later, however,

Cherkasky told Egan that MMC could no longer discuss the separation agreement

with Egan.[35]

On or about November 4, 2005, Bachelder made a third attempt to

discuss Egan's separation agreement, sending it to Leon Lichter, Vice President in

MMC's legal department.[36]  Egan also discussed the matter with MMC's Vice

Chairman of the Office of the CEO, Jack Sinnott, on November 22, 2005.[37]

According to Egan, Sinnott made clear that MMC would fulfill its obligations to

Egan.[38]  Over a year later, on or about March 16, 2007, Egan again discussed the

issue with Cherkasky, who told him that MMC was prepared to fulfill its

obligations and he would get back to him in thirty days.[39]  Cherasky, however,

failed to contact Egan again.[40]

---

[34]    *See id.*

[35]    *See id.* ¶ 31.

[36]    *See id.* ¶ 32.

[37]    *See id.* ¶ 33.

[38]    *See id.*

[39]    *See id.*

[40]    *See id.*

To date, Egan has received no termination or severance benefits. Moreover, MMC has cancelled Egan's option awards and "also stopped paying Egan dividends on his MMC restricted stock and restricted stock units, claiming that [he] had 'forfeited'" them.[41]

## III.  APPLICABLE LAW

### A.  Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[42]  To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[43]  Although the complaint need not provide "detailed factual allegations,"[44] it must "amplify a claim with some factual allegations . . . to render the claim *plausible*."[45]  The standard is no longer that a

---

[41]    *Id.* ¶ 35.

[42]    *Erickson v. Pardus*, — U.S. —, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[43]    *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1970 (2007).

[44]    *Id.* at 1964. *Accord ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007) (applying the standard of plausibility outside *Twombly's* anti-trust context).

[45]    *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original) (holding that the complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department

-10-

complaint can be dismissed only if there is "no set of facts" that plaintiff could prove "which would entitle him to relief."[46]  Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[47]

When deciding a motion to dismiss under Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[48] and "draw all reasonable inferences in plaintiff's favor."[49]  Even though plaintiff's allegations are taken as true, the claim may still fail as a matter of law if the claim is not legally feasible.[50]  "[B]ald assertions and conclusions of law will not suffice."[51]  Moreover, a court need not accord "legal conclusions, deductions or

---

of Justice would be aware of policies concerning individuals arrested after the events of September 11, 2001).

[46]    *Bell Atlantic*, 127 S. Ct. at 1969 (quoting *Conley v. Gibson*, 355 U.S. 45-46 (1957)). *Accord id.* ("The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

[47]    *ATSI*, 493 F.3d at 98 (quoting *Bell Atlantic*, 127 S. Ct. at 1965).

[48]    *Bell Atlantic*, 127 S. Ct. at 1964.

[49]    *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[50]    *See Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006).

[51]    *Law Offices of Curtis v. Trinko, L.L.P. v. Bell Atlantic Corp.*, 309 F.3d 71, 74 (2d Cir. 2002) (quotation marks omitted).

-11-

opinions couched as factual allegations . . . a presumption of truthfulness."[52]

### B.    Breach of Contract

To establish a claim for breach of contract under New York law, a party must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."[53]  In determining a party's obligations under a contract, it is not for the court to "supply a specific obligation the parties themselves did not spell out."[54]  "The interpretation of an unambiguous contract is a question of law for the court, and the provisions of a contract addressing the rights of the parties will prevail over the allegations in a complaint."[55]  At the motion to dismiss stage, where a plaintiff's "factual allegations or legal conclusions are flatly contradicted by documentary evidence, they are not presumed to be true, or even accorded favorable inference[,]" in the context of a breach of contract action.[56]

---

[52]    *In re NYSE Specialists Sec. Litig.*, No. 06-1038-cv, 2007 WL 2701341, at *5 (2d Cir. Sept. 18, 2007) (quotation marks and citation omitted).

[53]    *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000).

[54]    *Tonking v. Port Auth. of New York and New Jersey*, 3 N.Y.3d 486, 490 (2004).

[55]    *Taussig v. Clipper Group, L.P.*, 787 N.Y.S.2d 10, 11 (1st Dep't 2004).

