Peter N. Wang (PW 9216)
Jeremy L. Wallison (JW 6707)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329

*Attorneys for Roger Egan*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

ROGER EGAN,

                              Plaintiff,

          v.

MARSH & McLENNAN COMPANIES, INC.,

                              Defendant.

------------------------------------------------------------------X

No. 07 Civ. 7134 (SAS)

**SECOND
AMENDED COMPLAINT**

**Jury Trial Demanded**

          Plaintiff, ROGER EGAN ("Egan"), by his attorneys, Foley & Lardner LLP, for

his Second Amended Complaint, alleges as follows[1]:

## PARTIES

          1.     Egan is an individual residing at 2 Hartley Farms Road, Morristown, New Jersey.

          2.     Defendant Marsh & McLennan Companies, Inc. ("MMC") is a Delaware

corporation with its principal place of business at 1166 Avenue of the Americas, New York,

---

          [1] By Opinion and Order dated January 29, 2008, the Court dismissed certain causes of
action alleged in the Amended Complaint dated October 10, 2007. Solely for purposes of
preserving for appeal those dismissed causes of action, this Second Amended Complaint
incorporates by reference those dismissed causes of action and each and every allegation pled in
support thereof.

New York. MMC is a global professional services firm which owns companies active in the sectors of risk and insurance services, risk consulting and technology, and investment management.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 29 U.S.C. § 1132(e)(1). Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e)(2).

## FACTUAL BACKGROUND

4.      Egan was employed by MMC from September 1972 through December 2004, ultimately becoming one of only approximately fifty partners of MMC, as well as a managing director, President and Chief Operating Officer of Marsh, Inc. ("Marsh"), MMC's risk and insurance subsidiary.

### Relevant Equity Awards And Benefit Plans

5.      Over the term of his employment, Egan, in recognition of his valuable service to MMC, was awarded stock options, restricted stock, deferred stock units and restricted stock units – all on various vesting schedules.

6.      Egan also was made a participant in a plan issued by MMC on November 21, 1996, which provided a specific benefit to MMC executives who terminate from MMC for reasons other than cause, death, total and permanent disability or normal retirement, and who at the time of termination had at least ten years of service with MMC and are grantees of certain types of restricted stock awards ("Special Severance Pay Plan"). Under the terms of that plan, a severance award would be paid in MMC shares equal to a percentage of the restricted stock and restricted stock units the executive forfeited upon his/her termination of employment. For

2

executives like Egan, with 25 years or more of service, the stock awarded under this plan would equal 90% of the restricted stock and restricted stock units forfeited.

7.    In addition, upon information and belief, MMC, by its conduct and otherwise, also established, sponsored and administered other plans that were governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), and constitute employee benefit plans under ERISA, 29 U.S.C. § 1002(3), for the payment of certain benefits in the event of an employee's involuntary termination without cause, including:

8.    First, MMC established, sponsored and administered a plan for paying MMC partners, upon their involuntary termination without cause, benefits in an amount equal to a multiple of the individual's base salary and bonus (including stock bonus), a prorated portion of the individual's bonus in the year of his/her termination, immediate vesting of all restricted stock and restricted stock unit awards, an extension of the exercise period on the individual's stock option awards for the remainder of the exercise term of the awards, a continuation of the individual's health benefits, the immediate payment of the individual's retirement pension at a "bridged" rate equal to the amount the individual would have been entitled to had he/she waited until the age of 62 to retire, and the continuation of indemnification/D&O liability insurance. This plan (the "MMC Partners Plan") was and is an employee benefit plan governed by ERISA for purposes of obtaining the benefits provided under the plan.

9.    Second, MMC established, sponsored and administered a plan for paying managing directors of its subsidiaries, such as Marsh, upon their involuntary termination without cause, a benefit equal to at least a year's base salary plus bonus. This plan (the "MMC Managing Directors Plan") was and is an employee benefit plan governed by ERISA for purposes of obtaining the benefits provided under the plan.

3

NYC_83906.2

10.     Third, MMC established, sponsored and administered a plan for paying involuntarily terminated MMC employees a benefit equal in amount to the severance provided under any formal severance plans covering the time period during which the employee was involuntarily terminated but with respect to which the employee was ineligible.  This plan (the "MMC Employees Plan") was and is an employee benefit plan governed by ERISA for purposes of obtaining the benefits provided under the plan.