[56]    *Id.*

Under Delaware law, the plaintiff must establish: "first, the existence of a contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[57]

## C.   Employee Retirement Income Security Act ("ERISA") Preemption

Section 514(a) of ERISA explicitly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."[58]  "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan."[59]  The Supreme Court has "long acknowledged that ERISA's pre[]emption provision is clearly expansive."[60] Indeed, at various times, the Court has stated that the preemption provision has "broad scope," an "expansive sweep," and is "broadly worded," "conspicuous for

---

[57]   *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  Defendants contend that plaintiff's second claim for breach of contract is governed by Delaware law pursuant to a choice of law provision in the MMC 2000 Senior Executive Incentive and Stock Award Plan. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint ("Def. Mem.") at 12 n.6.

[58]   29 U.S.C. § 1144(a).

[59]   *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983).

[60]   *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324 (1997) (quotation marks and citation omitted).

-13-

its breadth," and "deliberately expansive."[61]  The Supreme Court, however, has

warned that "[i]f 'relate to' were taken to extend to the furthest stretch of

indeterminacy, then for all practical purposes pre[]emption would never run its

course for [r]eally, universally, relations stop nowhere."[62]

A preemption analysis under ERISA must begin with the "starting

presumption that Congress does not intend to supplant state law."[63]  Outlining the

Supreme Court's preemption jurisprudence, the Second Circuit has described two

ways in which preemption will apply.  *First*, preemption will apply where a state

law "clearly refers to ERISA plans . . . or where the existence of ERISA plans is

essential to the law's operation."[64]  *Second*, a state law that "has a clear connection

with a[n] [ERISA] plan in the sense that it . . . provide[s] alternative enforcement

---

[61]     *Id.* (quotation marks and citations omitted).

[62]     *New York State Conference of Blue Cross & Blue Shield Plans v.
Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (quotation marks and citation
omitted).  Indeed, the Supreme Court has "explained that to interpret the term
["relate to"] literally would render Congress's words of limitation a mere sham."
*Hattem v. Schwarzenegger*, 449 F.3d 423, 428 (2d Cir. 2006) (citing *Travelers*,
514 U.S. at 655).

[63]     *Travelers*, 514 U.S. at 654.

[64]     *Plumbing Indus. Bd. v. E.W. Howell Co.*, 126 F.3d 61, 67 (2d Cir.
1997).

-14-

mechanisms" is preempted.[65] "Outside these areas, the presumption against preemption is considerable – state laws of general application that merely impose some burdens on the administration of ERISA plans . . . should not be disturbed."[66]

### D.    Promissory Estoppel

"The law of promissory estoppel varies according to whether the alleged promise relates to ERISA benefits."[67] *First*, in the ERISA context, promissory estoppel may be used to redress injury that arises from the denial of ERISA benefits.[68] In such cases, "'state law does not control.'"[69] Promissory estoppel in ERISA cases requires satisfaction of four elements: "'(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if

---

[65]    *Id.*

[66]    *Id.*

[67]    *Weinberg v. Mizuho Capital Markets Corp.*, No. 03 Civ. 2612, 2003 WL 22462022, at *7 (S.D.N.Y. Oct. 30, 2003).

[68]    *See id.*

[69]    *Id.* (quoting *Devlin v. Empire Blue Cross and Blue Shield ("Devlin II")*, 274 F.3d 76, 85 n.5 (2d Cir. 2001) (noting that "general common law principles apply")).

-15-

the promise is not enforced.'"[70]    To minimize "the danger that commonplace communications from employer to employee will routinely give rise to employees' rights beyond those contained in formal benefit plans," the Second Circuit has added a fifth element: "extraordinary circumstances."[71]  Extraordinary circumstances are present, for example, where an employer promised severance benefits to persuade an employee to retire and then reneged.[72]  Other types of intentional inducement and deception also qualify.[73]

        *Second*, promissory estoppel may arise under state common law. Here, the parties agree that New York law applies.  Under the clear weight of authority in this Circuit, however, it is apparent that New York does not recognize promissory estoppel as a valid cause of action within the employment context.[74]

---

[70]    *Abbruscato v. Empire Blue Cross and Blue Shield*, 274 F.3d 90, 100-01 (2d Cir. 2001) (quoting *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 151 (2d Cir. 1999)).

[71]    *Aramony*, 191 F.3d at 151.

[72]    *See Devlin v. Transportation Commc'ns Int'l Union ("Devlin I")*, 173 F.3d 94, 102 (2d Cir. 1999).

[73]    *See id.*

[74]    *See Baguer v. Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393, 2007 WL 2780390, at *5 (S.D.N.Y. Sept. 20, 2007) (citing *Weinberg*, 2003 WL 22462022, at *7; *Deutsch v. Kroll Assocs.*, No. 02 Civ. 2892, 2003 WL 22203740, at *3 (S.D.N.Y. Sept. 23, 2003); *Miller v. Citicorp*, No. 95 Civ. 9728, 1997 WL 96569, at *10 (S.D.N.Y. Mar. 4, 1997)).