11.     With respect to each of the above-described ERISA-governed employee benefit plans, a reasonable person could ascertain the intended benefits, beneficiaries, source of financing and procedures for receiving benefits.  Egan in particular could ascertain and was aware of these matters since, in his management position, he often was consulted on the benefits to be awarded to involuntarily terminated partners, managing directors and employees and was always referred to the above-described plans in making the determination of appropriate benefits.

12.     As an MMC partner, managing director of Marsh and an employee of MMC, Egan was a participant in these plans within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1002(7).  Moreover, the existence of these plans and Egan's status as a participant thereunder explicitly was confirmed to him on a number of occasions by MMC agents, including by MMC's then-chairman, Jeffrey Greenberg, at a dinner in 2001.

**Egan's Involuntary Termination Without Cause and The Denial of Benefits Owed**

13.     In April 2004, the New York State Attorney General ("NYS AG") commenced an investigation of MMC.

14.     Upon information and belief, to help contain the damage from the investigation (and the litigation that followed), MMC elevated Michael Cherkasky, a close personal friend of then-Attorney General Elliot Spitzer, to the chairmanship of the company.

4

15.    Although acknowledging Egan's lack of culpability in anything related to the NYS AG's investigation, Cherkasky asked Egan to resign in the Fall of 2004.

16.    As part of this request, Cherkasky once again reiterated the existence of the above-described plans, Egan's participation in and eligibility for benefits thereunder, and directed Egan to begin the process of submitting a claim for benefits – explicitly advising Egan to hire a lawyer so that Egan and MMC could reach a "generous settlement."

17.    On or about November 12, 2004, Joseph Bachelder, the attorney retained by Egan at Cherkasky's urging, submitted a Proposed Separation Agreement (attached hereto as Exhibit A) outlining Egan's claim for benefits.

18.    Soon thereafter, and despite an agreement that he would remain at the company to help Marsh make the transition to new management, MMC, on or about December 7, 2004, constructively terminated Egan's employment – demanding that he vacate MMC premises, giving him approximately six hours to pack his belongings, and barring him any further access to MMC's offices, his MMC e-mail account and personal files.

19.    Moreover, despite his original directions, and approximately two weeks after the events described in the previous paragraph, Cherkasky told Egan that negotiations of the Proposed Separation Agreement would have to wait until the resolution of MMC's litigation with the NYS AG.

20.    Still believing that he would receive the benefits to which he was entitled, Egan waited.

21.    On or about January 31, 2005, MMC settled with the NYS AG.

22.    On or about February 8, 2005, Cherkasky reiterated Egan's entitlement to benefits, telling Egan that MMC was ready to continue negotiations of the Proposed Separation Agreement and that negotiations could be concluded within ten days.  Cherkasky told Egan to

NYC_83906.2

have Bachelder contact Mike Petrullo, MMC's chief administrative officer. Two days later, Bachelder sent Petrullo the Separation Agreement for his review and approval.

23.    One week later, however, Cherkasky changed course again, informing Egan that MMC could no longer talk to Egan about the Proposed Separation Agreement.

24.    Bachelder, on Egan's behalf, made a subsequent attempt to reopen discussions with MMC by sending the Proposed Separation Agreement to Leon Lichter, Vice President in MMC's Legal Department.

25.    Egan, on or about November 22, 2005, also discussed the matter with Jack Sinnott, MMC's Vice Chairman, Office of the CEO.

26.    Finally, Egan discussed the matter again with Cherkasky on or about March 16, 2007. Cherkasky advised Egan that he would get back to him within thirty days on the Proposed Separation Agreement. He never did.

27.    By its actions, MMC has effectively denied Egan's claim for benefits under the above-described plans. Moreover, MMC has also stopped paying Egan dividends on his MMC restricted stock and restricted stock units, claiming that Egan has "forfeited" his restricted shares and restricted stock units. MMC has also informed Egan that it will not pay him his rightful benefits under the Special Severance Pay Plan and has cancelled Egan's option awards.

28.    All conditions precedent to Egan's right to recover on the causes of action alleged herein have been performed, have occurred, have been exhausted or have been excused.