-16-

## IV.    DISCUSSION

### A.    Plaintiff's Second Claim May Proceed

Defendants move to dismiss plaintiff's claim for breach of contract

under the restricted stock and restricted stock unit awards, contending that under

the plain language of those awards, plaintiff's resignation of his position prior to

the vesting date resulted in his forfeiture of those benefits.  Plaintiff opposes the

motion primarily on the ground that because he was constructively terminated,  the

plain language relied on by defendants does not apply.

The parties dispute which restricted stock and restricted stock unit

awards are implicated by plaintiff's breach of contract claim.[75]  Because plaintiff's

complaint is taken as true at this stage in the proceedings and because his second

claim globally refers to the "grants of restricted stock and restricted stock units

made to Egan during his employment with MMC,"[76] I decline to solely consider

the two specific awards MMC discusses in its motion to dismiss.

Plaintiff, however, has failed to append the award plan documents

---

[75]     Memorandum of Law in Opposition to Defendants' Partial Motion to
Dismiss ("Pl. Opp.") at 7 ("MMC tries to fit Egan's claim to its argument,
deliberately misreading the allegations of the Amended Complaint to be claiming
benefits only under the two awards MMC addresses, the 2004 Restricted Stock
Award [] and the 2003 Restricted Stock Unit Award [].").

[76]     Compl. ¶ 43.

corresponding to each of the "roughly [eighteen] different awards made [to plaintiff] over the course of a decade."[77]  Some of those documents appear to be appended to defendants' motion to dismiss, but the Court declines to consider or take judicial notice of those documents.  The Second Circuit has noted that "generally, the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered."[78]  A "plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion . . . ."[79]  "Consideration of extraneous material in judging the sufficiency of a complaint is at odds with the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2)" and "risks depriving the parties of a fair adjudication of the claims by examining an incomplete record."[80]  Courts may consider documents appended to a defendant's motion to dismiss.  It will usually only do so, however, when the document is undisputedly authentic and when it is

---

[77]    Pl. Opp. at 8.

[78]    *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).

[79]    *Id.* (citing *Cortec*, 949 F.2d at 47-48).

[80]    *Id.* at 154-55.

-18-

central to plaintiff's claims.[81]

Plaintiff does not explicitly dispute the authenticity of the stock

award documents appended to defendants' motion, but those documents clearly do

not constitute a comprehensive set of the plans at issue, as described in the

Complaint.[82] It is within the Court's discretion to determine "whether to consider

this claim as presented in the Amended Complaint,"[83] and I take that approach

here to find that plaintiff has sufficiently stated a cause of action for breach of

contract under both New York and Delaware law. Plaintiff has sufficiently alleged

the existence of contracts granting him restricted stock and restricted stock units

during his employment at MMC. Further, he has alleged that he continued in his

---

[81]    *See, e.g., Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 n.9 (8th Cir. 1997) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

[82]    *Cf. Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196-97 (2d Cir. 2005) (considering a copy of a contract appended to defendants' motion to dismiss where plaintiff referred extensively to that contract in its complaint, purported to quote from it, and failed to dispute the accuracy of defendant's proffered copy).

[83]    *Chambers*, 282 F.3d at 155 ("Once the District Court was presented with matters outside the pleadings, Rule 12(b) afforded two options. The court could have excluded the extrinsic documents. Because it elected not to do so, however, the court was obligated to convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56.").

employment with MMC until he was constructively terminated prior to the vesting

of certain stock awards.  Pursuant to the terms of those awards, plaintiff alleges

that MMC had an obligation to effect the vesting of his stock upon his termination

but has failed to do so, instead claiming that he forfeited those shares.  Because

plaintiff has adequately pled a claim for breach of contract and because the Court

cannot determine at this point in the proceedings whether his claim is untenable as

a matter of law in light of the provisions of the contracts at issue, I decline to

dismiss plaintiff's second claim.

**B.    Plaintiff's Third Through Eleventh Claims Are Dismissed Because They Are Preempted by ERISA**

Defendants move to dismiss plaintiff's common law claims for

severance and termination benefits primarily on the ground that those claims

"involve unenforceable alleged oral modifications to formal ERISA plans" and are

therefore preempted by ERISA.[84]  Plaintiff alleges that defendants breached

implied contracts and policies by failing to pay him at least the same benefits

consistently given to three groups of employees upon their involuntary termination

– *i.e.*, partners and senior officers, managing directors, and any employee – and

those alleged benefits differ across these groups.