## FIRST CAUSE OF ACTION

(Breach of Contract – Special Severance Pay Plan)

29.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 28, inclusive, as if fully set forth herein.

30.    Pursuant to the Special Severance Pay Plan, MMC is obligated to issue Egan an amount of MMC stock equal to 90% of the restricted stock and restricted stock units (if any) which were forfeited at Egan's termination of employment.

31.    Despite due demand, MMC has refused to issue such stock. MMC's failure to fulfill this obligation is a breach of the Special Severance Pay Plan.

32.    By virtue of the foregoing, Egan has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

(Breach of Contract – Restricted Stock and Restricted Stock Unit Awards)

33.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 28, inclusive, as if fully set forth herein.

34.    MMC's refusal, upon Egan's constructive termination, to effect the vesting of the unvested restricted stock and restricted stock units he was awarded over the term of his employment, and to pay Egan dividends (or dividend equivalent payments) since November 2005 on such shares, constitutes a breach of the awards.

35.    By virtue of the foregoing, Egan has been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

(Recovery of Benefits Under The MMC Partners Plan, 29 U.S.C. § 1132(a)(1)(B))

36.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 28, inclusive, as if fully set forth herein.

37.    This is a claim to recover benefits and enforce rights under 29 U.S.C. § 1132(a)(1)(B). Pursuant to that provision, Egan, as a participant in the MMC Partners Plan, is entitled to sue for a judicial determination and enforcement of benefits.

7

38.    Egan was involuntarily terminated without cause and therefore is entitled to benefits under the MMC Partners Plan.

39.    Egan submitted a claim for benefits under the plan.

40.    MMC, contrary to the terms of the plan, wrongfully denied Egan the benefits to which he is entitled under the plan and ERISA.

41.    By virtue of the foregoing, Egan has been damaged in an amount to be proved at trial.

42.    The MMC Partners Plan has not established formal claims and appeals procedures for the plan, and, therefore, there are no administrative remedies for Egan to exhaust prior to filing suit.  Moreover, to the extent there were such procedures, Egan should be deemed to have exhausted them by virtue of the actions alleged above.

## FOURTH CAUSE OF ACTION

(Recovery of Benefits Under the MMC Managing Directors Plan, 29 U.S.C. § 1132(a)(1)(B))

43.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 28, inclusive, as if fully set forth herein.

44.    This is a claim to recover benefits and enforce rights under 29 U.S.C. § 1132(a)(1)(B).  Pursuant to that provision, Egan, as a participant in the MMC Managing Directors Plan, is entitled to sue for a judicial determination and enforcement of benefits.

45.    Egan was involuntarily terminated without cause and therefore is entitled to benefits under the MMC Managing Directors Plan.

46.    Egan submitted a claim for benefits under the plan.

47.    MMC, contrary to the terms of the plan, wrongfully denied Egan the benefits to which he is entitled under the plan and ERISA.

8

48.    By virtue of the foregoing, Egan has been damaged in an amount to be proved at trial.

49.    The MMC Managing Directors Plan has not established formal claims and appeals procedures for the plan, and, therefore, there are no administrative remedies for Egan to exhaust prior to filing suit.  Moreover, to the extent there were such procedures, Egan should be deemed to have exhausted them by virtue of the actions alleged above.

## FIFTH CAUSE OF ACTION

(Recovery of Benefits Under the MMC Employees Plan, 29 U.S.C. § 1132(a)(1)(B))

50.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 28, inclusive, as if fully set forth herein.

51.    This is a claim to recover benefits and enforce rights under 29 U.S.C. § 1132(a)(1)(B).  Pursuant to that provision, Egan, as a participant in the MMC Employees Plan, is entitled to sue for a judicial determination and enforcement of benefits.

52.    Egan was involuntarily terminated without cause and therefore is entitled to benefits under the MMC Employees Plan.

53.    Egan submitted a claim for benefits under the plan.

54.    MMC, contrary to the terms of the plan, wrongfully denied Egan the benefits to which he is entitled under the plan and ERISA.

55.    By virtue of the foregoing, Egan has been damaged in an amount to be proved at trial.

56.    The MMC Employees Plan has not established formal claims and appeals procedures for the plan, and, therefore, there are no administrative remedies for Egan to exhaust prior to filing suit.  Moreover, to the extent there were such procedures, Egan should be deemed to have exhausted them by virtue of the actions alleged above.