---

[84]    Def. Mem. at 15.

-20-

As an initial matter, I reject defendants' argument that "plaintiff's resignation render[s] him ineligible for benefits that were supposedly customarily given to employees who were involuntarily terminated."[85]  Plaintiff alleges that he was constructively discharged by MMC at the end of 2004.[86]  Courts in this Circuit have stated, albeit in dicta, that employees who are constructively discharged, where their "employer[s], rather than discharging them directly, intentionally create a work atmosphere so intolerable"[87] that they are forced to quit, can claim eligibility for severance payments even when such payments are conditioned upon involuntary termination.[88]

### 1.     Claims Three, Five, Six, and Eight Are Dismissed Because They Are Preempted by ERISA

Plaintiff alleges that MMC offered to give him "upon involuntary termination of his employment without cause, at least the same termination package it consistently and regularly gave terminated MMC partners and senior

---

[85]     *Id.* at 14.

[86]     *See* Compl. ¶ 26.

[87]     *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003).

[88]     *See, e.g., Criscuolo v. Joseph E. Seagram & Sons, Inc.*, No. 02 Civ. 1302, 2003 WL 22415753, at *8 (S.D.N.Y. Oct. 21, 2003).

officers."[89]  According to plaintiff, defendants' failure to provide this termination

package – including, inter alia, "cash severance in an amount equal to a multiple

of the individual's base salary and bonus [and] . . . a continuation of the

individual's health benefits . . . ."[90] – constitutes a breach of implied contract as

well as a breach of policy.

Defendants move to dismiss primarily on the ground that ERISA

preempts state law claims that relate to ERISA severance plans, and "supposed

oral modifications to existing formal ERISA severance plans are unenforceable

regardless of promises allegedly made or the supposed practice at MMC."[91]

According to defendants, plaintiff essentially seeks to supplement the severance

benefits already provided under the ERISA-governed SPP and the Restructuring

SPP, for which he is allegedly eligible, and to recover additional benefits based on

MMC's alleged practices and oral representations.[92]  Plaintiff opposes the motion

to dismiss primarily on the ground that his state law claims cannot relate to

MMC's ERISA severance plans because they are based on practices and oral

---

[89]     Compl. ¶ 49.

[90]     *Id.* ¶ 12.

[91]     Def. Mem. at 17.

[92]     *See id.* at 20.

-22-

representations that predate the existence of those plans.[93]  Plaintiff further argues

that because he seeks recovery from MMC and not from the plans themselves, the

administration of the plans would not be burdened and ERISA preemption does

not apply.[94]

Plaintiff's third and sixth claims are dismissed because they are

preempted by ERISA.  The Restructuring SPP is defined in the Complaint as a

"Fall 2004" plan, but there is no similar defining date parameter with respect to

the SPP.  Additionally, nowhere in the Complaint does plaintiff allege that the SPP

came into effect either prior to or following the alleged practices and oral

representations at issue.  Because the Court must limit its review to the facts

alleged in the Complaint, and because the Complaint suggests that MMC's plans

were in effect at the time of at least some of the alleged representations, plaintiff's

argument that his state law claims cannot relate to MMC's ERISA plans because

the representations predate the plans' existence is not supported by the Complaint.

Plaintiff alleges that he was promised and is therefore entitled to the

"standard package"[95] of benefits customarily awarded to partners and senior

---

[93]    *See* Pl. Opp. at 14-15.

[94]    *See id.*

[95]    Compl. ¶ 13.

-23-

officers upon their involuntary termination.  Although plaintiff contends in his opposition that he seeks only a *"one-time payment of damages* for [MMC's] breach of obligations created by certain promises and conduct – obligations that in no way arose from or depend on any ERISA plans,"[96] plaintiff misapprehends both the scope of ERISA's preemption as well as the law of ERISA preemption in this Circuit.

Attempting to draw a distinction between his claim and those that are routinely found to be preempted, plaintiff contends that he is not seeking to recover the benefits offered under MMC's plans:  *i.e.*, he is not seeking to alter future payments, or to reinstate health benefits offered under MMC's severance plans nor does he claim that MMC is misapplying the terms of those plans.[97] "Whether ERISA preempts [plaintiff's] state law claims does not depend[, however,] on whether he brings an ERISA claim" and seeks to recover the actual benefits awarded under the terms of an ERISA plan.  Rather, preemption "depends on whether his claims *'relate to'* an employee's severance plan."[98]  Similar to the

---

[96]    Pl. Opp. at 19.