NYC_83906.2

WHEREFORE, Plaintiff requests judgment as follows:

      (a)     On the First Cause of Action, damages in an amount to be determined at trial;

      (b)     On the Second Cause of Action, damages in an amount to be determined at trial;

      (c)     On the Third Cause of Action, damages in an amount to be determined at trial;

      (d)     On the Fourth Cause of Action, damages in an amount to be determined at trial;

      (e)     On the Fifth Cause of Action, damages in an amount to be determined at trial;

and

      (f)     The costs and disbursements of this action, including attorney's fees under 29 U.S.C. § 1132(g), together with such other and further relief as this Court deems just, proper and equitable.

Dated: New York, New York
       February 18, 2008

                      FOLEY & LARDNER LLP

                      By: _____

                        Peter N. Wang (PW 9216)
                        Jeremy L. Wallison (JW 6707)
                        90 Park Avenue
                        New York, New York 10016
                        (212) 682-7474

                        *Attorneys for Plaintiff Roger Egan*

10

# EXHIBIT A

<u>BLO DRAFT – 11/12/04</u>
<u>FOR PURPOSES OF NEGOTIATING SETTLEMENT ONLY</u>

Proposed Separation Agreement (the "<u>Agreement</u>")
<u>Between M Co. (the "Company") and Mr. R (the "Executive")</u>

| | | |
|---|---|---|
| 1. | <u>Retirement Date</u> | The Company to bridge the Executive to early retirement at age 55. For all purposes, the Executive shall be deemed to have satisfied the requirements for early retirement. |
| 2. | <u>Cash Severance</u> | $5.5 million (representing 2 times base salary ($800,000) and 2003 bonus (cash and the value of restricted shares) ($1,950,000)), payable in a lump sum within 10 days after the execution of the Agreement (the "Effective Date"). Pro-rata bonus (cash and restricted shares) for 2004 (approximately $1.625 million), payable when bonuses are paid to other senior executives. |
| 3. | <u>Treatment of Equity Awards</u> | As of the Effective Date, full vesting of all outstanding equity awards pursuant to the applicable stock incentive plan, including, but not limited to, stock options, restricted shares and restricted stock units (including RUSs and RURs), with all vested stock options remaining exercisable for the remainder of their original terms. Notwithstanding anything to the contrary in the Company's plans or award agreements, the Executive's equity awards shall not be subject to forfeiture or clawback for any reason. In the event that any stock options are repriced by the Company or any equity awards are otherwise adjusted, the Executive shall be entitled to participate fully in such repricing or adjustment on the same basis as other senior executives of the Company. In addition, in the event of a change in control of the Company, the Executive's outstanding equity awards shall be treated no less favorably than the outstanding equity awards held by senior executives of the Company. |
| 4. | <u>Health and Welfare Benefits</u> | The Executive and his eligible dependents shall continue to participate, at the same cost to the Executive as if he remained a senior executive of the Company, in all the Company's health and welfare plans, programs and arrangements, until the earlier of (i) the second anniversary of the Effective Date or (ii) the date or dates upon which the Executive receives comparable coverage from a subsequent employer. In the event that the Executive and/or his eligible dependents are unable to participate in any plan, program or arrangement, the |

37012-1                                        1

Company shall provide him with an amount, which after taxes, will enable the Executive to purchase equivalent coverage. In all events, the Executive and his eligible dependents shall be entitled to participate in the Company's retiree medical program as such program is in effect as of the Effective Date.

5. **Stock Investment Supplemental Plan**

TBD.

6. **Pension**

The Company shall pay the Executive an amount which represents the difference between the Executive's entitlements under the retirement plans (including the qualified plan, the Benefit Excess Plan ("BEP") and the Supplemental Retirement Plan ("SERP")) at age 55 and what the Executive would have been entitled to if he had remained employed by the Company and retired at age 60 and had a final average compensation (based on the average of the last 5 years prior to age 60) of $1 million (this assumes a 5% annual increase in the Executive salary from 2004 to 2010, when the Executive will be 60). The Executive shall be entitled to elect a lump-sum payment for the non-annuity portion of his BEP and SERP benefits.