[97]    *See id.*

[98]    *Tappe v. Alliance Capital Mgmt.*, 177 F. Supp. 2d 176, 188 (S.D.N.Y. 2001) (emphasis added).

-24-

approach rejected by the Second Circuit in *Smith v. Dunham-Bush, Inc.*,[99]

plaintiff's "attempt[] to fashion his complaint as one relating only to his

[termination] benefits, and not to any plan" is unavailing where, as here, "the

existence of [defendants'] [severance] plan is inseparably connected to any

determination of liability under state law."[100]  Indeed, although plaintiff may not

seek the actual benefits available under MMC's formal severance plans, "[i]t is

well-settled that claims to recover the lost *value* of benefits arising under . . . the

terms of an ERISA plan are completely preempted . . . ."[101]

      Moreover, a plaintiff's claims are preempted where "[i]n reality, his

suit represents an attempt to supplement the plan[s'] express provisions and secure

an additional benefit."[102]  While plaintiff contends that these state law claims have

---

[99]     959 F.2d 6 (2d Cir. 1992).

[100]    *Id.* at 11.  *Accord Finocchiaro v. Squire Corrugated Container Corp.*,
No. 05-5154, 2007 WL 608462, at *3-4 (D.N.J. Feb. 23, 2007) (granting
defendants' motion to dismiss plaintiff's claims as preempted by ERISA and
rejecting plaintiff's contention that his claims did not relate to an ERISA plan
because he did not seek to recover benefits from the plan and where the alleged
misrepresentations primarily concerned his employment relationship with
defendants).

[101]    *Deutsch*, No. 02 Civ. 2892, 2003 WL 367884, at *1 (S.D.N.Y. Feb.
20, 2003) (emphasis added) (citations omitted).

[102]    *Smith*, 959 F.2d at 10 (affirming district court's holding that
plaintiff's claim for benefits in addition to those provided under his employer's
ERISA plan was preempted by ERISA notwithstanding the fact that plaintiff sued

-25-

no connection to MMC's ERISA plans, plaintiff is essentially alleging that

MMC's practice and oral representations regarding termination benefits to

partners and officers constituted a major modification to, and enhancement of, the

terms of its written plans governing benefits for those individuals.[103]  Plaintiff's

claims relate "not merely to his benefits, but to the essence" of MMC's severance

plans themselves and in light of the breadth of ERISA's preemption clause,[104] the

third and sixth claims must be dismissed.

Similarly, plaintiff's fifth and eighth claims are preempted by ERISA

and are therefore dismissed on the same grounds.  By plaintiff's own allegation, he

seeks the severance benefits provided under MMC's formal severance plans,

explicitly alleging that MMC had a "regular and consistent policy and practice of

paying severance equal to the severance *provided under such plans* to any

employee involuntarily terminated without cause during the time period covered

_____

his employer rather than the plan, and plaintiff did not challenge his benefits under
the plan nor did he seek recovery from the plan's assets).

[103]    *See* Compl. ¶ 12 ("Specifically, for the elite group of MMC partners
and other senior officers, MMC, *notwithstanding the terms of any written plans
and awards to the contrary*, had, upon information and belief, a consistent and
regular policy of paying . . . .") (emphasis added).

[104]    *See Tappe*, 177 F. Supp. 2d at 188.

-26-

by such plans."[105]  Plaintiff has "directly based his state law claims on severance

plans that [MMC] allegedly provides to terminated employees on an ongoing

basis,"[106] and this is a "situation in which the existence of a [] plan [is] a critical

factor in establishing liability"[107] under the state law claims.  Therefore, plaintiff's

fifth and eighth claims are also preempted by ERISA and are dismissed.

### 2.    Claims Four and Seven Are Dismissed Because They Are Preempted by ERISA

For the reasons stated above, plaintiff's fourth and seventh claims are

also dismissed because they are related to MMC's formal severance plans.  That

said, these claims warrant an independent analysis as to whether MMC's alleged

policy and practice of paying the managing directors of its subsidiaries "at least a

year's base salary plus bonus" upon involuntary termination without cause

constitutes an ERISA plan, distinct from the SPP and the Restructuring SPP.[108]

---

[105]    Compl. ¶ 19 (emphasis added).