7. **Other**

For one year, the Executive shall be provided with office space that is comparable to his current office space, office and administrative support and the full-time services of his current secretary. The Executive shall be entitled to retain his laptop computer and BlackBerry. For two years, the Executive shall continue to be entitled to his current perquisites (including any income tax gross up).

8. **Reimbursement of Business Expenses**

The Company shall promptly reimburse the Executive for reasonable business expenses incurred by him through the Effective Date and shall reimburse the Executive for legal fees and other expenses incurred by him in negotiating his termination of employment by the Company.

9. **Indemnification/D&O Liability Insurance**

The Executive shall continue to be indemnified (and advanced expenses) to the fullest extent permitted under applicable law and/or pursuant to the corporate governance documents of the Company and its affiliates (including the insurance broker). The Executive shall continue to be covered under the Company's directors' and officers' liability insurance policies (as well as those of any affiliate for which the Executive was a director or

37012-1                                    2

officer) until suits can no longer be brought against him as a matter of law. The Company agrees (i) the Executive shall have the right to be represented by separate counsel in connection with any investigation, suit or action relating to his duties or actions as an officer or director of the Company or any affiliate (including the insurance broker) ("Covered Action") and (ii) to advance to the Executive fees and expenses (including, without limitation, his attorneys' fees) incurred in connection with any such Covered Action, including, but not limited to, fees and expenses incurred in his representation by Cyrus R. Vance, Jr. and the law firm of Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C. The Executive shall only be required to repay any such advance if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that the Executive is not entitled to be indemnified for such expenses, in which event the Executive shall only be required to repay any such advance on an after-tax basis.

10. **Access to Company Materials**

The Company agrees the Executive shall have full and unfettered access to any and all materials (whether in hard copy, electronic or other form) in the possession or control of the Company (or any affiliate) which would be of assistance to the Executive and/or his counsel in connection with the Executive's preparation for, or defense of, any Covered Action.

11. **Non-Disparagement/ Company Statements**

The Company agrees that it shall not, and it shall cause its directors and senior officers (and those of any affiliate) not to, make any statement which would disparage the Executive or impair his reputation. The Executive agrees that he shall not make any statement which would disparage the Company or its directors and senior executives (or those of any affiliate). The Company agrees to provide a letter of recommendation for the Executive affirmatively stating his positive contributions to the Company and that the Executive's termination of employment was not as a result of any culpability in connection with the current investigations (form of statement to be provided as an exhibit to the Agreement). It further agrees to respond to any other third party inquiries as to the Executive's employment and termination thereof by providing a statement to the same effect.

37012-1                                                    3

| | | |
|---|---|---|
| 12. | Arbitration | Any disputes between the Company and the Executive relating to the Agreement will be settled in the Borough of Manhattan, by binding and final arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The Company shall advance the Executive his expenses (including any attorneys' fees) in connection with any claim, subject to the Executive's obligation to repay such advance, on an after-tax basis, in whole or in part, if and to the extent the arbitrator(s) determine(s) that there was no reasonable basis for the Executive's position in respect of a particular claim. |
| 13. | No Mitigation/No Offset | The Executive shall be under no obligation to seek other employment and there shall be no offset against amounts due to him on account of any remuneration or benefits provided by subsequent employment he may obtain or on account of any claims the Company or any affiliate may have against him. |
| 14. | Tax Indemnity | (a)  If the termination of the Executive's employment is deemed by the Internal Revenue Service to be in connection with a change in control of the Company, the Company agrees to fully gross up the Executive for any excise tax liability and the Executive agrees to cooperate with the Company to rebut any presumption that his termination was in connection with a change in control. |
| | | (b)  The Executive is a participant in various plans operated by the Company that provide non-qualified deferred compensation. In the event that the Executive is subject to additional tax liability under Section 409A of the Internal Revenue Code, including a deemed interest charge, the 20% additional tax and the present value cost of incurring federal and state tax liability before he receives such deferred compensation (including any retirement benefits and stock awards), the Company agrees to fully gross up the Executive for all such additional tax liability. The Executive agrees that he will cooperate with the Company in challenging the assessment of such additional tax liability. |
| 15. | Representations | The Company shall make standard representations and warranties regarding its authority to enter into the Agreement, etc. |
| 16. | Governing Law | New York. |

37012-1

4