[106]    *Tappe*, 177 F. Supp. 2d at 188 (citation omitted) (dismissing plaintiff's state claims relating to defendant's severance plan as preempted by ERISA where plaintiff alleged that defendant had a "long-standing policy and practice of paying severance to terminated employees" and that he "relied upon it in rendering services" to defendant "throughout the course of his employment").

[107]    *Hattem*, 449 F.3d at 434 (quotation marks and citation omitted).

[108]    Compl. ¶ 16. That the Court discusses an alternative ground for preemption with respect to these claims and has not done so with respect to plaintiff's third, fifth, sixth, and eighth claims should not be regarded as an

This alleged practice and policy involves only the payment of a one-time lump sum to each eligible managing director, and so the threshold question presented is whether ERISA would apply at all. "ERISA applies only where [employer undertakings or obligations to pay severance benefits] requires the creation of an ongoing administrative program."[109] As the Second Circuit has made clear, "'Congress pre[]empted state laws relating to *plans*, rather than simply to *benefits*.'"[110]

   In determining whether an ongoing program for the administration of severance benefits rises to the level of an ERISA plan, courts look to, inter alia:

> 1) whether the employer's undertaking requires managerial discretion in its administration; 2) whether a 'reasonable

---

indication that the preemption ground for these claims is weaker. Rather, the Court engages in this analysis regarding plaintiff's fourth and seventh claims because these claims present an interesting legal question as to when the payment of benefits constitute a plan under ERISA.

   [109]   *Dennis v. RSL COM U.S.A., Inc.*, No. 97 Civ. 5013, 1998 WL 409720, at *2 (S.D.N.Y. July 21, 1998) (citing *Schonholz v. Long Island Jewish Medical Ctr.*, 87 F.3d 72, 75 (2d Cir. 1996)).

   [110]   *James v. Fleet/Norstar Fin. Group, Inc.*, 992 F.2d 463, 466 (2d Cir. 1993) (quoting *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11 (1987)). *See Fort Halifax*, 482 U.S. at 21 ("The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control.").

employee would perceive an ongoing commitment by the employer to provide employee benefits;' 3) whether the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria.[111]

Based on this standard, I find that the payment of severance benefits to involuntarily terminated managing directors of MMC's subsidiaries constitutes a plan under ERISA.

The plan "necessitate[s] both managerial discretion and a separate analysis of each employee in light of certain criteria."[112]  For example, MMC must determine whether each managing director at issue had been involuntarily terminated and thus qualified for benefits under the plan.  MMC must also determine the amount to award the managing director since the plan, as alleged, permits discretion as to the amount awarded rather than requiring only "simple arithmetical calculations."[113]  Moreover, the plan is "not limited either to a single payment" to all eligible employees at one time "or to a short span of time upon a

---

[111]     *Dennis*, 1998 WL 409720, at *3 (quoting *Schonholz*, 87 F.3d at 76).

[112]     *Schonholz*, 87 F.3d at 76.

[113]     *James*, 992 F.2d at 468 (reversing summary judgment on state law claims upon holding that "employer's undertaking to give employees sixty days of pay following their last day of work" did not create an employee welfare benefit plan under ERISA where only "simple arithmetical calculations and clerical determination" were required).

-29-

plant or office closing,"[114] but rather, its effective period is unlimited and can

reasonably be conceived as an ongoing commitment by MMC to award these

benefits to managing directors as they become eligible.

In light of these factors, MMC's plan governing the payment of

severance benefits to the managing directors of its subsidiaries constitutes a plan

under ERISA. Plaintiff's fourth and seventh common law claims relate to that

plan, and thus those claims are preempted and dismissed.

### 3.    Claims Nine Through Eleven Are Dismissed Because They Fail to Plead Claims For Promissory Estoppel Under ERISA

Plaintiff's ninth through eleventh causes of action are based on

promissory estoppel. Specifically, plaintiff claims that he "reasonably and

foreseeably relied to his detriment" on MMC's promises that he would be entitled

to the same benefits upon involuntary termination that had been provided to

partners and senior officers, managing directors, or any employee.[115] Plaintiff

alleges that this caused him to forego lucrative offers of employment from other

---

[114]    *Id. Cf. Fort Halifax*, 482 U.S. at 9-15 (holding that state statute requiring employers to pay a one-time severance to employees in event of plant closing was not preempted by ERISA where "the theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits").

[115]    *See* Compl. ¶¶ 78-92.

companies,[116] to forfeit his right to sue MMC for, inter alia, wrongful termination, and to incur legal fees when he retained a lawyer to negotiate his separation agreement.[117]

Defendants contend that plaintiff's promissory estoppel claims are preempted and they fail even if they are construed as ERISA claims rather than state law claims because plaintiff has not alleged any extraordinary circumstances as required by the Second Circuit. While plaintiff has pled reliance, the Second Circuit has made clear that "reliance is one of the four basic elements of promissory estoppel, and would not by itself render this case 'extraordinary.'"[118] Although the Second Circuit has not limited "extraordinary circumstances" to "circumstances of inducement,"[119] "the requirement is in any event not satisfied unless the surrounding circumstances are indeed beyond the ordinary."[120]

Plaintiff has not alleged that the promise of termination benefits

---

[116]    *See id.* ¶¶ 15, 19.

[117]    *See id.* ¶¶ 80, 85, 90.

[118]    *Devlin I*, 173 F.3d at 102.

[119]    *Devlin II*, 274 F.3d at 86.

[120]    *Aramony*, 191 F.3d at 152.

"was used to intentionally induce any particular behavior" on plaintiff's part.[121]
He contends that he was induced to remain at MMC, and to hire an attorney to
assist with the negotiation of a separation agreement, these circumstances do not
rise to the level of extraordinary under Second Circuit precedent.[122] Moreover,
plaintiff does not allege that MMC intentionally induced or deceived him with
respect to benefits "in order to persuade [him] to take some action that inures to"
MMC's benefit.[123] Although plaintiff contends that he relied upon MMC's
representations to forego "other lucrative offers of employment from other
companies" and to forego bringing suit against MMC, he does not allege that
those representations were made by MMC in order to intentionally induce him to

---

[121]    *Devlin I*, 173 F.3d at 102 (affirming district court's determination that
plaintiff's promissory estoppel claim under ERISA was not viable where plaintiff
had failed to demonstrate the existence of extraordinary circumstances).

[122]    *Cf. Devlin II*, 274 F.3d at 86-87 (finding extraordinary circumstances
where plaintiffs contend that they were induced by defendant to "work for over
twenty and up to forty years in order to receive (inter alia) a particular level of life
insurance coverage," where such coverage was described in literature distributed
to plaintiffs, and where the court found plaintiffs had "dedicated much of their
working lives" to defendant). Here, in contrast, plaintiff does not allege (and
offers no facts to support such an allegation) that MMC intentionally induced him
to remain at the company for decades in order to receive the allegedly promised
termination benefits.

[123]    *Keiser v. CDC Inv. Mgmt. Corp.*, No. 99 Civ. 12101, 2004 WL
516212, at *2 (S.D.N.Y. Mar. 17, 2004) (citations omitted).

-32-

remain at the company or to otherwise induce any particular behavior.  Instead,

plaintiff's allegations speak more to reliance than to extraordinary circumstances.

Plaintiff's ninth through eleventh claims are therefore dismissed.

### C.    Plaintiff's Twelfth and Thirteenth Causes of Action Are Dismissed for Failure to Exhaust Administrative Remedies

"[T]he federal courts – including this [c]ircuit – have recognized a

'firmly established federal policy favoring exhaustion of administrative remedies

in ERISA cases.'"[124]  This requirement is aimed at helping to "reduce the number

of frivolous lawsuits under ERISA; to promote the consistent treatment of claims

for benefits; to provide a nonadversarial method of claims settlement; and to

minimize the costs of claims settlement for all those concerned."[125]  The

exhaustion requirement is "purely a judge-made concept that developed in the

absence of statutory language demonstrating that Congress intended to make

---

[124]    *Paese v. Hartford Life and Accident Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006) (quoting *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993)).

[125]    *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980)).  *Accord Kennedy*, 989 F.2d at 594 ("The primary purposes of the exhaustion requirement are to:  (1) uphold Congress'[s] desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not *de novo*.").

ERISA administrative exhaustion a jurisdictional requirement."[126]

In *Paese v. Hartford Life and Accident Ins. Co.*, the Second Circuit held that the failure to exhaust ERISA administrative remedies does not deprive courts of subject matter jurisdiction but is rather an affirmative defense.[127] Contrary to plaintiff's assertion, that holding, however, does not alter the "firmly established"[128] policy that plaintiffs must exhaust administrative remedies in ERISA actions. Indeed, in cases following *Paese*, courts in this Circuit have explicitly noted that "*Paese* does not remove the requirement that the plaintiff exhaust his administrative remedies."[129]

Plaintiff makes no allegations whatsoever that he exhausted any or all administrative remedies available to him under the SPP or the Restructuring SPP, and the Court cannot find any allegation from which it can infer that he did so

---

[126]    *Paese*, 449 F.3d at 445.

[127]    *See id.* at 445-46. *See also Coleman v. Newburgh Enlarged City School Dist.*, 503 F.3d 198, 208 (2d Cir. 2007).

[128]    *Paese*, 449 F.3d at 443 (quotation marks omitted).

[129]    *Novella v. Empire State Carpenters Pension Fund*, No. 05 Civ. 2079, 2007 WL 2417303, at *3 (S.D.N.Y. Aug. 28, 2007). *Accord Merkent v. SI Bank & Trust Spring 2004 Severance Benefit Plan*, No. 05 Civ. 2449, 2006 WL 898086, at *2 (E.D.N.Y. Apr. 5, 2006) (dismissing plaintiff's ERISA claim for failure to exhaust administrative remedies where the severance plan at issue contained a provision allowing for appeal but plaintiff failed to file an appeal).

-34-

before filing suit. While a plaintiff may be excused from exhausting administrative remedies where such exhaustion would be futile, the Second Circuit requires a "clear and positive showing that seeking review by [the defendant] would be futile . . . ."[130] Plaintiff has failed to allege any facts from which the Court might infer that his pursuit of administrative remedies under the plans at issue would be futile.

Plaintiff contends that his communications with Cherkasky, as well as other high-level MMC employees, should be considered sufficient exhaustion of remedies. Further, plaintiff argues that he was never told that the procedure he was pursuing was inadequate or inappropriate.[131] This argument fails. Under Second Circuit case law, courts look to whether plaintiffs have utilized and exhausted administrative remedies provided for *under the plan* at issue, rather than pursuant to plaintiff's understanding of what may constitute the best method of addressing his claims.[132] Plaintiff does not allege in the Complaint that raising his

---

[130]    *Jones v. Unum Life Ins. Co. of Am.*, 223 F.3d 130, 140 (2d Cir. 2000) (citation omitted).

[131]    *See* Pl. Opp. at 26.

[132]    *See, e.g., Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989) (affirming district court's denial of plaintiff's motion to amend complaint where plaintiff "made no attempt, as required to exhaust the administrative remedies provided for *under the plan*.") (emphasis added).

claims with high-level MMC executives or employees constituted administrative

remedies as provided for under the plans, or that he understood them to qualify as

such. Accordingly, plaintiff's twelfth and thirteenth claims are dismissed for

failure to exhaust administrative remedies.

## V.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the

Amended Complaint is granted as to plaintiff's third through thirteenth claims.

The motion is denied as to plaintiff's second claim. Under Federal Rule of Civil

Procedure 15(a), "leave to amend shall be freely granted when justice so

requires."[133] While "[i]t is the usual practice upon granting a motion to dismiss to

allow leave to replead,"[134] the question of whether to permit a plaintiff to amend

his pleadings is a matter committed to the Court's "sound discretion."[135] Leave to

replead is denied with respect to plaintiff's third through eighth claims insofar as

they are repled as common law claims because they are preempted by ERISA.[136]

---

[133]    Fed. R. Civ. P. 15(a).

[134]    *Cortec*, 949 F.2d at 48.

[135]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

[136]    Plaintiff may choose to replead these claims and bring them under ERISA's civil enforcement scheme, codified at 29 U.S.C. § 1132. That avenue appears very unlikely, however, where plaintiff has argued in his opposition to

-36-

Plaintiff is granted leave to replead his ninth through eleventh claims to

specifically plead causes of action for promissory estoppel in the ERISA context,

and to allege facts supporting the existence of extraordinary circumstances.

Plaintiff is also granted leave to replead his twelfth and thirteenth claims, which

are brought under ERISA, to allege facts to support his exhaustion of

administrative remedies under the ERISA plans at issue, or to allege facts to

support a claim that any attempts to exhaust would have been futile.  Plaintiff must

replead within twenty days of this Opinion and Order.  The Clerk of the Court is

directed to close this motion [Document #32].  A conference is scheduled for

February 4, 2008, at 4:30 p.m.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            January 29, 2008

_____

defendants' motion to dismiss that "[t]here is nothing in the record to establish . . .
that these promises and conduct [underlying the third through eleventh claims]
placed a sufficient administrative and discretionary burden on MMC necessary to
create an ERISA-governed plan." *See* Pl. Opp. at 14. n.4.